# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| FL RECEIVABLE TRUST 2002-A<br>Plaintiff, | : <br> : <br> :    Civil Action<br> :    Nos.    02-CV-2710<br> :             02-CV-2711<br> :             02-CV-2780<br> :             02-CV-2786 |
| vs. | : |
| BAGGA ENTERPRISES, INC., JAMUNA REAL<br>ESTATE, LLC., UNITED MANAGEMENT<br>SERVICES, INC., and WELCOME GROUP, INC.,<br>Defendants. | : <br> : <br> : <br> : |

## ORDER

**AND NOW** this _____ day of _____, 2003, upon consideration of Non-Party Witness Khushvinder K. Bagga's Motion to Quash and any opposition thereto, it is ORDERED that the Motion is **GRANTED** and that the subpoena issued on August 11, 2003 is hereby quashed.

By the Court:

_____
LOWELL A. REED U.S.D.J

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FL RECEIVABLE TRUST 2002-A <br> Plaintiff, | Civil Action Nos. <br> 02-CV-2710 <br> 02-CV-2711 <br> 02-CV-2780 <br> 02-CV-2786 |
| vs. | |
| BAGGA ENTERPRISES, INC., JAMUNA REAL ESTATE, LLC., UNITED MANAGEMENT SERVICES, INC., and WELCOME GROUP, INC., Defendants. | |

### NON-PARTY KHUSHVINDER K. BAGGA'S
### MOTION TO QUASH SUBPOENA

Non-party Kushvnidar K. Bagga ("Mrs. Bagga") hereby moves this Court for an Order pursuant to Fed. R. Civ. P. 45(c)(3)(A) and 69(a) quashing the subpoena issued to Mrs. Bagga by the Plaintiff on August 11, 2003. In support of this Motion Mrs. Bagga incorporates herein the accompanying Memorandum of Law.

*Monica S. M. Thews*

Suzanne Ilene Schiller
Tina M. Colman
Monica S. Mathews
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888
(215) 241-8844 (facsimile)

Attorneys for Non-Party Witness
Khushvinder K. Bagga

Dated:   August 15, 2003

## Certification of Counsel

I, Monica S. Mathews, pursuant to Federal Rule of Civil Procedure 26(c) and Local Rule 26.1(f), hereby certify that the parties, after reasonable effort, were unable to resolve the dispute as to the August 11, 2003 subpoena issued to Ms. Bagga.

Dated:  August 15, 2003

Monica S. Mathews

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| FL RECEIVABLE TRUST 2002-A | : |  |
| Plaintiff, | : | Civil Action |
|  | : | Nos.    02-CV-2710 |
|  | : |          02-CV-2711 |
|  | : |          02-CV-2780 |
|  | : |          02-CV-2786 |
| vs. | : |  |
|  | : |  |
| BAGGA ENTERPRISES, INC., JAMUNA REAL | : |  |
| ESTATE, LLC., UNITED MANAGEMENT | : |  |
| SERVICES, INC., and WELCOME GROUP, INC., | : |  |
| Defendants. | : |  |
|  | : |  |

## MEMORANDUM OF LAW IN SUPPORT OF NON-PARTY BAGGA'S MOTION TO QUASH SUBPOENA

In support of her Motion to Quash Subpoena, Non-Party witness Khushvinder K. Bagga ("Mrs. Bagga") submits the following memorandum of law.

### I.    Introduction

Mrs. Bagga moves this Court to quash a subpoena served ostensibly in aid of execution but in reality for the primary purpose of harassing her and her husband Paul Bagga, a principal of the judgment debtor corporations. As more fully set forth below, without a scintilla of evidence supporting any claim against her, Plaintiff has subjected Mrs. Bagga to approximately 12 hours of deposition wherein Plaintiff asked Mrs. Bagga every conceivable question designed to ferret out any hint of fraudulent transfers to her by the judgment debtors or her husband, or any evidence that she is the alter ego of any of the judgment debtors. No such evidence was found. Undaunted by the lack of evidence, Plaintiff now tries to delve even deeper into Mrs. Bagga's

private affairs.

Despite requests from Mrs. Bagga's counsel, Plaintiff has failed to offer any explanation as to why the personal information sought from Mrs. Bagga is in any way relevant to collection of the judgment entered against the judgment debtors. Although Mrs. Bagga is married to Paul Bagga who is the owner of the judgment debtor companies, Mrs. Bagga is not a party to this action, is not a shareholder of the judgment debtors in this action and is not an officer or director of the judgment debtors. At best she is only a clerical employee of one of the four defendants in this action. Given her limited connection to these judgment debtors, her two lengthy depositions have provided Plaintiff more than sufficient opportunity to explore her knowledge of the judgment debtor's assets, and indeed have offered Plaintiff the opportunity to examine Mrs. Bagga on matters clearly unrelated to the judgment debtors in any way.

Despite the clear lack of evidence, Plaintiff continues to subject Mrs. Bagga to overwhelmingly broad and burdensome discovery requests and seeks to invade her personal finances[1] and correspondence and requires that such production be performed within an unreasonably short time (less than one week). It is clear that Mrs. Bagga is the focus of Plaintiff's tactics, not because she has any information related to the judgment debtor's assets but solely because she is Mr. Bagga's wife, and for no other reason. The Court simply can not permit these gross violations of privacy to continue.

