# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

FL RECEIVABLE TRUST 2002-A
    Plaintiff,

vs.

BAGGA ENTERPRISES, INC., JAMUNA REAL
ESTATE, LLC., UNITED MANAGEMENT
SERVICES, INC., and WELCOME GROUP, INC.,
    Defendants.

Civil Action
Nos. 02-CV-2710
   02-CV-2711
   02-CV-2780
   02-CV-2786

## ORDER

**AND NOW** this _____ day of _____, 2003, upon

consideration of Non-Party Witness Khushvinder K. Bagga's Motion To Quash Plaintiff's Third-

Party Bank Subpoenae and any opposition thereto, it is ORDERED that the Motion is

**GRANTED** and that the subpoenae issued on August 11, 2003 to Sovereign Bank, J.P. Morgan

Invest., LLC, First Union Bank, and Commerce Bank are hereby quashed.

By the Court:

_____

LOWELL A. REED U.S.D.J

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| FL RECEIVABLE TRUST 2002-A | : | Civil Action Nos. |
| Plaintiff, | : | 02-CV-2710 |
|  | : | 02-CV-2711 |
|  | : | 02-CV-2780 |
|  | : | 02-CV-2786 |
| vs. | : | |
|  | : | |
| BAGGA ENTERPRISES, INC., JAMUNA REAL | : | |
| ESTATE, LLC., UNITED MANAGEMENT | : | |
| SERVICES, INC., and WELCOME GROUP, INC., | : | |
| Defendants. | : | |
|  | : | |

## NON-PARTY KHUSHVINDER K. BAGGA'S
## MOTION TO QUASH PLAINTIFF'S THIRD-PARTY BANK SUBPOENAE

Non-party Khushvnidar K. Bagga ("Mrs. Bagga") hereby moves this Court for an Order

pursuant to Fed. R. Civ. P. 45(c)(3)(A) and 69(a) quashing the subpoenae issued to Sovereign

Bank, J.P. Morgan Invest., LLC, First Union Bank and Commerce Bank by the Plaintiff on

August 11, 2003, for all records related to Mrs. Bagga. In support of this Motion Mrs. Bagga

incorporates herein the accompanying Memorandum of Law.

*Monica S. Mathews*

Suzanne Ilene Schiller
Monica S. Mathews
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888
(215) 241-8844 (facsimile)

Attorneys for Non-Party Witness
Khushvinder K. Bagga

Dated:    August 22, 2003

## Certification of Counsel

I, Monica S. Mathews, pursuant to Federal Rule of Civil Procedure 26(c) and Local Rule 26.1(f), hereby certify that the parties, after reasonable effort, were unable to resolve the dispute as to the August 11, 2003 subpoenae issued to Sovereign Bank, J.P. Morgan Invest., LLC, First Union Bank and Commerce Bank.

Dated:  August 22, 2003

Monica S. Mathews
Monica S. Mathews

# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| FL RECEIVABLE TRUST 2002-A<br>Plaintiff, | : <br> : <br> : <br> : <br> : <br> : | Civil Action<br>Nos.   02-CV-2710<br>02-CV-2711<br>02-CV-2780<br>02-CV-2786 |
| vs. | : <br> : <br> : | |
| BAGGA ENTERPRISES, INC., JAMUNA REAL<br>ESTATE, LLC., UNITED MANAGEMENT<br>SERVICES, INC., and WELCOME GROUP, INC.,<br>Defendants. | : <br> : <br> : <br> : <br> : | |

## MEMORANDUM OF LAW IN SUPPORT OF NON-PARTY BAGGA'S MOTION TO QUASH PLAINTIFF'S THIRD-PARTY BANK SUBPOENAE

In support of her Motion to Quash Plaintiff's Third-Party Subpoenae, Non-Party witness

Khushvinder K. Bagga ("Mrs. Bagga") submits the following memorandum of law.

### I.    Introduction

On August 11, 2003, in addition to the subpoena served upon Mrs. Bagga ("the personal

subpoena"),[1] Plaintiff also issued four subpoenae on Sovereign Bank, J.P. Morgan Invest., LLC,

First Union Bank, and Commerce Bank commanding them each to produce

> Any and all records relating to Kushivindar K. Bagga [sic] a/k/a/
> Khushi Bagga, including but not limited to, statements of account,
> checks and endorsements, transaction histories, ledgers, and other
> such documents regarding, reflecting and/or relating to all
> transactions made from January 1, 2000 to the present on any and
> all bank accounts, certificates of deposit, safe deposit boxes,

---

[1]    Mrs. Bagga filed a Motion to Quash the personal subpoena on August 15, 2003, which referenced the subpoenae issued to Sovereign Bank, J.P. Morgan Invest., LLC, First Union Bank, and Commerce Bank ("the Bank Subpoenae"), and indicated that Mrs. Bagga would be filing this Motion to Quash.

> pledges, documents of title, securities, Treasury Bills, repurchase
> agreements, notes, bonds, coupons, receivables, collateral,
> investment and/or commercial paper to which the above party has
> ownership and/or interest in.

<u>See</u> Copies of the Bank Subpoenae attached hereto as Exhibit "A."

These Bank Subpoenae were served ostensibly in aid of execution pursuant to Fed. R.

Civ. P. 69(a) ("Rule 69(a)"), but in reality are instruments to harass Mrs. Bagga. As the Court is

aware, Plaintiff has been permitted to depose Mrs. Bagga for more than 12 hours wherein

Plaintiff asked Mrs. Bagga every conceivable question designed to ferret out any hint of

fraudulent transfers to her by the judgment debtors or her husband, or any evidence that she is

the alter ego of any of the judgment debtors. <u>Not a scintilla of such evidence was found</u>.

Undaunted by the lack of evidence, Plaintiff has issued the Bank Subpoenae demanding access

to Mrs. Bagga's personal and confidential financial information, while failing to subpoena the

judgment debtors' financial records, and while disregarding evidence that would yield the same

information without intrusion into Mrs. Bagga's private financial records.

As evidenced by the Bank Subpoenae, Plaintiff is not truly interested in taking discovery

of the judgment debtor's assets: the Bank Subpoenae do not seek records related to the judgment

debtors -- even where the judgment debtors have bank accounts at the same institutions -- but

instead focus exclusively on Mrs. Bagga's personal accounts. To the best of counsel for Mrs.

Bagga's knowledge, these records for the judgment debtors have not been subpoenaed.[2]

Additional evidence of Plaintiff's single-minded pursuit of Mrs. Bagga is the fact that Plaintiff

issued subpoenae only to banks where Mrs. Bagga has or had personal accounts, while Plaintiff

---

[2]     Counsel for the judgment debtors advised counsel for Mrs. Bagga that he was unaware of any such
subpoenae being issued.

2

failed to subpoena banks such as PNC, where Mrs. Bagga made deposits into or wrote checks

from one of the judgment debtors' accounts, but held no personal account.

It is clear that Mrs. Bagga is the focus of Plaintiff's tactics, not because she has any

information related to the judgment debtor's assets, but solely because she is Mr. Bagga's wife,

and for no other reason. This type of "discovery" exceeds the scope of permissible discovery

under Rule 69 and Rule 45, and for that reason the Bank Subpoenae should be quashed.

## II.    **Background Facts**

Plaintiff FL Receivable Trust 2002-A is the subsidiary of Captec Financial Group, Inc.

("Captec"). On or about April 12, 2002, Captec filed four complaints against Defendants Bagga

Enterprises Inc. ("Bagga Enterprises"), United Management Services, Inc. ("United

Management"), Jamuna Real Estate, LLC ("Jamuna") and Welcome Group, Inc. ("Welcome

Group")[3] (collectively "judgment debtors") alleging that payments were due and owing under

various promissory notes made to and guaranteed by judgment debtors in late 2000 and early

2001. Default judgments were entered against judgment debtors in all actions on December 20,

2002.

Mrs. Bagga is the wife of Paul Bagga, who is, and always has been, the 100% owner of

Bagga Enterprises, United Management and Welcome Group. Mrs. Bagga has never had any

ownership interest in Bagga Enterprises, United Management or Welcome Group. See Exhibit

"B."[4] Mrs. Bagga's ownership interest in Jamuna ended when, on January 1, 2001, she

transferred all of her interest in Jamuna, to her husband Paul. See Exhibit "B." Since that time,

---

[3]     Defendant Welcome Group Inc. filed a voluntary Chapter 11 petition pursuant to 11 U.S.C. § 101 et seq. and as such, to the extent that this proceeding is in aid of execution against that Defendant, it must be stayed in accordance with the automatic stay provision, 11 U.S.C. § 362.

[4]     See Affidavit of Khushvinder K. Bagga In Support of Motion to Quash which was filed with the Court on or about May 7, 2003. An additional copy of the Affidavit is attached hereto as Exhibit "B" for the Court's convenience.

Mrs. Bagga's association with the judgment debtors has been limited to her employment

relationship with Defendant United Management which pays her a yearly salary for

administrative work she performs for the company, and, as is typical with small struggling

enterprises, she has loaned personal funds to the judgment debtors so that they could meet their

operating expenses. See Exhibit "B" and the relevant portions of Mrs. Bagga's deposition

testimony attached hereto as Exhibit "C," Vol. I at p. 235:14 - 238:1.[5]  The majority of such

loans remain outstanding to date.  Vol. I at p. 235:14 - 238:1, 241:17-245:22; Vol. II. at p. 86:9 -

91:1; 93:23-94:6.

### A.    Previous discovery taken in aid of execution.

On or about April 15, 2003, Plaintiff served Mrs. Bagga with a subpoena requiring her to

appear and provide testimony on May 15, 2003. Pursuant to this Court's orders, Mrs. Bagga's

deposition was taken on June 17, 2003 and was continued on August 7, 2003.  In total, Mrs.

Bagga gave more than 12 hours of testimony, and by the conclusion that time, Mrs. Bagga had

provided answers to every single question posed by Plaintiff, without regard for the subject

matter of the question and without regard to the connection, or lack thereof, of the question to the

assets of the judgment debtors.  Indeed, Mrs. Bagga testified frankly about matters such as the

location of her personal bank accounts, (Vol. II at p. 11:13-12:2, 24:24-25:3, 37:21-38:20), the

cash deposits in her personal bank accounts (Vol. II at p. 94:7-99:8), the monthly mortgage

payments for her home, including the amount of principal owed on the mortgage (Vol. II at p.

22:23-23:4).[6]   In addition, Mrs. Bagga answered all of Plaintiff's questions about her

---

[5]  The relevant portions of Mrs. Bagga's deposition transcripts for both June 17, 2003 (Volume I) and August 7, 2003 (Volume II) are attached hereto as Exhibit "C" and are designated in this memorandum as Vol. (I or II) at p. (page):(line).