## II.   Background Facts

Plaintiff FL Receivable Trust 2002-A is the subsidiary of Captec Financial Group, Inc. ("Captec"). On or about April 12, 2002, Captec filed four complaints against Defendants Bagga

---

[1]     In addition to the subpoena addressed in this Motion, Plaintiff has subpoenaed Mrs. Bagga's financial records from Sovereign Bank, Commerce Bank, First Union (now known as Wachovia) and J.P. Morgan. Mrs. Bagga intends to oppose these subpoenae by separate motion.

Enterprises Inc. ("Bagga Enterprises"), United Management Services, Inc. ("United Management"), Jamuna Real Estate, LLC ("Jamuna") and Welcome Group, Inc. ("Welcome Group")[2] (collectively "judgment debtors") alleging that payments were due and owing under various promissory notes made to and guaranteed by judgment debtors in late 2000 and early 2001. Default judgments were entered against judgment debtors in all actions on December 20, 2002.

Mrs. Bagga is the wife of Paul Bagga. Paul Bagga is, and always has been, the 100% owner of Bagga Enterprises, United Management and Welcome Group. Mrs. Bagga has never had any ownership interest in Bagga Enterprises, United Management or Welcome Group. See Exhibit "A."[3] Mrs. Bagga's ownership interest in Jamuna ended when, on January 1, 2001, she transferred all of her interest in Jamuna, to her husband Paul. See Exhibit "A." Since that time, Mrs. Bagga's only association with any of the judgment debtors has been her employment relationship with Defendant United Management which pays her a yearly salary of approximately $36,000 for administrative work she occasionally performs for the company. See Exhibit "A." This is the only association Mrs. Bagga currently has with any of the judgment debtors, and is the only association she has had with judgment debtors for the last two years. See Exhibit "A."

A.    **Previous discovery taken in aid of execution.**

On or about April 15, 2003, Plaintiff served Mrs. Bagga with a subpoena requiring her to appear and provide testimony on May 15, 2003. Pursuant to this Court's orders, Mrs. Bagga's

---

[2]    Defendant Welcome Group Inc. filed a voluntary Chapter 11 petition pursuant to 11 U.S.C. § 101 et seq. and as such, to the extent that this proceeding is in aid of execution against that Defendant, it is must be stayed in accordance with the automatic stay provision, 11 U.S.C. § 362.

[3]    See Affidavit of Khushvinder K. Bagga In Support of Motion to Quash which was filed with the Court on or about May 7, 2003. An additional copy of the Affidavit is attached hereto as Exhibit "A." for the Court's convenience. All future references to Mrs. Bagga's affidavit will be merely to Exhibit "A."

deposition was taken on June 17, 2003 and was continued on August 7, 2003. In total, Mrs. Bagga gave more than 12 hours of testimony.[4] By the conclusion of these depositions, Mrs. Bagga had provided answers to <u>every single question</u> posed by Plaintiff, without regard for the subject matter of the question and without regard to the connection, or lack thereof, of the question to the assets of the judgment debtors. Indeed, Mrs. Bagga testified frankly about matters such as the cash deposits in her personal bank accounts (Dep. at p. 11: 13- 12:2), the monthly mortgage payments for her home, including the amount of principal owed on the mortgage (Dep. at p.22:23-23:4), what type of vehicles she and her husband own (Dep. at p. 81:17-82:4), and whether she has had romantic relationships outside of her marriage (Dep. at p. 118:18, 121:3-13).

    In addition, Mrs. Bagga answered all of Plaintiff's questions about her knowledge of her husband's activities, her husband's and families' activities and her employment with Bagga Enterprises. As Mrs. Bagga's deposition testimony makes clear, Mrs. Bagga has no information concerning the assets of any of the judgment debtors. Despite Plaintiff's posturing to the contrary, there is simply no evidence to support Plaintiff's claim that Mrs. Bagga knew of or participated in any fraudulent transfers or treated the judgment debtors as her alter ego. For example, at her deposition, Mrs. Bagga testified that she did not transfer any assets or receive any transfers from her husband:

> Q:    Have you assigned any property to creditors in the last three years?
>
>       * * *
>
> A:    I don't know of anything, no.

Dep at p. 27:11-20

---

[4] The relevant portions of Mrs. Bagga's deposition transcripts are attached hereto as Exhibit "B" and are designated in this memorandum as Dep. at <u>(page):(line)</u>.

* * *

Q:    Have you sold any assets in India in the past ten years?

A:    I don't have any assets in India.

Dep at p. 37:3-5

* * *

Q:    Have you ever asked any of your family members to put some of your money in some of their accounts for safe-keeping?

A:    No.

Dep at p. 39:2-5

* * *

Q:    Did [Paul Bagga] ever give you cash to deposit into your personal accounts?

A:    No, I don't remember that.

Q:    Never. Is that right?

A:    I don't remember him giving me cash to deposit into my account.

Dep at p. 78:1-7

Indeed, the only evidence that exists is that Mrs. Bagga lent money to some of the judgment debtors for operational costs, which was recorded as loans, for which she has yet to be fully repaid. (Dep. at p. 86:9-94:13).