[6]  Plaintiff also asked purely intrusive questions which had no bearing on the judgment debtor's assets such as whether she has had romantic relationships outside of her marriage (Vol. II at p. 118:18, 121:3-13).

employment with Bagga Enterprises and her knowledge of how the judgment debtors distributed and paid their money and expenses. Vol. I at p. 80:3-86:14; Vol. II at p. 75:14-77:17, 126:18-127:8. As Mrs. Bagga's deposition testimony makes clear, Mrs. Bagga has no information concerning the assets of any of the judgment debtors. Despite Plaintiff's posturing to the contrary, there is simply no evidence to support Plaintiff's claim that Mrs. Bagga knew of or participated in any fraudulent transfers or treated the judgment debtors as her alter ego. Indeed, the only evidence that exists is that Mrs. Bagga lent money to some of the judgment debtors for operational costs, which was recorded as loans, for which she has yet to be fully repaid. (Vol. I at p. 235:14 - 238:1, 241:17-245:22; Vol. II at p. 86:9-94:13).

In addition, Mrs. Bagga's Quicken computer files from her computer at Bagga Enterprises were produced in response to a subpoena served by Plaintiff. Again, in an effort to comply with the spirit of this Court's previous orders, and without objection, the Baggas spent thousands of dollars in expert technician's and attorney's fees to recover and produce these files which were produced prior to her second scheduled deposition. Plaintiff questioned Mrs. Bagga about those files at her second deposition, wherein she explained the deposits made to the account. Vol. II at p. 9:19-11:22, 94:7-99:8.

### B.      Plaintiff's demand for additional discovery.

The same day Plaintiff served the Bank Subpoenae, on August 11, 2003, Plaintiff issued another subpoena to Mrs. Bagga seeking production of additional documents and computer files. The subpoena demands that all requested items be produced on August 18, 2003. It seeks any and all records relating to and including (1) the tax returns for the business of K&P from January

1, 2000 to the present;[7] (2) Mrs. Bagga's personal tax returns from January 1, 2000 to the

present; (3) any and all hard drives or disks for Mrs. Bagga's home and/or personal computer

from January 1, 2002 to present; and (4) any and all correspondence written, prepared and/or

sent by Mrs. Bagga from January 1, 2000 to the present.

### III.    Legal Argument

It is well established, and indeed, both parties have previously submitted memoranda of

law acknowledging the fact that a judgment creditor is entitled to a thorough examination of the

judgment debtor's assets when attempting to satisfy a judgment. See Cassion Corp. v. County

West Building Corp., 62 F.R.D. 331, 334 (E.D. Pa 1974). However, it is also well recognized

that Rule 69's broad scope opens the door for abuse performed under the guise of discovery in

aid of execution, and to guard against such abuse, debtors and third party witnesses may turn to

the Court for protection under Fed. R. Civ. P. 45. See id. Mrs. Bagga has submitted to over

twelve hours of depositions over the course of two days and turned over her business computer

files, all of which revealed no evidence of impropriety. Thus, Plaintiff has been given more than

sufficient opportunity to explore Mrs. Bagga's knowledge of the judgment debtors' assets and

has been permitted more than sufficient opportunity to investigate its baseless suspicions of Mrs.

Bagga. However, because Plaintiff continues to suspect impropriety -- even without evidence of

such -- Mrs. Bagga seeks the protection of this Court and requests that the Court quash Plaintiff's

subpoena pursuant to Rule 45(c) as it is beyond the scope and intent of Rule 69(a).

---

[7]    Mrs. Bagga has agreed to produced the tax return for K&P for 2000 and the schedule to her personal tax
return that was filed for K& P for 2001. Mrs. Bagga also has agreed to produce a copy of the request for
the extension that were filed for K&P for 2002.

6

**A.    Plaintiff's subpoena must be quashed because it seeks documents that are not beyond the scope of permissible discovery under Fed. R. Civ. P. 69(a).**

It is axiomatic that a plaintiff hunting for assets of a judgment debtor may not be permitted unfettered access to personal information of third parties, and that the privacy rights of third party witnesses must be balanced with the broad discovery which is permitted to be taken in aid of execution under Rule 69(a). See Burak v. Scott, 29 F. Supp. 775, 776 (D.D.C. 1939). This is to ensure that the privacy rights of an individual -- who is not a party to the underlying action -- are protected from the abuse that would result from a court ordered and yet unrestricted investigation into a witness's personal life. See id. To protect against the potential for such abuse, demands for documents and testimony that are made in aid of execution must be narrowly drawn to examine the assets of the judgment debtor. See Hearst/ABC-Viacom Entertainment Services v. Goodway Marketing, Inc., 1993 U.S. Dist. LEXIS 6154, *4 (E.D. Pa. 1993).

Although this Court granted Plaintiff's request to extend discovery beyond the typical scope of Rule 69(a), Plaintiff appears to be construing this Court's prior rulings as permission to conduct an unfettered investigation into all aspects of Mrs. Bagga's life. Plaintiff's demands for unrestricted access to Mrs. Bagga's confidential financial information completely disregards Mrs. Bagga's right to be free from intrusion into her personal affairs and makes a mockery of the balancing test envisioned by Rule 69. As such, Plaintiff's current discovery demand for Mrs. Bagga's confidential financial information has certainly crossed the line into harassment and exceeded the type of requests reasonably related to and necessary for the examination of the assets of the judgment debtors under Rule 69(a).[8]

---

[8]    See Cassion, 62 F.R.D. at 334; Costamar Shipping Co., Ltd. v. Kim-Sail, Ltd., 1995 U.S. Dist. LEXIS 18430, * (S.D.N.Y. Dec. 12, 1995) ("Generally, non-parties may only be examined about the assets of a judgment debtor and cannot be required to disclose their own assets"); Burak, 29 F.Supp. at 776 (quashing Rule 69 subpoena requiring non-parties to disclose their personal assets); Magnaleasing Inc. v. Staten Island Mall, 76 F.R.D. 559, 561-2 (S.D.N.Y. 1977); 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3014 at 72 (1973).

It bears repeating that Plaintiff has uncovered no evidence of impropriety -- whatsoever -- despite its broad discovery taken to date. If Plaintiff could present some evidence of an alter-ego relationship between Mrs. Bagga and the judgment debtors or point to some evidence that would support even an inference of any fraudulent transfers between Mrs. Bagga and the judgment debtors, further inquiry into Mrs. Bagga's financial assets and bank records would, more arguably, be appropriate. Cf. Strick Corp. v. Thai Teak Prods. Co., 493 F. Supp. 1210, 1218 (E.D. Pa. 1980).

However, in the absence of any evidence of impropriety -- which is the case here -- Mrs. Bagga is entitled to protection from Plaintiff's progressively intrusive demands. See id. Indeed, there is no authority to support Plaintiff's position that it has authority to expand discovery under Rule 69 to Mrs. Bagga's personal financial accounts and bank records. See Strick, 493 F. Supp. at 1218 (granting protection from discovery requests unrelated to the judgment debtor's assets in the absence of a factual showing, beyond mere allegation, as to an alter ego relationship); Costamar, 1995 U.S. Dist. LEXIS at *9 ("The mere allegation of an alter ego relationship is insufficient; it must be supported by facts showing the basis for the assertion"). As such, Plaintiff's Bank Subpoenae for these items exceed the scope of permissible discovery under Rule 69(a) and must be quashed.

**B.      Plaintiff's Bank Subpoena must be quashed because they violate Fed. R. Civ. P. 45(c) inasmuch the discovery requires disclosure of protected matter, is oppressive and subjects Mrs. Bagga to an undue burden.**

Rule 45 imposes on the issuer of a subpoena an obligation to "take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." Fed. R. Civ. P. 45(c)(1). This Court has the power to enforce this duty and to quash a subpoena if it requires disclosure of protected matter, is oppressive or subjects a person to an undue burden. Fed. R. Civ. P. 45(c)(3)(A)(iii) and (iv). Once a party objects to the enforcement of a subpoena as

8

oppressive or unduly burdensome, "the burden is upon the party seeking the production to show

'good cause' -- that is, that the requested documents are necessary to establish his claim or

defense, or that denial of production would unduly prejudice the preparation of his case or cause

him hardship or injustice." U.S. v. American Optical Co., 39 F.R.D. 580, 583 (N.D. Cal. 1966).

In this case, Plaintiff can make no such showing because it is clear that the Bank Subpoenae are

burdensome and oppressive and are simply being used, under the guise of discovery in aid of

execution, to harass Mrs. Bagga.

### 1.    The disclosure of Mrs. Bagga's personal financial information is oppressive and unduly burdensome and protected under Rule 45.

The financial information of non-parties to a lawsuit is private and not routinely available

for discovery. Hecht v. Pro-Football, Inc., 46 F.R.D. 605, 607 (D.D.C. 1969). In particular, the

"right of privacy and the right to keep confidential one's financial affairs is well recognized,

when the information involves non-parties, even though they may be allied to the parties. It

seems to be part of human nature not to desire to disclose them." Id. Where a subpoena seeks

the disclosure of private financial information -- especially when the financial information is

unrelated to the underlying action -- this Court is vested with the "inherent power to protect

anyone from oppressive use of process." Id. at 606. Hecht, like this case, involved a motion by

third party witnesses to limit *subpoenae duces tecum* that were issued against them. The

witnesses alleged that the subpoenae were unreasonable and oppressive because they sought the

production of private financial records of non-parties. Finding that the subpoenae were

oppressive, the court quashed the subpoenae. See also United States v. Fed'n of Physicians &

Dentists, Inc., 63 F. Supp. 2d 475, 479-80 (D.Del. 1999)(subpoena held to be oppressive and

impose an undue burden because the information sought would entail the disclosure of sensitive,

private information of the non-parties which was only remotely connected to the Government's

claims); see e.g. In re ANC Rental Corp., 2002 U.S. Dist. LEXIS 12260, *6-7 (E.D.Pa. June 20, 2002)(quashing subpoena seeking discovery of confidential financial information).