In addition, Mrs. Bagga's Quicken computer files from her computer at Bagga Enterprises were produced in response to a subpoena served by Plaintiff. Again, in an effort to comply with the spirit of this Court's previous orders, and without objection, the Baggas spent thousands of dollars in expert technician's and attorney's fees to recover and produce these files which were produced prior to her second scheduled deposition. A copy of the computer

technician's bill is attached hereto as Exhibit "C."

### B.    Plaintiff's demand for additional discovery.

Presumably because Plaintiff's prior discovery requests have turned up no evidence to implicate Mrs. Bagga or her assets, on August 11, 2003, Plaintiff issued yet another subpoena to Mrs. Bagga ("the Subpoena") – this one seeking production of additional documents and computer files. The subpoena demands production of all requested items on August 18, 2003. It seeks any and all records relating to and including (1) the tax returns for the business of K&P from January 1, 2000 to the present; [5] (2) Mrs. Bagga's personal tax returns from January 1, 2000 to the present; (3) any and all hard drives or disks for Mrs. Bagga's home and/or personal computer from January 1, 2002 to present; and (4) any and all correspondence written, prepared and/or sent by Mrs. Bagga from January 1, 2000 to the present.

### III.    Legal Argument

It is well established, and indeed, both parties have previously submitted memoranda of law acknowledging, that a judgment creditor is entitled to a thorough examination of the judgment debtor's assets when attempting to satisfy a judgment. See Cassion Corp. v. County West Building Corp., 62 F.R.D. 331, 334 (E.D. Pa 1974). However, it is also well recognized that Rule 69's broad scope opens the door for possible abuse performed under the guise of discovery in aid of execution, and to guard against such abuse, debtors and third party witnesses may turn to the Court for protection under Fed. R. Civ. P. 45. Because Mrs. Bagga has submitted to over twelve hours of depositions over the course of two days and turned over her business computer files -- all of which revealed no evidence of impropriety -- Mrs. Bagga now

---

[5]    Mrs. Bagga has agreed to produce the tax return for K&P for 2000 and the schedule to her personal tax return that was filed for K&P for 2001. The 2002 taxes have not yet been filed. If necessary, Mrs. Bagga will produce copies of the extensions that were filed for that year.

requests that the Court quash Plaintiff's subpoena pursuant to Rule 45(c) as it is beyond the scope and intent of Rule 69(a).

### A.    Plaintiff's subpoena must be quashed because it seeks documents that are not beyond the scope of permissible discovery under Fed. R. Civ. P. 69(a).

It is axiomatic that a plaintiff hunting for assets of a judgment debtor may not be permitted unfettered access to personal information of third parties, and that the privacy rights of the individual must be balanced with the broad discovery which is permitted to be taken in aid of execution under Rule 69(a), so that the privacy rights of an individual -- who is not a party to the underlying action -- are protected from the abuse that would result from a court ordered and yet unrestricted investigation into a witness's personal life. See Burak v. Scott, 29 F. Supp. 775, 776 (D.D.C. 1939). To protect against the potential for such abuse, the demands for documents and testimony that are made in aid of execution must be narrowly drawn to examine the assets of the judgment debtor. See Hearst/ABC-Viacom Entertainment Services v. Goodway Marketing, Inc., 1993 U.S. Dist. LEXIS 6154, *4 (E.D. Pa. 1993).

Although this Court ordered Plaintiff to answer deposition questions relating to her personal assets, [6] Plaintiff remained unsatisfied with those disclosures and now seeks even more personal information related to her tax returns, personal correspondence and personal computer files.

---

[6] In doing so, this Court failed to adopt the reasoning of persuasive authority which has held that discovery under Rule 69(a) is limited to the assets of the judgment debtors. See Cassion, 62 F.R.D. at 334; Costamar Shipping Co., Ltd., v. Kim-Sail, Ltd., 1995 U.S. Dist. LEXIS 18430, * (S.D.N.Y. Dec. 12, 1995)("Generally, non-parties may only be examined about the assets of a judgment debtor and cannot be required to disclose their own assets"); Burak, 29 F.Supp. at 776 (quashing Rule 69 subpoena requiring non-parties to disclose their personal assets); Magnaleasing Inc., v. Staten Island Mall, 76 F.R.D. 559, 561-2 (S.D.N.Y. 1977); 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3014 at 72 (1973).

Plaintiff's current discovery demand now has certainly crossed the line into harassment and exceeded the type of requests reasonably related to and necessary for the examination of the assets of the judgment debtors. There can be no dispute that the Baggas have spent thousands of dollars complying with Plaintiff's discovery demands and that Mrs. Bagga has answered hours and hours of questions regarding her personal assets and activities, the majority of which questions had no relationship to locating any of the assets of the judgment debtors. Plaintiff has been given the right to make its broad inquiry and has unabashedly sought to extend its right by demanding access Mrs. Bagga's home computer, personal tax information and correspondence. Apparently, Plaintiff believes that there is no limit to the questions it may ask and no limit to its ability to access Mrs. Bagga's personal documents. Given Plaintiff's demands, Mrs. Bagga is left with no alternative other than to seek protection from such abuse.