In this case, Mrs. Bagga's personal financial records should be protected from disclosure because the Bank Subpoenae were issued soley to subject Mrs. Bagga to undue burden and oppression. The Bank Subpoenae themselves offer proof of this fact. For example, Plaintiff has subpoenaed Sovereign Bank, but has not sought records related to the judgment debtors' assets, despite the fact that Mrs. Bagga acknowledged making deposits for the judgment debtors at that bank. Vol. II at p. 126:12-17, 128:2-18. Instead, as the Bank Subpoenae indicate, Plaintiff has only subpoenaed Mrs. Bagga's financial information from Sovereign Bank. Similarly, Plaintiff did not subpoena PNC Bank where the judgment debtors had accounts (Vol. II at p. 76:15-17, 126:12-17), undoubtedly because Mrs. Bagga did not maintain an account at PNC. Similarly, J.P. Morgan Invest. LLC was subpoenaed only because Mrs. Bagga had a personal account there (Vol. II at p. 24:24-25:3): the judgment debtors have no accounts at that institution, Vol. II at p. 126:12-17, 128:2-18.

Furthermore, the Bank Subpoenae are oppressive and burdensome inasmuch as there is independent evidence -- to which Plaintiff undeniably has access -- which would support or disclaim Mrs. Bagga's testimony, obviating the need to disclose her personal financial information. In particular, the issue of the personal loans that Mrs. Bagga made to United, and the partial repayment of those loans -- which are the only actions that can be viewed as out of the ordinary -- can be verified against United's profit and loss statements.[9] Alternatively, Plaintiff

---

[9] For example, Mrs. Bagga testified that she made a $40,000 loan to United of which $13,500 was repaid. Mrs. Bagga further testified that these amounts -- as well as the fact that they are loans -- would be reflected in that company's profit and loss statement. Vol. I at p. 235:14-238:1, 241:17-245:22; Vol. II at p. 86:9-94:6.

could take the deposition of the office employee that disbursed the partial loan repayment to Mrs. Bagga. Vol. II at p. 89:3-18.

### 2. Plaintiff has failed to demonstrate that 'good cause' exists for the disclosure of Mrs. Bagga's personal financial information.

In light of the evidence demonstrating the true purpose of the Bank Subpoenae is to harass Mrs. Bagga, and the availability of other means to collect the same information, it is clear that Plaintiff has failed to carry its burden of proving 'good cause' for the disclosure of Mrs. Bagga's personal financial information. Similarly, Plaintiff has not, and cannot, show that that the requested documents are necessary to establish his claim or defense, or that denial of production would unduly prejudice the execution of its judgment or cause it hardship or injustice.

This being the case, Mrs. Bagga is entitled to have the Court's vigilance to protect her from Plaintiff's burdensome and oppressive subpoenae. See generally McAleese v. Owens, 1990 U.S. Dist. LEXIS 4539, *13-14 (M.D. Pa. March 29, 1990). Accordingly, the Bank Subpoenae should be quashed.

### IV. Conclusion

At this juncture, with twelve hours of deposition testimony and nothing substantive to show in support of Plaintiff's allegations of impropriety, it is clear that Mrs. Bagga is the subject of Plaintiff's fishing expedition, which can no longer be permitted under the guise of discovery in aid of execution under Rule 69. See Carpenter v. Winn, 221 U.S. 533 (1911) ("Fishing expeditions for the purpose of constructing a case are frowned on by the courts"). Accordingly, for all of the foregoing reasons, Mrs. Bagga respectfully requests that the Bank Subpoenae

served upon Sovereign Bank, J.P. Morgan Invest., LLC, First Union Bank, and Commerce Bank

be quashed.

Suzanne Ilene Schiller
Monica S. Mathews
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA  19103
(215) 241-8888
(215) 241-8844 (facsimile)

Attorneys for Non-Party Witness
Khushvinder K. Bagga

Dated:    August 22, 2003

F:\40031\026\motions\motion to quash Bank subpoenae Kushi.doc

**EXHIBIT "A"**

88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FL RECEIVABLE TRUST 2002-A
                *Plaintiff*

   v.

BAGGA ENTERPRISES, INC.; JAMUNA REAL
ESTATE, LLC; UNITED MANAGEMENT SERVICES,
INC.

            *Defendants*

**SUBPOENA IN A CIVIL CASE**

CIVIL ACTION NO:  02-CV-2710;
                           02-CV-2711;
                           02-CV-2080;

TO:    Sovereign Bank
         One Belmont Avenue
         Bala Cynwyd, PA 19004

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See the attached Exhibit "A".

| PLACE<br>OBERMAYER REBMANN MAXWELL & HIPPEL LLP<br>One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd.<br>Philadelphia, PA 19103 | DATE AND TIME<br>On or before<br>August 18 2003 |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Plaintiff | DATE<br>August 11, 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Dorothy M. Claeys, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd.
Philadelphia, PA 19103
(215) 665-3000

476508

## EXHIBIT "A"

Any and all records relating to Kushivindar K. Bagga a/k/a Kushi Bagga,

including but not limited to, statements of account, checks and endorsements, transaction

histories, ledgers, and other such documents regarding, reflecting and/or relating to all

transactions made from January 1, 2000 to the present on any and all bank accounts,

certificates of deposit, safe deposit boxes, pledges, documents of title, securities, Treasury

Bills, repurchase agreements, notes, bonds, coupons, receivables, collateral, investment

and/or commercial paper to which the above party has ownership and/or an interest in.

476615

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

| DATE | SIGNATURE OF SERVER |
|---|---|

| | ADDRESS OF SERVER |
|---|---|

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A)    A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)    Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A)    On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person,

except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B)    If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

LAW OFFICES

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

ONE PENN CENTER-19TH FLOOR

1617 JOHN F. KENNEDY BOULEVARD

PHILADELPHIA, PA 19103-1895

(215) 665-3000
FAX (215) 665-3165

August 11, 2003

**VIA CERTIFIED MAIL R/R/R**

J.P. Morgan Invest, LLC
One Beacon Street
Boston, MA  02108-3102

> Re: *FL Receivable Trust v. Bagga Enterprises, et al.*
> *U.S.D.C., E.D.PA No.*
> *02-CV-2710*
> *02-CV2711*
> *02-CV2080*
> *02-CV-2086*

Dear Sir/Madam:

This office represents Plaintiff FL Receivable Trust 2002-A in the above matter. Enclosed is a Subpoena directing you to produce any and all records as outlined in Exhibit "A" attached to the Subpoena. You may forward the records to my attention at the above address, on or before August 18, 2003, as specified in the Subpoena.

If you have any questions concerning this matter, please do not hesitate to contact me at 215-665-3274. Thank you for your cooperation in this matter.

Very truly yours,

Dorothy M. Claeys

Enclosure
dmc/s
cc:     Victor Lipsky, Esquire (w/encl.)

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the
### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FL RECEIVABLE TRUST 2002-A<br>*Plaintiff*<br><br>v.<br><br>BAGGA ENTERPRISES, INC.; JAMUNA REAL ESTATE, LLC; UNITED MANAGEMENT SERVICES, INC.<br>*Defendants* | **SUBPOENA IN A CIVIL CASE**<br><br>CIVIL ACTION NO: 02-CV-2710;<br>02-CV-2711;<br>02-CV-2080; |

TO:  J.P. Morgan Invest, LLC
One Beacon Street
Boston, MA  02108-3102

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  See the attached Exhibit "A".

| PLACE<br>OBERMAYER REBMANN MAXWELL & HIPPEL LLP<br>One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd.<br>Philadelphia, PA  19103 | DATE AND TIME<br>On or before<br>August 18, 2003 |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Plaintiff | DATE<br>August 11, 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Dorothy M. Claeys, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd.
Philadelphia, PA  19103
(215) 665-3000

476614

## EXHIBIT "A"

Any and all records relating to Kushivindar K. Bagga a/k/a Kushi Bagga,

including but not limited to, statements of account, checks and endorsements, transaction

histories, ledgers, and other such documents regarding, reflecting and/or relating to all

transactions made from January 1, 2000 to the present on any and all bank accounts,

certificates of deposit, safe deposit boxes, pledges, documents of title, securities, Treasury

Bills, repurchase agreements, notes, bonds, coupons, receivables, collateral, investment

and/or commercial paper to which the above party has ownership and/or an interest in.

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|---|
| | SERVED BY (PRINT NAME) | TITLE |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE                          SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

476614

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A)   A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)   Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A)   On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person,

except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden,

(B)   If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

476614

LAW OFFICES

## OBERMAYER REBMANN MAXWELL & HIPPEL LLP

ONE PENN CENTER • 19TH FLOOR

1617 JOHN F. KENNEDY BOULEVARD

PHILADELPHIA, PA 19103-1895

(215) 665-3000

FAX (215) 665-2165

August 11, 2003

First Union Bank
43 E. Main Street
Norristown, PA  19401

      *Re:*     *FL Receivable Trust v. Bagga Enterprises, et al.*
              *U.S.D.C., E.D.PA No.*
                    *02-CV-2710*
                    *02-CV2711*
                    *02-CV2080*
                    *02-CV-2086*

Dear Sir/Madam:

      This office represents Plaintiff FL Receivable Trust 2002-A in the above matter. Enclosed is a Subpoena directing you to produce any and all records as outlined in Exhibit "A" attached to the Subpoena. You may forward the records to my attention at the above address, on or before August 18, 2003, as specified in the Subpoena.

      If you have any questions concerning this matter, please do not hesitate to contact me at 215-665-3274. Thank you for your cooperation in this matter.

                    Very truly yours,

                    Dorothy M. Claeys

Enclosure
dmc/s
cc:     Victor Lipsky, Esquire (w/encl.)

449549

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FL RECEIVABLE TRUST 2002-A

*Plaintiff*

v.

BAGGA ENTERPRISES, INC.; JAMUNA REAL
ESTATE, LLC; UNITED MANAGEMENT SERVICES,
INC.

*Defendants*

### SUBPOENA IN A CIVIL CASE

CIVIL ACTION NO: 02-CV-2710;
02-CV-2711;
02-CV-2080;

TO:   First Union Bank
43 E. Main Street
Norristown, PA 19401

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified
below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a
deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or
objects at the place, date, and time specified below (list documents or objects): See the attached Exhibit "A".

| PLACE | DATE AND TIME |
|---|---|
| OBERMAYER REBMANN MAXWELL & HIPPEL LLP One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd. Philadelphia, PA 19103 | On or before August 18, 2003 |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified
below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or
more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set
forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure,
30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) Attorney for Plaintiff | DATE August 11, 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Dorothy M. Claeys, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd.
Philadelphia, PA 19103
(215) 665-3000

476515

## EXHIBIT "A"

Any and all records relating to Kushivindar K. Bagga a/k/a Kushi Bagga,

including but not limited to, statements of account, checks and endorsements, transaction

histories, ledgers, and other such documents regarding, reflecting and/or relating to all

transactions made from January 1, 2000 to the present on any and all bank accounts,

certificates of deposit, safe deposit boxes, pledges, documents of title, securities, Treasury

Bills, repurchase agreements, notes, bonds, coupons, receivables, collateral, investment

and/or commercial paper to which the above party has ownership and/or an interest in.