It bears repeating that no evidence of impropriety -- whatsoever -- has been uncovered. If Plaintiff could present evidence of an alter-ego relationship between Mrs. Bagga and the judgment debtors or point to evidence that would support even an inference of any fraudulent transfers between Mrs. Bagga and the judgment debtors, further inquiry into Mrs. Bagga's personal assets and records would, more arguably, be appropriate. Cf. Strick Corp. v. Thai Teak Prods. Co., 493 F. Supp. 1210, 1218 (E.D. Pa. 1980). However, in the absence of any evidence of impropriety, Mrs. Bagga is entitled to protection from Plaintiff's progressively intrusive demands. See id. Indeed, there is no authority to support Plaintiff's position that it has authority to expand discovery under Rule 69 to Mrs. Bagga's personal tax returns, computer files and correspondence. Cf. Strick, 493 F. Supp. at 1218 (granting protection from discovery requests unrelated to the judgment debtor's assets in the absence of a factual showing, beyond mere allegation, as to an alter ego relationship); Costamar, 1995 U.S. Dist. LEXIS at *9 ("The mere

allegation of an alter ego relationship is insufficient; it must be supported by facts showing the basis for the assertion"). As such, Plaintiff's subpoena for these items must be quashed.

**B.**     **Plaintiff's subpoena must be quashed because it violates Fed. R. Civ. P. 45(c) inasmuch the documents are sought in bad faith with the intent of harassing and causing unreasonable burden and expense to Mrs. Bagga and it is does not allow reasonable time for compliance.**

Rule 45 imposes on the issuer of a subpoena an obligation to "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." Fed. R. Civ. P. 45(c)(1). This Court has the power to enforce this duty and to sanction one who breaches it. Id. "When a party objects to the enforcement of a subpoena, the burden is upon the party seeking the production to show 'good cause'--that is, that the requested documents are necessary to establish his claim or defense, or that denial of production would unduly prejudice the preparation of his case or cause him hardship or injustice." U.S. v. American Optical Co., 39 F.R.D. 580, 583 (N.D. Cal. 1966).

As set forth above, Plaintiff is clearly using the subpoena process to harass Mrs. Bagga. This Court has the "inherent power to protect anyone from oppressive use of process, even if no oppression is actually intended." Hecht v. Pro-Football, Inc., 46 F.R.D. 605, 606 (D.D.C. 1969). Hecht, like this case, involved a motion by third party witnesses to limit *subpoenae duces tecum* that were issued against them. The witnesses alleged that the subpoenae were unreasonable and oppressive because they sought the production of private financial records of non-parties. The Hecht court acknowledged that the "right of privacy and the right to keep confidential one's financial affairs is well recognized. It seems to be part of human nature not to desire to disclose them." Id. at 607. Moreover, the court explained that a subpoena may still be oppressive even though it seeks evidence which may, at a later date, prove relevant. On this basis, the court quashed the subpoena.

11

As is evident from the personal nature of the subpoenaed documents, Plaintiff's request for "correspondence" without any other limitation is a classic example of an overbroad request in that it seeks documents far beyond the scope of what is relevant to this action. The overbroad nature of the request literally seeks every piece of correspondence that Mrs. Bagga written within the 2 and one half year period specified and would necessarily including trivial and irrelevant correspondence such as consumer complaints, greeting cards, thank-you notes and letters written to ask her gardener to ask him to complete various tasks.

As further evidence of the outrageousness of the subpoena, Plaintiff has demanded all of Mrs. Bagga's correspondence for the last several years. Plaintiff certainly can not assert that all correspondence Mrs. Bagga sent or received is relevant to this action for the last two and a half years. It is well-settled that when a subpoena commanding the production of documents is held to be too broad and unreasonable, it must be quashed. See 403-411 East 65th Street Corp. v. Ford Motor Co., 27 F. Supp. 37, 38 (S.D.N.Y. 1939). Unlike other cases in which an explanation is needed to demonstrate the overbreadth of a request, the subpoena issued to Mrs. Bagga is so blatantly overbroad that no further discussion is necessary. Anyone reading the request will immediately understand why a request for "all correspondence" during a time period of two and one half years, without any limitation, is improper. See generally, Davis v. General Acc. Ins. Co., 1999 WL 228944 (E.D. Pa. 1999).

Moreover, even if Mrs. Bagga was capable of divining what documents Plaintiff would like to have produced, Plaintiff has absolutely failed to provide Mrs. Bagga with sufficient time in which to gather the requested materials. Plaintiff has demanded that Mrs. Bagga produce documents within only a few days. There is no legitimate reason why Plaintiff set such an unreasonably short return date. As such, the requests for Mrs. Bagga's personal financial

records, computer files and personal correspondence is oppressive and should be quashed. <u>See</u> Fed. R. Civ. P. 45(c)(3)(A)(i).

**IV.    Conclusion**

"Fishing expeditions' for the purpose of constructing a case are frowned on by the courts." <u>Id.</u>, (citing <u>Carpenter v. Winn</u>, 221 U.S. 533 (1911)). At this juncture, with twelve hours of deposition testimony and nothing substantive to show in support of Plaintiff's allegations of impropriety, it is clear that Mrs. Bagga is the subject of Plaintiff's fishing expedition, which can no longer be permitted under the guise of discovery in aid of execution under Rule 69. Accordingly, for all of the foregoing reasons, Mrs. Bagga respectfully requests that the subpoenas served upon non-party witness Mrs. Bagga be quashed.