476615

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

|  DATE  |  SIGNATURE OF SERVER  |

|    |  ADDRESS OF SERVER  |

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

476515

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person,

except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

LAW OFFICES

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

ONE PENN CENTER·19TH FLOOR

1617 JOHN F. KENNEDY BOULEVARD

PHILADELPHIA, PA 19103-1895

(215) 665-3000
FAX (215) 655-3165

August 11, 2003

Commerce Bank
1240 Bethlehem Pike
Flourtown, PA 19031

      Re:   *FL Receivable Trust v. Bagga Enterprises, et al.*
          *U.S.D.C., E.D.PA No.*
             *02-CV-2710*
             *02-CV2711*
             *02-CV2080*
             *02-CV-2086*

Dear Sir/Madam:

    This office represents Plaintiff FL Receivable Trust 2002-A in the above matter. Enclosed is a Subpoena directing you to produce any and all records as outlined in Exhibit "A" attached to the Subpoena. You may forward the records to my attention at the above address, on or before August 18, 2003, as specified in the Subpoena.

    If you have any questions concerning this matter, please do not hesitate to contact me at 215-665-3274. Thank you for your cooperation in this matter.

              Very truly yours,

              Dorothy M. Claeys

Enclosure
dmc/s
cc:    Victor Lipsky, Esquire (w/encl.)

449549

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FL RECEIVABLE TRUST 2002-A
*Plaintiff*

v.

BAGGA ENTERPRISES, INC.; JAMUNA REAL
ESTATE, LLC; UNITED MANAGEMENT SERVICES,
INC.

*Defendants*

### SUBPOENA IN A CIVIL CASE

CIVIL ACTION NO:   02-CV-2710;
02-CV-2711;
02-CV-2080;

TO:   Commerce Bank
1240 Bethlehem Pike
Flourtown, PA 19031

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See the attached Exhibit "A".

| PLACE | DATE AND TIME |
|---|---|
| OBERMAYER REBMANN MAXWELL & HIPPEL LLP<br>One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd.<br>Philadelphia, PA 19103 | On or before<br>August 18, 2003 |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Plaintiff | DATE<br>August 11, 2003 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Dorothy M. Claeys, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor, 1617 John F. Kennedy Blvd.
Philadelphia, PA 19103
(215) 665-3000

476528

## EXHIBIT "A"

Any and all records relating to Kushivindar K. Bagga a/k/a Kushi Bagga,

including but not limited to, statements of account, checks and endorsements, transaction

histories, ledgers, and other such documents regarding, reflecting and/or relating to all

transactions made from January 1, 2000 to the present on any and all bank accounts,

certificates of deposit, safe deposit boxes, pledges, documents of title, securities, Treasury

Bills, repurchase agreements, notes, bonds, coupons, receivables, collateral, investment

and/or commercial paper to which the above party has ownership and/or an interest in.

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

|  | |
|---|---|
| DATE | SIGNATURE OF SERVER |

| | |
|---|---|
| | ADDRESS OF SERVER |

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

476528

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person,

except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden,

(B)  If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**EXHIBIT "B"**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

FL RECEIVABLE TRUST 2002-A
      Plaintiff,

      vs.

BAGGA ENTERPRISES, INC., JAMUNA REAL
ESTATE, LLC., UNITED MANAGEMENT
SERVICES, INC., and WELCOME GROUP, INC.,
      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action
Nos.    02-CV-2710
        02-CV-2711
        02-CV-2780
        02-CV-2786

### AFFIDAVIT OF KHUSHVINDER K. BAGGA
### IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

Commonwealth of Pennsylvania   :
                        : ss.
County of Philadelphia         :

Khushvinder K. Bagga, being duly sworn according to law, deposes and says as follows:

1.     I am married to Paul Bagga and have been married to him for over 25 years. I have never possessed any ownership interest in Bagga Enterprises, United Management or Welcome Group. My husband Paul is and always has been the owner of Defendants Bagga Enterprises, United Management and Welcome Group.

2.     Prior to January 1, 2001 I had a 50% ownership interest in Defendant Jamuna, L.L.C. Effective January 1, 2001, I transferred my ownership interest in Jamuna to my husband, Paul Bagga. I have had no ownership interest in Jamuna and no information about its assets since that date.

3.    My only present relationship with any of the Defendants in the above captioned action is my employment relationship with Defendant United Management whereby I perform occasional administrative tasks.

4.    I did not participate in the negotiations which resulted in the loans that are the subject of the above-captioned actions and I did not execute any of the loan documents or promissory notes.

5.    I have no information regarding the location or transfer of any of Defendants' assets and have had no information since January 1, 2001.

6.    Any information which I would otherwise remember regarding the location or transfer of any of Defendants' assets would have been communicated to me by my husband Paul Bagga.

_____
Khushvinder K. Bagga

Subscribed to and sworn
before me this 7th day
of May, 2003:

_____
Notary Public

NOTARIAL SEAL
DEBORAH K. DUPLER, Notary Public
City of Philadelphia, Phila. County
My Commission Expires December 17, 2005

2

**EXHIBIT "C"**

```
1              IN THE UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF PENNSYLVANIA
2

3      FL RECEIVABLE TRUST          CIVIL ACTION
       2002-A,
4          Plaintiff

5                        vs.

6      BAGGA ENTERPRISES, INC;     NO. 02-2710
       JAMUNA REAL ESTATE, LLC;    NO. 02-2711
7      UNITED MANAGEMENT           NO. 02-2080
       SERVICES,INC.; and          NO. 02-2086
8      WELCOME GROUP,INC.
           Defendants
9                        ------
                    June 17, 2003
10                       ------
11                    Partial Videotape Oral
       Deposition of KHUSHVINDER KAUR BAGGA,
12     held in the law offices of Obermayer,
       Rebman, Maxwell & Hipple, 1617 John F.
13     Kennedy Boulevard, 19th Floor,
       Philadelphia,Pennsylvania 19103,
14     beginning at 9:38 a.m., before Ann V.
       Kaufmann, a Registered Professional
15     Reporter, Certified Realtime Reporter,
       Approved Reporter of the U.S. District
16     Court, and a Notary Public of the
       Commonwealth of Pennsylvania.
17

18                        ------
19

20

21

22          ESQUIRE DEPOSITION SERVICES
          1800 John F. Kennedy Boulevard
23                   15th Floor
         Philadelphia, Pennsylvania  19103
24               (215) 988-9191
25

          ESQUIRE DEPOSITION SERVICES
```

50

BY MR. HERMANN:
1   Q.   Have you in the past year
3   discussed with anyone plans to relocate
4   to India?
5       MS. BASKIN:  I'm going to
6   object and instruct her not to answer.
7   BY MR. HERMANN:
8       Q.   What other countries have
9   you visited in the past five years?
10      A.   India, Hong Kong, Thailand,
11  Burma, Indonesia, Italy, France, Venice,
12  England, Malaysia, Taiwan, Nepal.
13  That's all I remember.
14      Q.   Did you go with your
15  husband on all these trips?
16      A.   Not all of them.
17      Q.   Were all of these trips for
18  pleasure as opposed to business?
19      A.   No.
20      Q.   Which ones were business
21  trips?
22      MS. BASKIN:  I'm going to
23  object and instruct the witness not to
24  answer.

51

1   BY MR. HERMANN:
2       Q.   Did you in fact conduct
3   business on some of these trips?
4       MS. BASKIN:  You can
5   answer.
6       THE WITNESS:  Yes.
7   BY MR. HERMANN:
8       Q.   Which ones?
9       MS. BASKIN:  I'm going to
10  object and instruct the witness not to
11  answer.
12  BY MR. HERMANN:
13      Q.   Did you acquire property in
14  any of these countries?
15      MS. BASKIN:  I'm going to
16  object and instruct the witness not to
17  answer.
18  BY MR. HERMANN:
19      Q.   Did you open or make
20  deposits to any banks or securities
21  accounts in any of these countries?
22      MS. BASKIN:  I'm going to
23  object and instruct the witness not to
24  answer.

52

1   BY MR. HERMANN:
2       Q.   Did you purchase any large-
3   ticket items in any of these countries?
4       MS. BASKIN:  I'm going to
5   object and instruct the witness not to
6   answer.
7   BY MR. HERMANN:
8       Q.   Are you employed at the
9   present time?
10      A.   Yes.
11      Q.   Who is your employer?
12      A.   Bagga Enterprises.
13      Q.   Any other employer?
14      A.   I don't know.
15      Q.   Do you get a paycheck from
16  Bagga Enterprises?
17      A.   Yes.
18      Q.   How often?
19      A.   Every two weeks.
20      Q.   What is your annual salary?
21      A.   $52,000.
22      Q.   What do you do for Bagga
23  Enterprises?
24      A.   I oversee their billings

53

1   and payables.
2       Q.   Anything else?
3       A.   No.
4       Q.   For how long have you been
5   doing that for Bagga Enterprises?
6       A.   For Bagga Enterprises?
7   About a month.
8       Q.   Did you have employment
9   before that, before the one month ago?
10      A.   Yes.
11      Q.   What was that?
12      A.   United Management.
13      Q.   What did you do for them?
14      A.   Oversee the billings and
15  payables.
16      Q.   How long did you do that
17  for United Management?
18      A.   A few years.
19      Q.   While were you doing that
20  for United Management Services for two
21  years, were you employed by any other --
22      A.   I said a few years.
23      Q.   A few years; I'm sorry.
24  How many years is a few years, in your

14  (Pages 50 to 53)

234

1 a document that has been marked for
2 identification as Exhibit No. 1 and ask
3 you to take a look at it and tell me if
4 that looks familiar to you.
5    A.   Yes.
6    Q.   What is it?
7    A.   It's a deposit slip into
8 United Management.
9    Q.   That's on the first page.
10 What about the second page?
11    A.   That's also a deposit slip
12 into United Management.
13    Q.   On the first page of the
14 exhibit there is a deposit of $30,000 in
15 cash dated December 4, 2002; is that
16 correct?
17    A.   Yes.
18    Q.   Now, did you make that
19 deposit?
20    A.   I don't remember.
21    Q.   Do you know what that
22 $30,000 in cash was for?
23    A.   No.
24    Q.   Do you know where it came

235

1 from?
2    A.   No.
3    Q.   Did you happen to notice in
4 December of 2002 a $30,000 deposit into
5 that account?
6    A.   No.
7    Q.   Is that something that
8 happened with regularity, that large
9 sums of cash like that would be
10 deposited in the account?
11    A.   Not frequently.  But I
12 don't know where that deposit was made
13 from.
14    Q.   Take a look at the second
15 page.  Does that reflect a $40,000 cash
16 deposit?
17    A.   It's not a cash deposit.
18    Q.   What was it?  Doesn't it
19 say there "Currency $40,000"?
20    A.   Yes.  But I think this is
21 one of the loans made to United by me.
22 This was money taken, 40,000.  I think I
23 made a loan to United.
24    Q.   And you made that loan in

236

1 the form of cash?
2    A.   No.  I think it was
3 transferred from -- I think it's loan
4 from my account, I made a loan to
5 United.
6    Q.   What day was that?  Is that
7 the same date, December 4, 2002?
8    A.   Yes, because I had an
9 account at Commerce Bank so -- and I
10 think they were short of funds in
11 United.
12    Q.   Are you the person that
13 filled out that deposit ticket?
14    A.   Yes.  It's my handwriting.
15    Q.   Is it your testimony that
16 that 40,000 should have said 40,000
17 check instead of 40,000 currency?
18    A.   No, I didn't say that.
19    Q.   So how did you effect that
20 transaction?  Did you actually withdraw
21 $40,000 from one account and put it in
22 another in the form of currency?
23    A.   No.
24    Q.   Well, how did you do it?