Suzanne Ilene Schiller
Tina M. Colman
Monica S. Mathews
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888
(215) 241-8844 (facsimile)

Attorneys for Non-Party Witness
Khushvinder K. Bagga

Dated:    August 15, 2003

**EXHIBIT "A"**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

FL RECEIVABLE TRUST 2002-A
Plaintiff,

vs.

BAGGA ENTERPRISES, INC., JAMUNA REAL
ESTATE, LLC., UNITED MANAGEMENT
SERVICES, INC., and WELCOME GROUP, INC.,
Defendants.

Civil Action
Nos.    02-CV-2710
        02-CV-2711
        02-CV-2780
        02-CV-2786

## AFFIDAVIT OF KHUSHVINDER K. BAGGA
## IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

Commonwealth of Pennsylvania    :
                                : ss.
County of Philadelphia          :

Khushvinder K. Bagga, being duly sworn according to law, deposes and says as follows:

1.    I am married to Paul Bagga and have been married to him for over 25 years. I have never possessed any ownership interest in Bagga Enterprises, United Management or Welcome Group. My husband Paul is and always has been the owner of Defendants Bagga Enterprises, United Management and Welcome Group.

2.    Prior to January 1, 2001 I had a 50% ownership interest in Defendant Jamuna, L.L.C. Effective January 1, 2001, I transferred my ownership interest in Jamuna to my husband, Paul Bagga. I have had no ownership interest in Jamuna and no information about its assets since that date.

3.     My only present relationship with any of the Defendants in the above captioned action is my employment relationship with Defendant United Management whereby I perform occasional administrative tasks.

4.     I did not participate in the negotiations which resulted in the loans that are the subject of the above-captioned actions and I did not execute any of the loan documents or promissory notes.

5.     I have no information regarding the location or transfer of any of Defendants' assets and have had no information since January 1, 2001.

6.     Any information which I would otherwise remember regarding the location or transfer of any of Defendants' assets would have been communicated to me by my husband Paul Bagga.

Khushvinder K. Bagga

Subscribed to and sworn
before me this 7th day
of May, 2003:

Notary Public

NOTARIAL SEAL
DEBORAH K. DUFLER, Notary Public
City of Philadelphia, Phila. County
My Commission Expires December 17, 2005

2

**EXHIBIT "B"**

11

1     A.  On the -- with the checking -- with my checkbook,

2  there's a little book there.

3     Q.  And when you wrote a check, you would make an

4  entry and a notation of the person to whom you wrote it

5  and the date?

6     A.  Most of the time, yes.

7     Q.  Did you also note deposits in your checkbook

8  memos?

9     A.  Usually, yes.

10     Q.  For how long a period of time have you been doing

11  that prior to using the Quicken software?

12     A.  Since I've had my account.

13     Q.  Now, which account are we talking about?

14     A.  Checking account.

15     Q.  And where is that checking account?

16     A.  Sovereign Bank.

17     Q.  How long have you had a checking account at

18  Sovereign Bank?

19          MS. BASKIN:  Objection to form.

20          MR. KIDD:  Answer the question.

21     A.  It was a long time.  I don't remember since when.

22     Q.  Several years?

23     A.  Several years, yes.

24     Q.  Do you have any other checking accounts at any

12

```
 1   other banks?
 2       A.  No.
 3       Q.  Do you have more than one personal checking
 4   account at Sovereign Bank?
 5       A.  No.
 6       Q.  Do you sometimes write letters?
 7       A.  Yes.
 8       Q.  Do you write them by hand or on a typewriter?
 9       A.  By hand or on the computer sometimes.
10       Q.  When you write letters on a computer, do you
11   write them from home or from the office?
12       A.  Both.
13       Q.  You have a computer at home as well?
14       A.  Yes.
15       Q.  Do you write business letters from the office and
16   personal letters from home?
17       A.  Not necessarily.  Sometimes I write personal
18   letters from the office too.
19       Q.  When you write a letter on the computer in the
20   office, do you save it?
21           MS. BASKIN:  Objection to form.
22       A.  Sometimes, yes, not all the time.
23       Q.  When you save it in the office, do you save it to
24   the hard drive or do you save it on a disk?
```

ESQUIRE DEPOSITION SERVICE

22

1   returns?

2          MR. KIDD:  Invoke your rights.

3      A.  Relying on the advice of my attorney, I invoke my

4   rights against self-incrimination under the Constitution

5   of the United States and refuse to answer your question.

6          MR. HERMANN:  I'm just going to point out

7   that these are questions that were not answered last

8   time and that the judge directed her to answer.

9          MR. KIDD:  I'm aware that those questions

10  were asked last time with regard to her tax returns and

11  the questions involving Mr. Cahan.

12          With that awareness, I'm still advising her

13  to invoke her Fifth Amendment rights.

14          MR. HERMANN:  I'm not going to repeat that

15  observation but it's going to apply to a lot of the

16  questions.

17          MR. KIDD:  I guess I will give you a

18  continuing objection then.