237

1    A.   If you have two accounts in
2 the same bank and you transfer money
3 from one account to the other, it is
4 within the same bank, they transfer it
5 as cash.
6    Q.   And this was done on the
7 Commerce Bank in Cherry Hill, New
8 Jersey?
9    A.   No.  This was done at the
10 Flourtown branch.
11    Q.   Do you have any explanation
12 for why the reverse side of those
13 tickets shows Cherry Hill, New Jersey?
14 Is that a clearing office for the bank?
15    A.   I have no idea what
16 that....
17    Q.   Now, when you made -- and
18 it is your testimony that this $40,000
19 was a loan to United Management?
20    A.   Yes.
21    Q.   Was that reflected on the
22 books of United Management as a loan?
23    A.   Yes.
24    Q.   Has that loan been repaid?

238

1      A.   No.
2           MR. HERMANN:  Let me have
3   this marked, please, as K. Bagga 2 for
4   identification.
5           (Below-described document
6   marked as K. Bagga Exhibit 2.)
7   BY MR. HERMANN:
8      Q.   I'm showing you a document
9   that has been marked as Exhibit 2 for
10   identification and ask if you recognize
11   that document or documents.
12      A.   Yes.
13           MS. BASKIN:  Yes.
14   BY MR. HERMANN:
15      Q.   What is shown on Exhibit 2?
16      A.   This is a deposit ticket
17   into United Management and the checks
18   from Bagga, from Poojan, from Welcome
19   stores, all different stores, into
20   United Management Company.
21      Q.   Is that your stamped
22   signature on each of these checks?
23      A.   Yes.
24      Q.   And you wrote checks on

239

1   Bagga Enterprises; Poojan, Inc.; CJA
2   Enterprises; Welcome Group; and Welcome
3   Group d/b/a Arby's during that time; is
4   that correct?
5      A.   Yes.
6           Oh, that's not mine.
7      Q.   At the time --
8      A.   Excuse me.  CJA, this is
9   not my signature.
10      Q.   Oh.  I'm sorry.  Whose
11   signature is that?
12      A.   I don't know.
13      Q.   When did you become
14   employed by Bagga Enterprises?
15      A.   I was employed -- I get my
16   -- I used to work for all the
17   companies.  I used to get my check from
18   United Management.  And after this
19   Welcome litigation, they separated the
20   overhead.  So my payroll comes from
21   Bagga Enterprises because United is not
22   dead anymore.
23      Q.   So at the time that you
24   were writing -- December of 2002 that

240

1   were you writing checks on Bagga
2   Enterprises, you weren't actually an
3   employee there?
4      A.   I was an employee of
5   United.
6      Q.   And were you an officer in
7   any way of Bagga Enterprises signing
8   checks for them?
9      A.   No, I don't think so.  I
10   was -- I think I was just in charge of
11   the check-writing.
12           MR. HERMANN:  Please have
13   that marked as Exhibit 3.
14           (Below-described document
15   marked as K. Bagga Exhibit 3.)
16           MS. BASKIN:  She is ready on
17   this.
18   BY MR. HERMANN:
19      Q.   Bringing you back for a
20   moment to Exhibit 2, do you see that
21   first check, No. 5665, in the amount of
22   $30,000 to United Management?
23      A.   Yes.
24      Q.   Is that -- am I reading

241

1   that correctly as United Management
2   30,000?
3      A.   Yes.
4      Q.   Do you know what that
5   payment was for, that $30,000?
6      A.   We used to just transfer
7   all the monies into United to pay the
8   bills out of United.  It is not a
9   payment.  All the money had to be
10   consolidated into United to pay the
11   bills for all the units.
12      Q.   And directing your
13   attention to Exhibit No. 3, do you
14   recognize that document, which is
15   photocopies of five checks?
16      A.   Yes.
17      Q.   Now, on the third check
18   there, No. 1250, dated December 16,
19   2002, it is a $13,500 check made out to
20   you?
21      A.   Yes.
22      Q.   And whose signature is
23   that?
24      A.   Mine.

242

```
 1      Q.   And that's not a stamped
 2   signature, that is your handwriting; is
 3   that right?
 4      A.   Yes.
 5      Q.   And what was that check
 6   for?
 7      A.   It's probably an accounting
 8   adjustment for the money that was given
 9   in earlier, to return it.
10          THE COURT REPORTER:  I'm
11   sorry.  "The money that was given"?
12          THE WITNESS:  Earlier.
13          MS. BASKIN:  To return it.
14          THE WITNESS:  To return the
15   loan.
16   BY MR. HERMANN:
17      Q.   I understood your testimony
18   to be that the money had not been
19   repaid.
20      A.   All of it has not been.  I
21   guess this was a part of it.
22      Q.   So --
23      A.   I put the 40,000; you see
24   that deposit.
```

243

```
 1      Q.   And when you say you guess
 2   that it was that, do you recall or do
 3   you not recall?
 4      A.   I think it was a part of
 5   the accounting adjustment with the money
 6   that was going in.
 7      Q.   But when you say an
 8   "accounting adjustment," do you mean a
 9   repayment of the loan?
10      A.   Yes.
11      Q.   So this was a repayment of
12   the loans that you had made in part on
13   December 4?
14      A.   Or before.
15      Q.   Or before.
16      A.   Yes.
17      Q.   And was there an entry made
18   on the books of United Management
19   Services indicating a $13,500 partial
20   loan repayment on that date?
21      A.   Yes, there should be.
22      Q.   Do you know whether there
23   was?
24      A.   I have not checked it, but
```

244

```
 1   I'm sure there is.  If they wrote a
 2   check, they have to make an entry.
 3      Q.   Well, you wrote the check,
 4   didn't you?
 5      A.   I signed the check.
 6      Q.   Did you tell anybody to
 7   make an entry for repayment of the loan?
 8      A.   Yes.  I'm sure there is an
 9   entry.  There has to be an entry.  The
10   computer, you have to make an entry.
11   You can't just write a $13,000 check and
12   not put an entry what it's for.
13      Q.   Well, you can put it as an
14   expense item or you can put it as a
15   capital item.  A repayment of loan
16   wouldn't be an expense item, would it?
17      A.   No.  I'm sure the
18   accountants will catch it.  It has to be
19   a payment of the loan, I'm sure.
20      Q.   Did you tell anybody to
21   write it down as a repayment of a loan?
22      A.   Yes, I'm pretty sure
23   repayment, entered as a repayment.
24      Q.   And why are you sure of
```

245

```
 1   that?
 2      A.   Because I put the money in,
 3   so I'm sure I took some of it back,
 4   because there was a lot of money put in
 5   besides this 40,000 --
 6          MS. BASKIN:  The question is
 7   whether you recall if you told anyone.
 8          THE WITNESS:  Yes.
 9   BY MR. HERMANN:
10      Q.   Who did you tell?
11      A.   Whoever wrote the check.
12      Q.   I thought you wrote the
13   check.
14      A.   I signed the check.
15      Q.   Do you know from the
16   handwriting who actually wrote out the
17   check?
18      A.   No.
19      Q.   It's not familiar
20   handwriting to you?
21      A.   No.  I don't know who wrote
22   that check.
23      Q.   Do you see the check below
24   the small check from your husband?  Does
```

ESQUIRE DEPOSITION SERVICES

1

```
 1          IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF PENNSYLVANIA
 2          CIVIL ACTION NO. 2002-A; 02-2710;
            02-2711; 02-2711; 02-2711
 3
                      ------
 4
     FL RECEIVABLE TRUST,
 5
                      Plaintiff,
 6
 7          vs.
 8
 9   BAGGA ENTERPRISES, INC; JAMUNA REAL ESTATE,
     LLC; UNITED MANAGEMENT, SERVICES,INC.; and
10   WELCOME GROUP, INC.
11                Defendants.
12                    ------
13                AUGUST 7, 2003
14                    ------
15
16          (Completion of) Videotape Oral
     Deposition of KHUSHVINDER KAUR BAGGA, held in
17   the law offices of Obermayer, Rebman, Maxwell
     & Hipple, 1617 John F. Kennedy Boulevard, 19th
18   Floor, Philadelphia, Pennsylvania 19103,
     beginning at 12:31 pm, before Maureen
19   McCarthy, a Registered Professional Reporter,
     Certified Realtime Reporter, Approved Reporter
20   of the U.S. District Court, and a Notary
     Public of the Commonwealth of Pennsylvania.
21
                      ------
22
            ESQUIRE DEPOSITION SERVICES
23         1800 John F. Kennedy Boulevard
                    15th Floor
24       Philadelphia, Pennsylvania  19103
                  (215) 988-9191
```

ESQUIRE DEPOSITION SERVICE

9

```
1    documents from a computer that are in the software

2    format of Quicken.

3           Are you familiar with that?

4    A.  Yes.

5    Q.  Do you know where those computer records came

6    from?

7    A.  I guess someone in the office.  Probably got the

8    records from the office; right?

9    Q.  I don't want you to guess.  Do you know where

10   they came from?

11   A.  I was not there when your people came.  I know

12   somebody from your comp -- from your organization went

13   to the office to make copies of the computer records.

14   Q.  When you say the office, what building are you

15   referring to?

16   A.  714 Bethlehem Pike.

17   Q.  Excuse me just one minute.  I have to turn this

18   thing off.

19   Q.  Did you, in fact, see a copy of the records that

20   were produced to us yesterday?

21   A.  No.

22   Q.  You maintained, didn't you, certain records on a

23   computer in the Quicken software format.

24          Is that correct?
```

10

1    A.  Yes.

2    Q.  For how long a period of time did you keep those

3    records?