19          MR. HERMANN:  Continuing observation.

20  BY MR. HERMANN:

21      Q.  Do you have a personal money manager?

22      A.  No.

23      Q.  What's the amount of the mortgage on your home?

24      A.  About 8,000 dollars a month.  I'm sorry.

ESQUIRE DEPOSITION SERVICE

23

1    Q.  What's the principal?

2         MR. KIDD:  He asked you what is the

3    principal amount of the mortgage on your home.

4    A.  1.6 million.

5    Q.  Have you made any applications for loans in the

6    past two years?

7         MR. KIDD:  Invoke your rights under the

8    Fifth Amendment.

9    A.  Relying on the advice of my attorney, I invoke my

10   right against self-incrimination under the Constitution

11   of the United States and refuse to answer your question.

12   Q.  Is your home up for sale?

13   A.  No.

14   Q.  Have you given a listing to any broker?

15   A.  No.

16   Q.  Have you made any loan guarantees in the past two

17   years?  That is -- I see you're looking at your lawyer.

18        MR. KIDD:  She's looking to me for

19   clarification of the question, not for on whether to

20   invoke --

21   BY MR. HERMANN:

22   Q.  I was going to clarify.

23        Do you know what I mean by a loan guarantee?

24   A.  I don't understand.

ESQUIRE DEPOSITION SERVICE

27

1    A.  I invoke my right under the Fifth Amendment.

2    Q.  Have you set up any trusts in the last two years?

3        MR. KIDD:  Invoke your rights.

4    A.  I invoke my rights under the Fifth Amendment.

5    Q.  Have you transferred any real or personal

6    property in the last six years?

7        MR. KIDD:  Invoke your rights.

8    A.  I invoke my right against self-incrimination

9    under the Constitution of the United States and refuse

10   to answer your question.

11   Q.  Have you assigned any property to creditors in

12   the last three years?

13   A.  I don't understand. What do you mean?

14   Q.  You know what a creditor is?

15   A.  Yes.

16   Q.  Have you ever, in last three years, assigned

17   anything to them in payment of a debt that you had to

18   them or that you and your husband collectively had to

19   them?

20   A.  I don't know of anything, no.

21   Q.  Did you ever borrow any money from the Singh

22   Brothers' trust?

23       MR. KIDD:  Invoke your rights.

24   A.  I invoke my right under the Fifth Amendment.

ESQUIRE DEPOSITION SERVICE

27

1    A.  I invoke my right under the Fifth Amendment.

2    Q.  Have you set up any trusts in the last two years?

3        MR. KIDD:  Invoke your rights.

4    A.  I invoke my rights under the Fifth Amendment.

5    Q.  Have you transferred any real or personal

6    property in the last six years?

7        MR. KIDD:  Invoke your rights.

8    A.  I invoke my right against self-incrimination

9    under the Constitution of the United States and refuse

10   to answer your question.

11   Q.  Have you assigned any property to creditors in

12   the last three years?

13   A.  I don't understand. What do you mean?

14   Q.  You know what a creditor is?

15   A.  Yes.

16   Q.  Have you ever, in last three years, assigned

17   anything to them in payment of a debt that you had to

18   them or that you and your husband collectively had to

19   them?

20   A.  I don't know of anything, no.

21   Q.  Did you ever borrow any money from the Singh

22   Brothers' trust?

23       MR. KIDD:  Invoke your rights.

24   A.  I invoke my right under the Fifth Amendment.

27

```
 1     A.  I invoke my right under the Fifth Amendment.

 2     Q.  Have you set up any trusts in the last two years?

 3         MR. KIDD:  Invoke your rights.

 4     A.  I invoke my rights under the Fifth Amendment.

 5     Q.  Have you transferred any real or personal

 6   property in the last six years?

 7         MR. KIDD:  Invoke your rights.

 8     A.  I invoke my right against self-incrimination

 9   under the Constitution of the United States and refuse

10   to answer your question.

11     Q.  Have you assigned any property to creditors in

12   the last three years?

13     A.  I don't understand. What do you mean?

14     Q.  You know what a creditor is?

15     A.  Yes.

16     Q.  Have you ever, in last three years, assigned

17   anything to them in payment of a debt that you had to

18   them or that you and your husband collectively had to

19   them?

20     A.  I don't know of anything, no.

21     Q.  Did you ever borrow any money from the Singh

22   Brothers' trust?

23         MR. KIDD:  Invoke your rights.

24     A.  I invoke my right under the Fifth Amendment.
```

ESQUIRE DEPOSITION SERVICE

27

1    A.   I invoke my right under the Fifth Amendment.

2    Q.   Have you set up any trusts in the last two years?

3         MR. KIDD:   Invoke your rights.

4    A.   I invoke my rights under the Fifth Amendment.

5    Q.   Have you transferred any real or personal

6    property in the last six years?

7         MR. KIDD:   Invoke your rights.

8    A.   I invoke my right against self-incrimination

9    under the Constitution of the United States and refuse

10   to answer your question.

11   Q.   Have you assigned any property to creditors in

12   the last three years?

13   A.   I don't understand. What do you mean?

14   Q.   You know what a creditor is?

15   A.   Yes.

16   Q.   Have you ever, in last three years, assigned

17   anything to them in payment of a debt that you had to

18   them or that you and your husband collectively had to

19   them?