4    A.  Couple months.

5    Q.  In 2003?

6    A.  Yes.

7    Q.  Do you know when you started?

8    A.  Some time in May.

9    Q.  And did you stop at some point?

10   A.  No.  I just did it for a couple of months, then I

11   was not here, so it was just my personal accounts, I

12   guess, you're referring to.

13   Q.  Who made the entries in the computer that are

14   reflected in the information that was produced to us?

15        MR. KIDD:  I'm going to instruct you not to

16   answer that question.  Invoke your rights,

17   A.  Relying on the advice of my attorney, I invoke my

18   right against self-incrimination under the Constitution

19   of the United States and refuse to answer your question.

20   Q.  Why did you start using this Quicken software to

21   keep track of your personal accounts?

22   A.  I wanted to learn how Quicken works.

23   Q.  How did you keep track of this kind of

24   information before you used the Quicken software?

ESQUIRE DEPOSITION SERVICE

11

1     A.  On the -- with the checking -- with my checkbook,

2     there's a little book there.

3     Q.  And when you wrote a check, you would make an

4     entry and a notation of the person to whom you wrote it

5     and the date?

6     A.  Most of the time, yes.

7     Q.  Did you also note deposits in your checkbook

8     memos?

9     A.  Usually, yes.

10     Q.  For how long a period of time have you been doing

11     that prior to using the Quicken software?

12     A.  Since I've had my account.

13     Q.  Now, which account are we talking about?

14     A.  Checking account.

15     Q.  And where is that checking account?

16     A.  Sovereign Bank.

17     Q.  How long have you had a checking account at

18     Sovereign Bank?

19         MS. BASKIN:  Objection to form.

20         MR. KIDD:  Answer the question.

21     A.  It was a long time.  I don't remember since when.

22     Q.  Several years?

23     A.  Several years, yes.

24     Q.  Do you have any other checking accounts at any

ESQUIRE DEPOSITION SERVICE

12

1    other banks?

2        A.    No.

3        Q.    Do you have more than one personal checking

4    account at Sovereign Bank?

5        A.    No.

6        Q.    Do you sometimes write letters?

7        A.    Yes.

8        Q.    Do you write them by hand or on a typewriter?

9        A.    By hand or on the computer sometimes.

10       Q.    When you write letters on a computer, do you

11   write them from home or from the office?

12       A.    Both.

13       Q.    You have a computer at home as well?

14       A.    Yes.

15       Q.    Do you write business letters from the office and

16   personal letters from home?

17       A.    Not necessarily.   Sometimes I write personal

18   letters from the office too.

19       Q.    When you write a letter on the computer in the

20   office, do you save it?

21            MS. BASKIN:   Objection to form.

22       A.    Sometimes, yes, not all the time.

23       Q.    When you save it in the office, do you save it to

24   the hard drive or do you save it on a disk?

ESQUIRE DEPOSITION SERVICE

22

1      returns?

2                MR. KIDD:  Invoke your rights.

3      A.  Relying on the advice of my attorney, I invoke my

4      rights against self-incrimination under the Constitution

5      of the United States and refuse to answer your question.

6                MR. HERMANN:  I'm just going to point out

7      that these are questions that were not answered last

8      time and that the judge directed her to answer.

9                MR. KIDD:  I'm aware that those questions

10     were asked last time with regard to her tax returns and

11     the questions involving Mr. Cahan.

12                With that awareness, I'm still advising her

13     to invoke her Fifth Amendment rights.

14                MR. HERMANN:  I'm not going to repeat that

15     observation but it's going to apply to a lot of the

16     questions.

17                MR. KIDD:  I guess I will give you a

18     continuing objection then.

19                MR. HERMANN:  Continuing observation.

20     BY MR. HERMANN:

21     Q.  Do you have a personal money manager?

22     A.  No.

23     Q.  What's the amount of the mortgage on your home?

24     A.  About 8,000 dollars a month.  I'm sorry.

23

1       Q.  What's the principal?

2             MR. KIDD:  He asked you what is the

3    principal amount of the mortgage on your home.

4       A.  1.6 million.

5       Q.  Have you made any applications for loans in the

6    past two years?

7             MR. KIDD:   Invoke your rights under the

8    Fifth Amendment.

9       A.  Relying on the advice of my attorney, I invoke my

10   right against self-incrimination under the Constitution

11   of the United States and refuse to answer your question.

12      Q.  Is your home up for sale?

13      A.  No.

14      Q.  Have you given a listing to any broker?

15      A.  No.

16      Q.  Have you made any loan guarantees in the past two

17   years?  That is -- I see you're looking at your lawyer.

18             MR. KIDD:  She's looking to me for

19   clarification of the question, not for on whether to

20   invoke --

21   BY MR. HERMANN:

22      Q.  I was going to clarify.

23             Do you know what I mean by a loan guarantee?

24      A.  I don't understand.

24

1    Q.   Have you guaranteed the repayment of a loan that

2    somebody else took out in the last couple years?

3    A.   Somebody else?  Meaning who?

4    Q.   Well, your husband or any other person, where you

5    guaranteed repayment of that loan.   Children?

6         MR. KIDD:   Invoke your rights under the

7    Fifth Amendment.

8    A.   Relying on the advice of my attorney, I invoke my

9    right against self-incrimination under the Constitution

10   of the United States and refuse to answer your question.

11   Q.   Do you own any real estate other than your home,

12   either separately or jointly with somebody else?

13   A.   Yes.

14   Q.   What real estate is that?

15   A.   The office, 714 Bethlehem Pike.

16   Q.   And what's your ownership interest in that?

17   A.   I own hundred percent.

18   Q.   Is there any mortgage on that?

19   A.   Yes.

20   Q.   What's the amount of the mortgage on that?

21   A.   244,000.

22   Q.   Do you own any other property besides that?

23   A.   No.

24   Q.   Do you have a brokerage account?

25

```
 1    A.  Yes.

 2    Q.  With what firm or firms?

 3    A.  Brown and Company.

 4    Q.  Any others?

 5    A.  I used to have Fidelity.  I don't remember if

 6  it's still there.

 7    Q.  That would be a mutual fund account?

 8    A.  I don't remember what it was.

 9    Q.  Do you have any mutual fund accounts?

10    A.  I don't think so.  I don't remember.

11    Q.  You have a checking account with Sovereign Bank.

12        Is that correct?

13    A.  Yes.

14    Q.  And do you have a main branch for that, that you

15  deal with at Sovereign Bank?

16    A.  No.

17    Q.  When you have to go in to see somebody at the

18  Bank, where would you go?

19    A.  Wherever I am, I just go into any branch.

20    Q.  Is it correct that one of the things that you've

21  done in connection with United Management and Bagga

22  Enterprises is to handle certain banking deposits?

23    A.  Yes.

24    Q.  And can you tell me the names of all the banks in
```

ESQUIRE DEPOSITION SERVICE

37

1    ownership?

2        A.   No.

3        Q.   Have you sold any assets in India in the past ten

4    years?

5        A.   I don't have any assets in India.

6        Q.   I understand.  I'm asking you whether you sold

7    any and that's why you don't have any anymore.

8        A.   I can't sell something I don't have.  I don't

9    have assets in India.

10       Q.   And you haven't had any for the past ten years?

11       A.   No.

12       Q.   In the last three years, have you visited any

13   banks in India?

14       A.   Yes.

15       Q.   Which banks have you visited?

16       A.   ICICI Bank.

17       Q.   And where is that?

18       A.   In New Delhi.

19       Q.   Any other banks?

20       A.   No.

21       Q.   Can you approximate in the last ten years how

22   many times you visited ICICI Bank?

23       A.   I visited once last year.

24       Q.   What was the purpose of that visit?

38

```
 1     A.   I opened an account.
 2     Q.   Did you make an initial deposit in that account?
 3     A.   Yes.
 4     Q.   How much did you deposit into the account?
 5     A.   $200.
 6     Q.   And since that time, had you deposited any more
 7   money in the account?
 8     A.   No.
 9     Q.   Have you withdrawn any money from the account?
10     A.   No.
11     Q.   Why did you open an account in India with $200?
12     A.   Just thought, I go to India, sometimes I need it,
13   get an ATM card, if I need cash, I can get money, you
14   can -- I was told you can use it from here because they
15   have a bank here, but I haven't used it.
16     Q.   That's your only bank account in India?
17     A.   Yes.
18     Q.   Do you have any bank accounts in any other
19   countries?
20     A.   No.
21     Q.   Have you closed any bank accounts in any other
22   countries in the last ten years?
23     A.   No.
24     Q.   Does your husband have a bank account in India?
```

76

1    A.  What do you mean how many?

2    Q.  Tell me the names of the banks in which you have

3    deposited more than 500 dollars in cash in the last

4    three years.

5    A.  Personal account.

6    Q.  How about business accounts?

7    A.  Yeah.

8    Q.  Which ones?

9    A.  United, Bagga, Welcome.

10   Q.  Have you ever directed anybody else to make bank

11   deposits of cash in excess of 500 dollars?

12   A.  Yes.

13   Q.  Who did you direct to do that?

14   A.  Paul.

15   Q.  Now, these accounts, United, Bagga, Welcome, what

16   banks were they in?

17   A.  Sovereign, PNC, Commerce, Citizens.

18   Q.  Where did the cash come from?

19   A.  That was deposited?

20   Q.  Yes.

21   A.  Transfer money from one account to the other.

22   Q.  I'm asking about cash deposits.  Where did the

23   cash come from?

24   A.  Took the cash from one account to deposit into

77

1    the other account.

2    If one account needed the money, they needed,

3    short of cash; so took the cash out of one account and

4    put it into the other account with another bank.

5    Q.  And that's the only times you deposited cash in

6    accounts, when you would literally take cash out of one

7    account and put cash in another account?

8    A.  Yes.  Usually.

9    Q.  So you didn't make any deposits of cash that came

10   from an outside source and put that in one of those

11   accounts?

12   A.  I don't remember, no.

13   Q.  So the records of the businesses will reflect a

14   cash withdrawal from one account and a cash deposit in

15   another account at approximately the same time, if

16   they're correct?

17   A.  Yes, they should.

18   Q.  Did Paul Bagga ever give you cash to deposit in

19   one of the business accounts?

20   A.  Yeah, he might have some times.

21   Q.  Did he?

22   A.  I don't remember.  I'm sure.  Whoever was going

23   to the bank takes the bank deposits.  If I'm going to

24   the bank, he would give me the money to deposit.