20   A.   I don't know of anything, no.

21   Q.   Did you ever borrow any money from the Singh

22   Brothers' trust?

23        MR. KIDD:   Invoke your rights.

24   A.   I invoke my right under the Fifth Amendment.

ESQUIRE DEPOSITION SERVICE

81

1    Q.  Did your husband, as far as you know, make a

2    practice of driving around to the stores in Wilks Barre

3    and Scranton every week or more frequently?

4    A.  He used to go sometimes.

5    Q.  Did he sometimes drive around in a baseball cap?

6    A.  He may have.  Yes.

7    Q.  Have you ever seen him drive around in a baseball

8    cap?

9    A.  Yes.

10   Q.  Do you know whether he drove to the stores

11   sometimes with a baseball cap?

12   A.  He might have.

13   Q.  Did he ever come back from any of his trips to

14   the stores with cash in hand, as far as you know, that

15   he had picked up at the stores?

16   A.  No, I don't know.

17   Q.  How many cars does your family have?

18   A.  Four.

19   Q.  Do you have a BMW?

20   A.  Yes.

21   Q.  Does your husband sometimes use that BMW to visit

22   stores in Scranton and Wilkes Barre?

23   A.  Yes.

24   Q.  What other cars do you have?

ESQUIRE DEPOSITION SERVICE

82

1   A.  A Jeep and an Acura.

2   Q.  What's the forth one?

3   A.  BMW.

4   Q.  Two BMWs?

5   A.  Yes.

6   Q.  Do you have a safe in your home?

7   A.  Yes.

8   Q.  Did your husband sometimes go to the safe when he

9   came home from one of his trips to the stores?

10   A.  No.

11   Q.  Does your family keep cash in the safe?

12   A.  No.

13   Q.  Who owns those cars that you just told me about a

14   moment ago?  Are those leased cars or cars you own?

15   A.  They're leased.

16   Q.  All of them?

17   A.  I think everything, except the Jeep is not

18   leased; I think.

19   Q.  Did you ever personally deposit cash in any First

20   National City accounts?

21   A.  First National -- what account?

22   Q.  First National City Bank.

23   A.  Where is that?

24   Q.  You're not familiar with any account there?

ESQUIRE DEPOSITION SERVICE

86

1    Q.  Do you get any payments from any company that get

2    deposited into your checking account?

3    A.  Yes.

4    Q.  What company?

5    A.  It used to be from United.  Now that United is

6    not, I think it's called Welcome now.

7    Q.  Not 21st Century Restaurant Solutions?

8    A.  Yes, 21st Century Restaurant Solutions, probably.

9    Q.  Now, you told us last time about a 40,000 dollar

10   loan that you had made to one of the family companies.

11       Do you recall that?

12   A.  Um-hum

13   Q.  Have you made any other loans to any Bagga

14   family-related businesses in the last five years,

15   personally?

16   A.  Yes, I might have.

17   Q.  Do you remember any?

18   A.  I don't remember but I know I have made deposits,

19   loans into the accounts.

20   Q.  To which companies?

21   A.  I don't remember which company; could be United,

22   Welcome.

23   Q.  And would those loans be reflected in your

24   checkbook?  That is to say, did you make the loan in the

87

1    form of a check?

2      A.  Yes.

3      Q.  Did you make loans in any other form?  Cash,

4    let's say?

5      A.  Yeah.  It would be a check.  Like we went through

6    last time, if it's the same back, they would transfer it

7    as cash.  You asked me last time; they would transfer it

8    from my account to the business account and they put it

9    in as cash because it's in the same bank.

10     Q.  So you wouldn't actually physically write a

11   check; you would ask the bank to transfer money from one

12   -- from your personal account to one of the business

13   accounts?

14     A.  Yes.  If you do that, then it would show as cash.

15     Q.  Is that what you did, is what I'm asking you?

16     A.  Sometimes I might have done, yeah.

17     Q.  And sometimes you might have written a check

18   also?

19     A.  Yes.

20     Q.  Do you remember doing each of those things in

21   connection with loans made to businesses?

22     A.  Yes.

23     Q.  How did you keep track of what loans you made to

24   the businesses?

ESQUIRE DEPOSITION SERVICE

93

1    Q.  Did you ever discuss with Khalid how he should

2    describe the repayment of the loan to you?

3    A.  I told him when he -- when I put the money in, it

4    goes in as a loan from me.

5        And when I tell him to write the check, it's

6    against that loan.  He writes it, loan repayment against

7    the loan.

8    Q.  And he makes that notation on the check?

9    A.  Yes.

10   Q.  Now, when he would make a repayment of the loan

11   to you, it would be in the form of a check on each

12   occasion; right?

13   A.  Yes.

14   Q.  And what would you do with that check?

15   A.  Either deposit it into my account or cash it.

16   Q.  Do you recall ever cashing it for actual -- for

17   cash?

18   A.  Pardon?

19   Q.  Do you recall ever cashing one of those checks

20   for cash?

21   A.  Yes.  If I needed the money, I might have cashed

22   it, yes.

23   Q.  Do you recall the amounts of any of these

24   repayments?  You told me 13,500 dollars, I think, last

94

1    time with regard to the 40,000.