86

1    Q.  Do you get any payments from any company that get

2    deposited into your checking account?

3    A.  Yes.

4    Q.  What company?

5    A.  It used to be from United.  Now that United is

6    not, I think it's called Welcome now.

7    Q.  Not 21st Century Restaurant Solutions?

8    A.  Yes, 21st Century Restaurant Solutions, probably.

9    Q.  Now, you told us last time about a 40,000 dollar

10   loan that you had made to one of the family companies.

11       Do you recall that?

12   A.  Um-hum

13   Q.  Have you made any other loans to any Bagga

14   family-related businesses in the last five years,

15   personally?

16   A.  Yes, I might have.

17   Q.  Do you remember any?

18   A.  I don't remember but I know I have made deposits,

19   loans into the accounts.

20   Q.  To which companies?

21   A.  I don't remember which company; could be United,

22   Welcome.

23   Q.  And would those loans be reflected in your

24   checkbook?  That is to say, did you make the loan in the

87

1   form of a check?

2       A.   Yes.

3       Q.   Did you make loans in any other form?  Cash,

4   let's say?

5       A.   Yeah.  It would be a check.  Like we went through

6   last time, if it's the same back, they would transfer it

7   as cash.  You asked me last time; they would transfer it

8   from my account to the business account and they put it

9   in as cash because it's in the same bank.

10      Q.   So you wouldn't actually physically write a

11  check; you would ask the bank to transfer money from one

12  -- from your personal account to one of the business

13  accounts?

14      A.   Yes.  If you do that, then it would show as cash.

15      Q.   Is that what you did, is what I'm asking you?

16      A.   Sometimes I might have done, yeah.

17      Q.   And sometimes you might have written a check

18  also?

19      A.   Yes.

20      Q.   Do you remember doing each of those things in

21  connection with loans made to businesses?

22      A.   Yes.

23      Q.   How did you keep track of what loans you made to

24  the businesses?

88

1    A.  It shows up in the statement.

2    Q.  It shows up in what statement?

3    A.  In the bank statement.

4    Q.  The bank statement for the business that you lent

5    the money to?

6    A.  No, in the business, it would come in the P and

7    L, in the balance sheet, it would show that it was a

8    loan from me.

9        But if it's a personal account, if it's -- if I

10    transfer a check, it would say it.

11    Q.  What I'm asking is, apart from the, either the

12    check that you wrote or the movement of funds from one

13    bank account to another, would there be any other piece

14    of paper that would show that this was a loan by you to

15    one of the businesses?

16    A.  I'm saying it will show -- if I made a loan to

17    United, it would show in the United books.  When they

18    make the deposit, if it's a loan, it would show that

19    it's a loan from me.

20    Q.  But you would have had to tell somebody that

21    there was a loan that was made by you to United, let's

22    say?

23    A.  Yes.

24    Q.  And is that what you did in each case?

89

1    A.  Yes.  They had to make an entry.  They can't just

2  write the money came in.  They had to write from there.

3    Q.  Who would you tell when you made such a loan?

4    A.  Whoever is working in the office doing entries.

5    Q.  Do you know the name of that person or persons?

6    A.  Khalid.

7    Q.  That's the same Khalid you told us about last

8  time?

9    A.  Yes.

10    Q.  Is that K-H-A-L-I-D?

11    A.  Yes.

12    Q.  And you don't remember that person's last name;

13  right?

14    A.  No.

15    Q.  And who else?

16    A.  Basically, him.

17    Q.  And does he still work for the company?

18    A.  Yes.

19    Q.  If I can summarize what you just said.  Tell me

20  if it's an accurate summary.

21        When you made a loan to one of the companies, you

22  would transfer money either in the form of an

23  inter-account transfer or in the form of a check and you

24  would tell Khalid to record it as a loan from you?

90

1    A.  Yes.

2    Q.  And it would then show up on the books of United?

3    A.  Yes.

4    Q.  And did you get repaid on those loans?

5    A.  Some of it, yes.

6    Q.  Are some of the loans unpaid still?

7    A.  Yes.

8    Q.  And how much in total did you lend to the family

9  businesses in this matter?

10              MS. BASKIN:  Objection to form.

11   A.  I don't remember the exact amount.

12   Q.  Approximately.

13   A.  I don't know the amounts.  It should show up in

14  the tax returns and the company P and Ls.

15   Q.  Do you have any idea at this point how much is

16  owed to you from those loans?

17   A.  No.

18   Q.  If you were going to find out how much you had

19  advanced and had not been repaid, what would you do?

20   A.  I would look on the company P and Ls.

21   Q.  And you would look at United or any other

22  company?  For United.

23   A.  Right now, I would look at 21st Century.

24   Q.  As the successor to United?

91

1     A.  Yes.

2     Q.  And you haven't, in fact, looked at the P and Ls

3  of that?

4     A.  No.

5     Q.  Or the balance sheet?

6     A.  No.

7     Q.  On how many occasions do you think you've made

8  such loan advances?

9     A.  Several occasions.  I don't remember exactly how

10  much and how many times.

11    Q.  Over what course of time?

12    A.  Last few years.

13    Q.  Now, there had been times also when you took

14  money out in repayment of those loans.

15        Is that correct?

16    A.  Yes.

17    Q.  And what process did you go through?  Did you

18  tell Khalid?

19    A.  To write a check.  That's what we went through

20  last time when he showed me the check, and I showed you

21  it was part of payment back from the 40,000, the 13 and

22  a half thousand that I took back, and the rest, 27 and a

23  half thousand, is still owed to me and I have not taken

24  it back; and I cannot take it back now because, since

92

1    the bankruptcy started, I've not taken any money out.

2        Q.  So the same process applied to any other loans

3    that you made, that if you were going to be repaid, you

4    would go to Khalid and say, issue a check?

5        A.  Yes, I would get a check, yes.

6        Q.  When you did that, did you -- that is to say,

7    when you went to Khalid to ask him to write a check to

8    repay you, did he have to get an approval from anybody?

9        A.  No.

10       Q.  When you did it -- your request to him to write

11   the check to repay, was that something you just said to

12   him or did you write a memo about it?

13       A.  I just said it to him.

14       Q.  Did he ever say to you that there were no funds

15   to repay you when you were looking to be repaid?

16       A.  I wouldn't ask for the check if there were no

17   funds in the account.

18       Q.  So you knew already that there would be

19   sufficient funds?

20       A.  Yes.  The same way I knew when there was no funds

21   I put the money in because there were no funds in the

22   account.  That's why I put the money in, to take it out

23   when the funds were there for a temporary loan.  It

24   would not become permanent.

ESQUIRE DEPOSITION SERVICE

93

1    Q.  Did you ever discuss with Khalid how he should

2    describe the repayment of the loan to you?

3    A.  I told him when he -- when I put the money in, it

4    goes in as a loan from me.

5        And when I tell him to write the check, it's

6    against that loan.  He writes it, loan repayment against

7    the loan.

8    Q.  And he makes that notation on the check?

9    A.  Yes.

10   Q.  Now, when he would make a repayment of the loan

11   to you, it would be in the form of a check on each

12   occasion; right?

13   A.  Yes.

14   Q.  And what would you do with that check?

15   A.  Either deposit it into my account or cash it.

16   Q.  Do you recall ever cashing it for actual -- for

17   cash?

18   A.  Pardon?

19   Q.  Do you recall ever cashing one of those checks

20   for cash?

21   A.  Yes.  If I needed the money, I might have cashed

22   it, yes.

23   Q.  Do you recall the amounts of any of these

24   repayments?  You told me 13,500 dollars, I think, last

ESQUIRE DEPOSITION SERVICE

94

1   time with regard to the 40,000.

2       A.   That's what you showed me the check, and I said

3   it was payment, yes.

4       Q.   Do you recall the amounts of any other repayment

5   checks?

6       A.   No.

7       Q.   Did you transfer 362,000 dollars on March 31 of

8   this year from the Commerce Bank into your checking

9   account?

10      A.   I transferred it from the Commerce Bank savings

11  account into another savings account, not into a

12  checking account.

13      Q.   You transferred into your personal savings

14  account?

15      A.   I had a personal savings account in Commerce

16  Bank; and then when the fiasco with Prudential happened,

17  they attached my personal account at Commerce Bank

18  because of the business account was at Commerce Bank, so

19  that's why I was upset with Commerce Bank for taking my

20  -- you remember that -- and that's why I moved my

21  account out of Commerce Bank because they had no right

22  to take my personal account.

23      Q.   So the account at Commerce Bank, was your own?

24      A.   It was my personal savings account.

ESQUIRE DEPOSITION SERVICE

95

```
 1      Q.  And you moved it into what account?

 2      A.  Into a savings account into First Union Bank.

 3      Q.  How long had you had that 362,000 dollars in your

 4   savings account at Commerce Bank?

 5      A.  Pardon?

 6          (Pertinent portion was read by the court

 7   reporter.)

 8      A.  Since I had the account at Commerce Bank.

 9      Q.  How long is that?

10      A.  I don't know the exact dates.

11      Q.  Is it several years we're talking about?

12      A.  No, not several years.

13      Q.  Can you approximate how long you had that account

14   there?

15      A.  I don't know.  Maybe two years.  I don't know the

16   exact amount of time, how long.

17      Q.  Where did the 362,000 dollars come from?

18      A.  I had the money.

19      Q.  Where did you get the money from?  Was that

20   salary for you?

21      A.  What?

22      Q.  Was that some salary you had?

23      A.  No.  I don't remember exactly where.

24      Q.  Did you deposit it as a lump sum at some point?
```

ESQUIRE DEPOSITION SERVICE

96

```
 1      A.  Yes.

 2      Q.  Where did it come from before it was at Commerce

 3   Bank?

 4      A.  I don't remember.

 5      Q.  As I understood your testimony, you were upset

 6   that Commerce Bank had done something with your funds

 7   and that's why you moved the account out of there?

 8      A.  They had seized my account.  That's why I moved

 9   it out.

10      Q.  Which account did they seize?

11      A.  My personal savings account.

12      Q.  They had seized the account with the 362,000

13   dollars in it?

14      A.  Yes.

15      Q.  How were you able to move it then?

16      A.  They released it.

17          MS. BASKIN:  If I may interject, this was a

18   subject of some legal proceeding where some bank --

19   maybe it was Captec -- had a judgment.

20          THE WITNESS:  Prudential.

21          MS. BASKIN:  Prudential, and they froze

22   corporate bank accounts, inappropriately froze Mrs.

23   Bagga's personal account.

24          We had Blank, Rome on the phone, and we had
```

97

1    a lawyer from another firm on the phone who, within 24

2    hours, admitted that it was an improper seizure of her

3    bank accounts and they unfroze her bank account.