2        A.   That's what you showed me the check, and I said

3    it was payment, yes.

4        Q.   Do you recall the amounts of any other repayment

5    checks?

6        A.   No.

7        Q.   Did you transfer 362,000 dollars on March 31 of

8    this year from the Commerce Bank into your checking

9    account?

10       A.   I transferred it from the Commerce Bank savings

11   account into another savings account, not into a

12   checking account.

13       Q.   You transferred into your personal savings

14   account?

15       A.   I had a personal savings account in Commerce

16   Bank; and then when the fiasco with Prudential happened,

17   they attached my personal account at Commerce Bank

18   because of the business account was at Commerce Bank, so

19   that's why I was upset with Commerce Bank for taking my

20   -- you remember that -- and that's why I moved my

21   account out of Commerce Bank because they had no right

22   to take my personal account.

23       Q.   So the account at Commerce Bank, was your own?

24       A.   It was my personal savings account.

ESQUIRE DEPOSITION SERVICE

118

1      Q.  Did anyone ever ask you to write a check to SJM

2    Trading for the 1.2 million dollars that was due to it?

3      A.  I don't remember that.

4      Q.  Now, I'm also going to represent to you that a

5    year later, on the trial balance for the year 2000, it

6    was the same entry for SJM Trading, except which,

7    instead of being 1.2 million, was a little under 700,000

8    dollars.

9          Did you write checks during the year -- during

10   the year 2000 to SJM Trading to reduce that

11   indebtedness?

12     A.  I don't remember.

13     Q.  Did you ever hear of a company called Mega

14   Management, M-E-G-A?

15     A.  No.

16     Q.  Mrs. Bagga, I'd like not to have to ask you this

17   question but I do.

18         Do you have an intimate relationship with Ravi

19   Chawla?

20            MR. KIDD:  I'm instructing her not to answer

21   that question.

22            MR. HERMANN:  You're not in a position to

23   instruct her not to answer.

24               If you do, we'll seek a ruling from Judge

121

```
 1              (Pertinent portion was read by the court
 2    reporter.)
 3              MR. KIDD:  May I ask you, are you speaking,
 4    when you say "intimate," do you mean a sexual
 5    relationship?
 6              MR. HERMANN:  I mean a sexual, romantic
 7    relationship.
 8              MR. KIDD:  In that context, you can answer
 9    the question.
10       A.  No.
11       Q.  Have you ever had a sexual relationship with Mr.
12    Chawla?
13       A.  No.
14              MR. KIDD:  Are you almost finished?
15              MR. HERMANN:  I am.
16              MR. KIDD:  Mr. Hermann, we're going to go
17    back over, I believe there's a series of maybe eight or
18    ten questions that were asked where we invoked the Fifth
19    Amendment.
20              We're now going to go over all of those
21    questions and we will answer them for you.  I've asked
22    the young lady to mark those in whatever manner she
23    does, and she will pull them up and we will then go over
24    them.
```

**EXHIBIT "C"**

Inc.
Arch Street
Suite 408
Philadelphia, PA 19106

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/11/2003 | 82003-2 |

**Bill To**

Spector Gadon & Rosen, P.C.
1635 Market Street
Seven Penn Center - 7th Floor
Philadelphia, Pa 19103

| P.O. No. | Terms | Project |
|----------|-------|---------|
| Verbal ( Monica) | Due on receipt | |

| Item | Qty | Description | Rate | Amount |
|------|-----|-------------|------|--------|
| Security Consulting | 1 | Collection and retrieval of Quicken Financial records from the PC of Kushie Bagga. | 150.00 | 150.00 |
| Security Consulting | 14 | Retreval of financial records from client files as authorized. ( Faxed authorization in client file). Due to Firms' Client " Not remembering password". Procedures to include Password removal or recovery, Breaking of file encryption or any other method to make data available to Monica Matthews with regard to this case.<br><br>Data recovery sucessfull Data copies e-mailed to Monica Mathews. Original Hard copy of uncracked files hand delivered to Susanne for client file. | 150.00 | 2,100.00 |
| Security Consulting | 0.75 | Hand delivery of archival original files to Spector Gaddon & Rosen PC to be placed in file as original evidence. ( In the event plaintiff obtains order to review original files) | 150.00 | 112.50 |

It's been a pleasure working with you!

| **Total** | $2,362.50 |
|-----------|-----------|

## Certificate of Service

I, Monica S. Mathews, hereby certify that a true and correct copy of the foregoing Motion to Quash and accompanying memorandum of law was served August 15, 2003 upon the following persons in the manner indicated below:

Lawrence Tabas, Esquire (via hand delivery)
Dorothy M. Claeys, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center – 19th Floor
1617 JFK Blvd.
Philadelphia, PA 19103-1895

Victor Lipsky, Esquire (via hand delivery)
Lipsky & Brandt
1101 Market St., Suite 2820
Philadelphia, PA 19103

Steven D. Usdin, Esquire (via hand delivery)
Adelman Lavine Gold & Levin, PC
Two Penn Center Plaza, Suite 1900
Philadelphia, PA 19102-1799

Robert Hermann, Esquire (via email and first class mail)
Thatcher Proffitt & Wood
50 Main St., 5th Floor
White Plains, NY 10606

Monica S. Mathews