4              I don't remember the details, but I remember

5    I was involved in the telephone conversations when this

6    occurred.

7    BY MR. HERMANN:

8        Q.  Is that correct, Mrs. Bagga, as far as you know?

9        A.  Yes.

10       Q.  As you sit here today, what's your best

11   explanation of where that 362 thousand dollars came

12   from?

13       A.  I don't remember the exact details, but part of

14   it was a check that I got from the insurance company.

15   We had a water damage in the house, and the contractors

16   were still working on it.

17             We got paid by the insurance company, but I

18   deposited the check into my savings account, and then I

19   paid them later on when they finished the work.

20       Q.  And the insurance company paid you 362 thousand

21   dollars more than you owed the contractor for the work?

22       A.  I wrote the contractors after the check.  The

23   insurance company paid me the check.  The contractors I

24   paid them recently.

98

1    Q.  How much did you pay the contractors?

2    A.  100 and some thousand.  I said part of the

3    300,000 came from there.

4    Q.  Where did the rest of it come from?

5    A.  I don't remember that.  You know what I think?

6    Part of it came from the refinancing.

7        I don't know who -- were you there at the

8    refinancing or -- I don't remember.  We refinanced the

9    house, and we got back some money.  I think part of it

10   probably came from there.

11   Q.  But you're not sure?

12   A.  I don't remember.  I think part of it probably

13   came from there.

14   Q.  Do you have an account at MBNA?

15   A.  MBNA?

16   Q.  Yes.

17   A.  It's a credit card.

18   Q.  Did you transfer money to your personal checking

19   account from an MBNA account in April of this year?

20   A.  I transferred from MBNA -- I have a credit card

21   from them, and they had an offer for six months, no

22   interest, and so I took the money.

23   Q.  23,000 dollars?

24   A.  Yes.

99

1    Q.  Was there a particular use you had for that

2  23,000 dollars at the time?

3    A.  I needed to pay my expenses and this was a no

4  interest loan so I thought I could use it for six

5  months, so I transferred the money, the check into my

6  account.

7    Q.  That hasn't been repaid yet?

8    A.  No.

9    Q.  Who's Johnny Dang, D-A-N-G?

10    A.  He's my landscaper.

11    Q.  You paid him approximately 9,000 dollars in May

12  of 2003?

13    A.  Uh-huh.

14    Q.  Had he done some landscaping work at your house?

15    A.  He put some trees in the back.

16    Q.  Do you have an account at a Philadelphia private

17  bank?

18    A.  It's a trust account for my children.

19    Q.  Is that a Sansom Street account?

20    A.  Pardon?

21    Q.  Is that an account called Sansom, S-A-N-S-0-M,

22  Street?

23    A.  No.

24    Q.  If you made a notation on a check, a 35 hundred

115

1    Q.  Has Paul Bagga received any loans from the

2  Chawlas?

3    A.  I don't know that.

4    Q.  Are you currently getting a paycheck from 21st

5  Century Realty Solutions?

6    A.  Yes, I'm getting a paycheck, yes.

7    Q.  And how much are you being paid by them?

8    A.  It's like 1500 or some dollars every two weeks.

9    Q.  Are you getting a paycheck from any other

10  company?

11    A.  No.

12    Q.  Now, before there was 21st Century Realty

13  Solutions, there was United Management.

14        I'm sorry, 21st Century Restaurants.

15    A.  Yes.

16    Q.  You were getting a check from United Management;

17  right?

18    A.  Yes.

19    Q.  How much were you being paid by United

20  Management?

21    A.  About 1500 dollars.

22    Q.  1500 dollars?

23    A.  Every two weeks.

24    Q.  Approximately, 36,000 dollars a year?

ESQUIRE DEPOSITION SERVICE

1    A.  Yes.  Something like that.

2    Q.  For how many years in the past were you being

3  paid that amount?

4    A.  Long time.  Few years.

5    Q.  In, let's say, since the year 2000, since the

6  beginning of 2003, were you getting a paycheck from any

7  other company?

8    A.  I don't remember.

9    Q.  Were you getting any distributions of capital

10  from any other company?

11    A.  No.

12    Q.  Were you getting distributions of income from any

13  other company?

14    A.  No, not that I'm aware.

15    Q.  So your only source of income, personally, in

16  2000, 2001 and 2002, was the paychecks you were

17  receiving from United Management?

18    A.  Yes.

19    Q.  Mrs. Bagga, during the year of 2000, did you

20  write checks for American Merchandising?

21    A.  Yes.

22    Q.  So I'm going to represent to you that during the

23  year 2000, American Merchandising wrote at least a dozen

24  checks to Ten Tigers in an amount exceeding 6 million

118

1    Q.  Did anyone ever ask you to write a check to SJM

2    Trading for the 1.2 million dollars that was due to it?

3    A.  I don't remember that.

4    Q.  Now, I'm also going to represent to you that a

5    year later, on the trial balance for the year 2000, it

6    was the same entry for SJM Trading, except which,

7    instead of being 1.2 million, was a little under 700,000

8    dollars.

9        Did you write checks during the year -- during

10   the year 2000 to SJM Trading to reduce that

11   indebtedness?

12   A.  I don't remember.

13   Q.  Did you ever hear of a company called Mega

14   Management, M-E-G-A?

15   A.  No.

16   Q.  Mrs. Bagga, I'd like not to have to ask you this

17   question but I do.

18       Do you have an intimate relationship with Ravi

19   Chawla?

20       MR. KIDD:  I'm instructing her not to answer

21   that question.

22       MR. HERMANN:  You're not in a position to

23   instruct her not to answer.

24       If you do, we'll seek a ruling from Judge

121

1              (Pertinent portion was read by the court

2     reporter.)

3              MR. KIDD:  May I ask you, are you speaking,

4     when you say "intimate," do you mean a sexual

5     relationship?

6              MR. HERMANN:  I mean a sexual, romantic

7     relationship.

8              MR. KIDD:  In that context, you can answer

9     the question.

10    A.   No.

11    Q.   Have you ever had a sexual relationship with Mr.

12    Chawla?

13    A.   No.

14             MR. KIDD:  Are you almost finished?

15             MR. HERMANN:  I am.

16             MR. KIDD:  Mr. Hermann, we're going to go

17    back over, I believe there's a series of maybe eight or

18    ten questions that were asked where we invoked the Fifth

19    Amendment.

20             We're now going to go over all of those

21    questions and we will answer them for you.  I've asked

22    the young lady to mark those in whatever manner she

23    does, and she will pull them up and we will then go over

24    them.

ESQUIRE DEPOSITION SERVICE

126

1      A.  No.

2      Q.  Do you continue to maintain copies of those loan

3   applications?

4      A.  No.

5          MR. KIDD:  Next question.

6          (The following was read by the court

7   reporter:

8          "Have you guaranteed the repayment of a loan

9   that somebody else took out in the last couple years?")

10     A.  I don't remember.

11         (The following was read by the court reporter:

12         "Can you tell me the names of all the banks on

13  which you deposited money on behalf of Bagga Enterprises

14  or United Management in the last two years?")

15     A.  Yes, Sovereign Bank, PNC Bank, Commerce Bank,

16  Citizens Bank, First Union Bank.  I think that's about

17  it.

18     Q.  To the best of your recollection, did you make

19  any cash deposits in any of those banks in that period

20  of time?

21     A.  Yeah, I might have.

22     Q.  Well, you might not have also; right?

23     A.  Yes.

24     Q.  Do you remember doing so?

ESQUIRE DEPOSITION SERVICE

127

1       A.   I told you earlier, sometimes, if one account

2    needs some money, and you deposit a check, you don't get

3    the credit right of it; so you have to take the cash out

4    and put cash in the account so the account is covered.

5       Q.   I'm talking about cash from an outside source.

6            Did you at any time during those two years

7    deposit cash from an outside source into those accounts?

8       A.   I don't remember that.

9            MR. KIDD:   All right, Mr. Hermann, to

10   proceed?

11           MR. HERMANN:   Yes.

12           (The following was read by the court

13   reporter:

14           "Now, another of your functions is writing

15   checks for those businesses?

16           Answer:  Not anymore, no.

17           Question:  Was there a time when that was

18   one of your functions?"

19           MR. KIDD:   Do you understand the question?

20   BY MR. HERMANN:

21      Q.   The question was, was there a time when writing

22   checks was one of your questions?  But I think you

23   already answered that.

24      A.   Yes.

128

```
1          (The following was read by the court reporter:
2          "Can you tell me the names of all of the banks on
3    which you have, on behalf of Bagga Enterprises, United
4    Management or any other of the family-related
5    businesses, written checks in the past two years?
6          MR. KIDD:  Answer the question.
7    A.   I'm sorry.  Did you say entities or the banks?
8          (The following was read by the court reporter:
9          "Can you tell me the names of all of the banks on
10   which you have, on behalf of Bagga Enterprises, United
11   Management or any other of the family-related
12   businesses, written checks in the past two years?")
13   A.   All the banks I just mentioned.
14   Q.   Any others?
15   A.   No, I don't remember any of them.
16   Q.   And those are Sovereign, PNC, Commerce, Citizens
17   and First Union?
18   A.   Yes.
19         (The following was read by the court reporter?
20         "Have you set up any trusts in the last two
21   years?")
22         MR. KIDD:  Answer the question.
23   A.   No.
24         (The following was read by the court reporter:
```

ESQUIRE DEPOSITION SERVICE

## Certificate of Service

I, Monica S. Mathews, hereby certify that a true and correct copy of the foregoing Motion

To Quash Plaintiff's Third-Party Bank Subpoenae and accompanying memorandum of law were

served August 22, 2003 upon the following persons in the manner indicated below:

Lawrence Tabas, Esquire (via hand delivery)
Dorothy M. Claeys, Esquire
Obermayer Rebmann Maxwell & Hippel, LLP
One Penn Center – 19th Floor
1617 JFK Blvd.
Philadelphia, PA 19103-1895

Louis Lipsky, Esquire (via hand delivery)
Lipsky & Brandt
1101 Market St., Suite 2820
Philadelphia, PA 19103

Steven D. Usdin, Esquire (via hand delivery)
Adelman Lavine Gold & Levin, PC
Two Penn Center Plaza, Suite 1900
Philadelphia, PA 19102-1799

Robert Hermann, Esquire (via email and first class mail)
Thatcher Proffitt & Wood
50 Main St., 5th Floor
White Plains, NY 10606

Monica S. Mathews