## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FL RECEIVABLES TRUST 2002-A,<br><br>              Plaintiff,<br>vs.<br><br>BAGGA ENTERPRISES, INC., JAMUNA REAL ESTATE, LLC, UNITED MANAGEMENT SERVICES, INC., and WELCOME GROUP, INC.,<br><br>              Defendants. | Assigned Judge:<br>Hon. Lowell A. Reed, Jr., S.J.<br><br>Civil Action Nos. 02-CV-2710<br>                 02-CV-2711<br>                 02-CV-2080<br>                 02-CV-2086 |

## MEMORANDUM OF LAW OF PLAINTIFF FL RECEIVABLES TRUST 2002-A
## IN OPPOSITION TO MOTION TO QUASH BANK SUBPOENAS

**THACHER PROFFITT & WOOD LLP**
*Attorneys for Plaintiff*
*FL Receivables Trust 2002-A*
50 Main Street
White Plains, NY 10606-1920

**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
*Attorneys for Plaintiff*
*FL Receivables  Trust 2002-A*
One Maxwell Center - 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FL RECEIVABLES TRUST 2002-A,<br><br>                              Plaintiff,<br><br>vs.<br><br>BAGGA ENTERPRISES, INC., JAMUNA<br>REAL ESTATE, LLC, UNITED<br>MANAGEMENT SERVICES, INC., and<br>WELCOME GROUP, INC.,<br><br>                              Defendants. | Assigned Judge:<br>Hon. Lowell A. Reed, Jr., S.J.<br><br>Civil Action Nos. 02-CV-2710<br>                              02-CV-2711<br>                              02-CV-2080<br>                              02-CV-2086 |

## MEMORANDUM OF LAW OF PLAINTIFF FL RECEIVABLES TRUST 2002-A
## IN OPPOSITION TO MOTION TO QUASH BANK SUBPOENAS

Plaintiff FL Receivables Trust 2002-A (the "Trust"), through its attorneys, Obermayer

Rebmann Maxwell & Hippel LLP, and Thacher Proffitt & Wood LLP, submits this

memorandum of law in opposition to the motion of Khushvinder K. Bagga ("Bagga") for an

order quashing four subpoenas *duces tecum* that the Trust issued to Sovereign Bank, J.P. Morgan

Invest, LLC, First Union Bank and Commerce Bank on August 11, 2003 (collectively, the "Bank

Subpoenas"). The Bank Subpoenas each seek Bagga's own bank records from the period

January 1, 2000 to date.

Bagga's motion to quash the Bank Subpoenas is founded on the fanciful notion that the

Trust is inexplicably harassing a tangential third-party who has little connection to the defendant

judgment debtor companies, save for the fact that she is married to their principal and sole

owner. In fact, the record demonstrates that Bagga was deeply immersed in the financial

operation of the companies, had unfettered access to their funds, and took advantage of that fact

to transfer company funds to her personal account. Bagga's bank records constitute the most

reliable source of information concerning the movement of company funds to Bagga herself. Bagga's motion to quash the Bank Subpoenas should therefore be denied.

## PRELIMINARY STATEMENT

This Court has previously ruled that information about Bagga's personal assets is properly discoverable in deposition questioning of her. The information Bagga revealed during her deposition demonstrates there is no discernible line between Bagga's personal financial dealings and those of the corporate defendants. Bagga is a wealthy, sophisticated business woman who had discretion to issue checks from the defendant companies' various bank accounts, and she used her discretion by treating those accounts as if they were hers personally. She claims to have loaned money to the defendant companies and repaid herself, all without supporting documentation, supervision or accountability. She has no credible or consistent explanation for the fact that she has more than $400,000 in her personal checking account. She is equally vague concerning the finances of the businesses for which she was responsible for paying bills. She acknowledges she issued checks and wires on behalf of family-owned American Merchandising Co., Inc. ("American Merchandising") payable to one company totaling approximately $8 million in just one year, but she can do no more than speculate as to why the money was paid. She contends that she is owed "a lot" of money from the defendants, but she has produced no records of those debts and claims not to remember how much they are.

Bagga's own testimony establishes she was a significant participant in the financial operation of the defendant companies. This amply justifies the Trust's effort to discover information about Bagga's personal finances in its quest to locate assets of the defendant companies. There is no other means of obtaining this critical information. Accordingly, Bagga's motion to quash the Bank Subpoenas should be denied.

## FACTS

For the convenience of the Court, what follows is a brief summary of the facts set forth in the Affidavit of Robert Hermann sworn to September 4, 2003 (the "Hermann Affidavit"), previously submitted in connection with the motion to quash a subpoena for Bagga's records.

The four judgment debtor defendants defaulted on millions of dollars of loans that the Trust's predecessor in interest, Captec Financial Services, made to them in connection with a group of Arby's fast-food restaurants owned and operated by Pratpal (a/k/a "Paul") Bagga in Pennsylvania and Texas. The Trust seeks to execute on default judgments obtained against each of the defendants with respect to those loans. Hermann Affidavit ¶ 3.

Bagga is the wife of Paul Bagga. Together, they own and control dozens of companies, principally in Pennsylvania, in fast food, clothing and other businesses. They are related to, and involved in business ventures with, Paul Bagga's cousin Ravinder Chawla, a prominent real estate developer in Philadelphia who is also in the clothing business with the Baggas (and who is being sued in this Court for selling counterfeit goods, Nike v. Brandmania, 00 Civ. 05148). Hermann Affidavit ¶ 4.

On or about May 20, 2003, this Court granted, over Bagga's opposition, a motion by the Trust for an order compelling Bagga to appear for a deposition. Although the Court ordered the deposition to occur by June 4, 2003, Bagga left the country to travel to India and was not made available for deposition until June 17, 2003.[1] Hermann Affidavit ¶ 5. The deposition commenced on that date; however, Bagga's counsel blocked inquiry concerning Bagga's

---

[1] Excerpts from Bagga's June 17, 2003 deposition are referenced herein as "June:" followed by the page number of the deposition testimony. The entire transcript of the June deposition is annexed as Exhibit 2 to the Hermann Affidavit sworn to September 4, 2003 and submitted on September 5, 2003 in opposition to Bagga's motion to quash the subpoena *duces tecum* issued to Bagga by the Trust dated August 11, 2003.

personal assets. After the parties submitted letter briefs on the propriety of that conduct, this Court issued on July 17, 2003 an order requiring that Bagga resume her deposition and answer "all questions propounded at the deposition of June 17, 2003 as to which she was instructed not to answer on the grounds of 'personal assets or matters' or other grounds of relevancy and answer reasonable follow-up questions." Hermann Affidavit ¶ 6, Exhibit 1.

On August 7, 2003, the Trust resumed Bagga's deposition.[2] Although Bagga's counsel criticizes the questioning at the resumed deposition, no effort was made to terminate the examination or to preclude any of the questioning. Hermann Affidavit ¶ 7. During the course of the two days of deposition testimony, Bagga testified in pertinent part as follows:

She worked at Dunn & Bradstreet after graduating from college and her major in college was business management (June: 32, 33, 34). She was formerly the sole owner of various clothing stores that she operated as a franchisee, and was the president of a company identified as KB Apparel that was set up to deal with her franchises (June: 36, 37, 39). She handled the internal records for KB Apparel (August: 45, 46).

Bagga is the sole owner of the office building in which some of the Bagga family businesses are located (June: 25; August: 24). She is also the sole owner of a real estate company, K & P, which owns real estate and leases it out to some of the Arby's stores (June: 15, 17, 18, 20, 109-111). K & P receives the rent and pays the mortgage (June: 111). Bagga gets any net income from K & P (August: 111, 112). However, she claimed not to remember if she received any net income from K & P in the last three years (August: 112, 113).

---

[2] Excerpts from Bagga's August 7, 2003 deposition are referenced herein as "August:" followed by the page number of the deposition testimony. The entire draft transcript of the August deposition is annexed to the Hermann Affidavit sworn to September 4, 2003 and submitted on September 5, 2003 in opposition to Bagga's motion to quash the subpoena *duces tecum* issued to Bagga by the Trust dated August 11, 2003.

Bagga owned 50% of defendant Jamuna Real Estate, LLC ("Jamuna") a few years ago, but transferred it in 2000 or 2001 to her husband (June: 92, 93, 94). She claimed not to remember whether she received an interest in any other entity in return for the transfer (June: 92, 93, 94). However, after initially invoking her Fifth Amendment right against self-incrimination, Bagga subsequently testified that both Jamuna and K & P were originally co-owned by both her and Paul Bagga, and he then transferred K & P to her entirely and she transferred Jamuna to him entirely (August: 27, 129).

At her June 2003 deposition, Bagga testified she is employed by defendant Bagga Enterprises, Inc. ("Bagga Enterprises") and oversees its billings and payables (June: 52, 53). Her salary is $52,000 per year, which is the only type of financial distribution she receives from Bagga Enterprises (June: 52, 87). She performed the same function for defendant United Management Services, Inc. ("United Management"), the Baggas' management company, for the preceding four to six years (June: 53, 54). During that time, she was paid approximately $36,000 a year by United Management (August: 115, 116)[3]. Her only source of personal income from 2000 through 2002 was the income from United Management (August: 116).

Bagga, with her husband, was in charge of cash. She was responsible for ensuring that the money from all the Bagga Enterprises' Arby's stores was transferred into one management company account, and for handling payments from that account to vendors and trades people (June: 80 - 83, 123). She told the bookkeeper which checks to write (June: 83-89). She "sometimes" consulted Paul Bagga concerning her decisions as to which checks should issue

---

[3] When Bagga resumed her deposition in August, she testified that at that time she was getting a paycheck only from Bagga-owned 21st Century Restaurant Solutions amounting to about $1500 every two weeks (August: 115).

(June: 83, 84). If there was a problem in reconciling the bank statements for Bagga Enterprises, the bookkeeper consulted her (June: 85, 86).

When she wrote checks for Bagga Enterprises in December 2002, Bagga was not an employee of that company, but of United Management (June: 239). She was "in charge of the check writing" (June: 239, 240). She performed the same functions for defendant Welcome Group, determining which checks to release and handling its wire transfers (June: 101, 104).

Bagga also wrote checks for American Merchandising, one of the family's clothing businesses, during the year 2000, among others. She did not dispute that during that period American Merchandising wrote at least a dozen checks to an entity identified as Ten Tigers, owned by the Chawlas, for several million dollars (August: 116, 117; Hermann Affidavit ¶ 10, Exhibit 4). She speculated the money was "probably" for buying merchandise but she was unsure; she had no documentation for the payment, and did not remember seeing any (August: 116, 117).

If the money for one of the Bagga entities was short, Bagga testified, she would put her own money into the account and would reimburse herself when there were sufficient funds (June: 128; August: 75-77). She would tell the bookkeeper to put it down on the company's profit and loss statement as a loan from her when her money went in and as a loan repayment when he wrote a check to her (June: 128, 129; August: 88, 89, 91 - 93). Other than her directive, the bookkeeper did not have to get approval from anyone for these transactions (August: 92).

Bagga testified she personally made a $40,000 loan to United Management on December 4, 2002 which had not been repaid (June: 235 - 238). However, she acknowledged that she signed a $13,500 check to herself as partial repayment of the loan (June: 241 - 244). She decided to repay herself, instead of repaying the Trust or Captec, and did not consult with Paul Bagga

before she did so (June: 252, 253). She claimed the four defendant companies owed her "a lot" of money, but that she did not remember how much (June: 260; August: 90, 91). Other than the $40,000 loan, she might have made some loans to Bagga family-related businesses in the past five years, but she claimed not to remember the companies (August: 86, 87).

When the Bagga businesses needed money, Bagga contacted Hardeep Chawla about obtaining a loan from him (June: 183 - 84). After Paul Bagga arranged the loan, she was the person who talked to Chawla about getting the money and she was the person who went to Chawla's office and picked up checks "[a] couple of times" (June: 183 - 85).

Bagga transferred $362,000 on March 31, 2003 from Commerce Bank into her personal savings account at First Union Bank (August: 94 - 96). She did so, she claimed, because, as a result of this case, the Bank mistakenly attached her personal account at Commerce (August: 94 - 96). The money -- more than one-third of a million dollars -- had been in her Commerce Bank checking account for perhaps two years (August: 95, 96). She had deposited it as a lump sum but she did not remember where she got the money from, although a portion of the money may have been proceeds of an insurance claim (August: 95 - 98). She also transferred $23,000 to her personal checking account as a result of an MBNA credit card promotion which offered the money as an interest-free short-term loan (August: 98-99). Bagga's personal bank account summary reflecting activity in the second quarter of 2003 shows an aggregate of in excess of $400,000. Hermann Affidavit ¶ 10, Exhibit 5.

Bagga used the computer in the office building at 714 Bethlehem Pike to maintain records of her personal accounts (August: 8 - 10). She did not, however, use a computer in the office for any business purpose before May 2003 (August: 109-110). When she used e-mail in the office, she used it for personal as well as business reasons (August: 15). She wrote personal

letters from the office, and she wrote letters from home as well as from the office (August: 12). In sum, Bagga wrote both business and personal correspondence at both her office and her home.

After first invoking and then waiving her Fifth Amendment privilege against self incrimination, Bagga testified that she was the person who made the entries in the computer records in the Bagga office (August: 9, 10, 123). She was the person who prepared the applications for a refinancing of her multi-million dollar residence and a $244,000 loan for the office building she owns (August: 23, 125, 126).

On or about August 11, 2003, the Trust served each of Sovereign Bank, J.P. Morgan Invest, LLC, First Union Bank and Commerce Bank with a subpoena *duces tecum* seeking:

> Any and all records relating to Kushivindar K. Bagga a/k/a Kushi Bagga, including but not limited to, statements of account, checks and endorsements, transaction histories, ledgers, and other such documents regarding and/or relating to all transactions made from January 1, 2000 to the present on any and all bank accounts, certificates of deposit, safe deposit boxes, pledges, documents of title, securities, Treasury Bills, repurchase agreements, notes, bonds, coupons, receivables, collateral, investment and/or commercial paper to which the above party has ownership and/or an interest in.

Memorandum of Law in Support of Non-Party Bagga's Motion to Quash Plaintiff's Third-Party Bank Subpoenae ("Bagga Memorandum"), Exhibit A (copies of all four Bank Subpoenas).

On or about August 22, 2003, Bagga filed a motion to quash the Bank Subpoenas. On or about August 26, 2003 Bagga withdrew and then re-filed the motion to quash the Bank Subpoenas.

Argument

## THE MOTION TO QUASH THE SUBPOENA SHOULD BE DENIED

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides in pertinent part that

"[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim

or defense of any party. . . . Relevant information need not be admissible at the trial if the

discovery appears reasonably calculated to lead to the discovery of admissible evidence."

The liberal relevancy standard applicable to discovery under Rule 26(b)(1) governs

subpoenas as well. *Syposs v. United States*, 181 F.R.D. 224, 226 (W.D.N.Y. 1998). Federal

Rule of Civil Procedure 45(c)(3)(A)(iv) permits a court to quash or modify a subpoena if it

"subjects a person to undue burden," but a movant seeking to quash a subpoena on this basis

bears the "heavy burden of establishing that compliance with the subpoena would be

'unreasonable and oppressive.'" *Composition Roofers Union Local 30 Welfare Trust Fund v.*

*Graveley Roofing Enterprises, Inc.*, 160 F.RD. 70, 72 (E.D. Pa. 1995) (citation omitted); *Wright*

*v. Montgomery County*, 1998 WL 848107 (E.D. Pa. 1998) (Tab 1).[4]

In *Wright v. Montgomery County*, 1998 WL 848107 *2, the Court summarized these

principles governing a motion to quash a subpoena:

> Rule 45(c)(3)(A) of the Federal Rules of Civil Procedure authorizes a
> court to quash or modify a subpoena that subjects a person to undue
> burden. . . . Accordingly, a court may quash or modify a subpoena if it
> finds that the movant has met the *heavy burden* of establishing that
> compliance with the subpoena would be "unreasonable and oppressive." . .

---

[4] Bagga cites a California case, *United States v. American Optical Company*, 39 F.R.D. 580
(N.D. Cal. 1966), for the proposition that the party opposing a motion to quash has the burden to
demonstrate "good cause" for the production of the documents. That proposition is not the law
of this District, as another case cited by Bagga demonstrates. *Davis v. General Accident*
*Insurance Company of America*, 1999 WL 228944 *1 (E.D. Pa. 1999) (Tab 2) ("a court may
quash or modify a subpoena if it finds that the movant has met the heavy burden of establishing
that compliance with the subpoena would be 'unreasonable and oppressive.'")

> Furthermore, Rule 26(b)(1) provides that discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence." . . . Relevancy is to be *broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case.* . . . Rather, discovery requests may be deemed relevant if there is *any possibility that the information may be relevant to the general subject matter of the action.* . . . Although courts have imposed broader restrictions on the scope of discovery when a non-party is targeted . . . *discovery rules are to be accorded broad and liberal construction.* . . . Since the precise boundaries of the Rule 26 relevance standard will depend on the context of the particular action, the determination of relevance is within the district court's discretion. . . .

(citations omitted) (emphasis added).

The scope of discovery under Rules 34 for parties and Rule 45 for nonparties is "virtually coextensive." *Gaskin v. Commonwealth of Pennsylvania*, 1997 WL 734031, page 5 of 5 (E.D. Pa. 1997) (Tab 3).

Bagga cannot meet her "heavy burden" of establishing that the subpoena *duces tecum* is "unreasonable and oppressive." That conclusion is especially compelling here because Bagga's deposition testimony makes clear that she was a business person who employed her free access to the funds of the defendant companies, that she herself drew no distinction between her personal and her business dealings, and that she was incredibly evasive concerning her handling of the finances of the defendant companies.

As the deposition revealed, Bagga had little accountability and exercised great discretion in the disbursement of company funds, in some instances choosing to pay company expenses and in some choosing to "repay" herself for supposed loans that are not supported by any documentation. When Bagga desired that a check issue, she simply directed her assistant to issue it; nothing more than Bagga's instruction was needed.

10

Despite her position of fiscal responsibility, and despite her ownership of various companies throughout her career, she was unfailingly vague in her testimony concerning the handling of millions of dollars in funds over which she had control. She was unable to provide a reason for $7 million that she disbursed to one Chawla-owned company during the year 2000 on behalf of American Merchandising -- a Bagga-owned company -- and she conceded that no documentation existed to support the disbursements. (This is important because her husband claimed that was the amount lost by American Merchandising in an improvident export transaction, and that is why the Trust was not repaid [August: 57 - 60; 63 - 66]). She claimed she might have made some "loans" to Bagga family-related businesses in the last five years, but she could not remember the companies. She claimed the defendant companies owed her "a lot" of money was but could not remember how much.

Bagga was equally hazy concerning the source of funds that she contended were hers, blurring the line between her personal and her business affairs. She has no credible explanation for the sources of large sums of money that are in her personal account. She acknowledged transferring $362,000 from Commerce Bank into her savings account only five months ago but claimed not to recall where the money came from, offering only the weak and partial explanation that less than a third of it may have come from an insurance settlement. Although she testified her income amounted to $52,000 a year, she was nonetheless in a position to make a $40,000 "loan" to United Management in December 2002. The Trust is not required to take Bagga's word for the source of these funds, especially where Bagga's explanations are evasive to the point of being unworthy of belief.

11

As against these facts, Bagga contends only that her privacy rights would be violated by disclosure of the bank account records, and that her "personal financial records should be protected from disclosure because the Bank Subpoenae were issued sole[l]y to subject Mrs. Bagga to undue burden and oppression." Bagga Memorandum at 10. These claims are insupportable.

Bagga, of course, has no standing to contend that the subpoenas addressed to her banks are unduly burdensome to them. *See Chazin v. Lieberman*, 129 F.R.D. 97, 98 (S.D.N.Y. 1990) ("'Ordinarily a party has no standing to seek to quash a subpoena to one who is not a party unless the party claims some personal right or privilege with regard to the documents sought.'") (citation omitted). Moreover, although Bagga may be entitled under some circumstances to have a third-party subpoena quashed where she can demonstrate a privacy interest, Bagga's generalized claim of a privacy interest here does not come close to meeting to meeting her "heavy burden" of demonstrating that the requests are oppressive. *Davis v. General Accident Insurance Company of America*, 1999 WL 228944 *1 (E.D. Pa. 1999) (Tab 2); *Chazin v. Lieberman*, 129 F.R.D. at 98. The critical issue is whether the records sought *are* truly personal, or involve transfers of business funds or other non-personal transactions. Given Bagga's testimony and the Court's prior ruling, the Trust is not required to take Bagga's dubious word.

Moreover, Bagga has effectively forfeited any claim that the discovery of her personal bank records is an unwarranted invasion of her privacy. Bagga has already provided to the Trust certain recent checking and savings account records of accounts in her name, presumably for the purpose of convincing the Trust that she had not engaged in any wrongful transfers. Hermann Affidavit ¶10, Exhibit 5. Having produced those records for the purpose of establishing her innocence, Bagga is hard-pressed to claim now that it is a violation of her privacy to produce

other records of a similar nature. *See Augustine v. Adams*, 169 F.R.D. 664, 670 (D. Kansas 1996) (production of videotape containing discussion of provisions of trust instrument waived whatever privilege might have protected trust instrument itself).

The Trust is not required to seek documents in any specific order. Bagga argues that the Trust has not yet subpoenaed the bank account records of the judgment debtors. Even if that were true (and it is at best partially true), it would be of no consequence. Given Bagga's control over the finances of these companies, it is eminently reasonable for the Trust to seek in the first instance information concerning Bagga's own accounts, once she herself testified that company funds were disbursed to her account.

Bagga's sole "factual" support for her contention that the Trust seeks these bank records solely to harass her is, moreover, contravened by the record. Astonishingly, Bagga claims that her "association with the judgment debtors has been limited to her employment relationship with Defendant United Management which pays her a yearly salary for administrative work she performs for the company, and, as is typical with small struggling enterprises, she has loaned personal funds to the judgment debtors so that they could meet their operating expenses." Bagga Memorandum at 4. This facile explanation of Bagga's relationship with the defendant companies completely ignores her own deposition testimony demonstrating that she was the primary actor in determining which checks should issue -- including those payable to herself -- and presumes that it is "typical" that an employee with a "limited" administrative relationship to the company would make lump sum loans to the company and "repay" herself at will without the need for supporting documentation.

Finally, Bagga contends that the Trust can obtain the financial information it seeks from other sources, citing Bagga's own deposition testimony that her putative "loan" to United

13

Management of $40,000 "as well as the fact that they are loans" would be reflected in that

company's profit and loss statement. Bagga Memorandum at 10, n.9. This claim ignores that

the profit and loss statements for these companies were likely prepared under the direction of, or

using information obtained from, Bagga herself. Bagga was consistently evasive in her

deposition concerning the financial information that the Trust now seeks through her bank

records. The Trust should not be forced to rely upon company records that Bagga may have had

a hand in preparing.

By contrast, the bank records are indisputably reliable and relevant. Even if some

information can be obtained through alternative sources, it can only be verified by cross-

checking against bank records prepared by a neutral third party -- the bank itself. It is similarly

unpersuasive for Bagga to argue that the Trust should instead depose the office employee who, at

her direction, disbursed the partial loan repayment to her (Bagga Memorandum at 10 - 11; June:

101, 102; August: 92).[5]

Bagga's counsel's brief distorts governing case law. Bagga relies principally upon *Hecht*

*v. Pro-Football, Inc.*, 46 F.R.D. 605 (D.C. 1969) for the proposition that "[t]he financial

information of non-parties to a lawsuit is private and not routinely available for discovery."

Bagga Memorandum at 9. Her reliance is misplaced. In *Hecht*, the defendant was a league of

professional football clubs. The plaintiffs, individuals who were attempting to organize a

---

[5]  Bagga also complains about the Trust's single question at the end of her deposition concerning
her relationship with Ravinder Chawla. Bagga Memorandum at 4, n.6. However, Mrs. Bagga
testified that she participated in arranging and procuring loans from the Chawlas for the debtor
companies, that she sees Ravinder Chawla alone a great deal (June: 187 - 89; August: 59, 101)
and that Ravinder Chawla had assured her he would make good on the money the Baggas lost in
a business transaction with him if the situation turned around [August: 67, 68]). Because the
Chawlas and the Baggas had strong financial connections to each other, it would be relevant if
Bagga herself had an intimate personal relationship with Ravinder. If she did, it would further
undermine the Bagga claim that the judgment debtors were unable to repay the loans due to a
failed arms-length business transaction with Ravinder Chawla.

professional football club in Washington, D.C., claimed that they were prevented from doing so because the authorities that operated the stadium in the D.C. area had made an exclusive agreement for the use of that stadium with the defendant. In an effort to prove the damages it had sustained by its inability to organize a football club, the plaintiff issued a third party subpoena to the Miami Dolphins football club, as a member of a professional football league, seeking its profit and loss statements and the prices paid for partnership interests in the club. The court held that, although the Miami Dolphins were "allied" with the defendant, that fact alone was not enough to obtain its private financial records. Here, Bagga is demonstrably more than "allied" with the defendants. She was the primary actor in the movement of the defendant companies' funds, and her own deposition testimony establishes that she moved those funds to her own personal accounts.

*United States v. Federation of Physicians and Dentists, Inc.*, 63 F. Supp.2d 475 (D. Del. 1999), is similarly unpersuasive to support Bagga's contention. In that case, the court rejected the Government's efforts to procure financial information from third-party surgeons in a Sherman Act case alleging a price-fixing conspiracy case. The Government's theory was that the financial information would enable it to demonstrate that the surgeons' claims that they refused Blue Cross's fee reductions on the basis of quality of patient care was merely a pretext. The court reasoned that the Government's pretext argument was speculative, and that the information sought was only remotely connected to the Government's claims against the defendants. Here, as shown, the bank records are sought to explore precisely the issue posed by this case: whether Bagga's unsupervised and unfettered access to the defendant companies' bank accounts resulted in her wrongful transfer of company funds.

15

*Hearst/ABC-Viacom Entertainment Services v. Goodway Marketing, Inc.*, 1993 WL
150350 (E.D. Pa. 1993) (Tab 4), also relied upon by Bagga's counsel, instead supports the
Trust's effort to seek discovery.  In *Hearst*, the Court denied a motion to quash a subpoena *duces
tecum* seeking the source of the debtors' payments to their attorney for his legal fees.  The Court
held that a judgment creditor was entitled to the "examination of third parties in relation to the
financial affairs of the judgment debtor" and concluded that disclosure of the source of the
payments was precisely that type of inquiry.  Here, similarly, the Trust seeks Bagga's financial
records for the purpose of examining the relationship of her finances to that of the defendants.

    *Strick Corporation v. Thai Teak Products Company, Ltd.*, 493 F. Supp. 1210 (E.D. Pa.
1980) and *Costamar Shipping Co., Ltd. v. Kim-Sail, Ltd.*, 1995 WL 736907 (S.D.N.Y. 1995)
(Tab 5), which Bagga also relies upon, are simply inapposite.  Bagga's counsel cite both,
apparently for the proposition that the Trust is not entitled to the discovery sought until and
unless it can make a factual showing as to an *alter ego* relationship between Bagga and the
defendant companies.  *Strick*, however, involved the Court's consideration of the
constitutionality of the Pennsylvania state law garnishment procedures, holding that a third
party's due process rights were violated when its property was garnished based solely on the
allegation of an *alter ego* relationship.  Bagga offers no support for that proposition that the
disclosure of three sets of tax returns and her computer records is subject to the heightened
scrutiny afforded the garnishment of property.

    Bagga's reliance upon *Costamar* is similarly unavailing.  In that case, the subpoena *duces
tecum* sought bank records and other financial records of a third party based solely on the
allegation that the third party -- which was the defendant's agent -- had assets commingled with
the defendant.  The court held that although the commingling of the assets might lead to an

inference that there had been a transfer of funds, that fact alone was not enough to establish a prima facie case of *alter ego*. In addition, the court found notable that the defendant was indebted to the third party, undermining the claim that the third party used the defendant for its own private ends.

Here, in contrast, Bagga's own testimony establishes transfers between the business accounts and her own, and she cannot satisfactorily account for more than $400,000 in her personal account, which is what the partial recent records show. If anything, *Costamar* supports denial of Bagga's motion to quash the subpoena in this case. Other unproduced records likewise may bear on additional transfers and diversions.

It is not persuasive for Bagga to argue that "no evidence of impropriety . . . has been uncovered" and that the Trust should be required to present evidence of an *alter ego* relationship between Mrs. Bagga and the judgment debtors" <u>before</u> obtaining the discovery sought.   Unless Bagga is required to comply with the subpoena, the Trust will be unable to understand fully whether she has done it a wrong. *Grasselli Chemical Co. v. National Aniline & Chemical Co.,* 282 F. 379, 381 (S.D.N.Y. 1920).  The Trust is not required to demonstrate an *alter ego* relationship <u>before</u> obtaining the requested discovery, although there is much evidence already of such a relationship.   That is putting the cart well ahead of the horse.

## CONCLUSION

For the reasons stated herein, this Court should deny Bagga's motion to quash in its entirety.

Respectfully submitted,

Thacher Proffitt & Wood LLP

by: Robert Hermann (Attorney I.D. # RH 9994)
*Admitted Pro Hac Vice*
*Attorneys for Plaintiff FL Receivables Trust 2002-A*
50 Main Street
White Plains, NY  10606
(914) 421-4100

Obermayer Rebmann  Maxwell & Hippel LLP
*Attorneys for Plaintiff FL Receivables Trust 2002-A*
One Maxwell Center - 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103

Dated:  September 8, 2003

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 848107
**(Cite as: 1998 WL 848107 (E.D.Pa.))**
**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Robert E. WRIGHT, Sr.,
v.
MONTGOMERY COUNTY, et al.

**No. CIV. A. 96-4597.**

Dec. 4, 1998.

*MEMORANDUM AND ORDER*

.../delivery.html?dataid=B00558000000244100039244439B9FE2A8FC46BDBCC&dest=atp&fo 9/8/2003

HUTTON .

*1 Presently before this Court is the Motion of Plaintiff Robert E. Wright, Sr. to Quash Subpoena Issued to G.E. Capital Mortgage Services, Inc. (Docket No. 43), Defendants Montgomery County, et al.'s Motion for Sanctions and Response to Plaintiff's Motion to Quash Subpoena to G.E. Capital Mortgage Services, Inc. (Docket No. 48), Plaintiff's reply thereto (Docket No. 50), the Defendants Response to Plaintiff's Motion to Quash Subpoena to Sheilah Wright (Docket No. 54) and the Montgomery County Defendants' surreply thereto (Docket No. 58), and the Defendants' Motion to Compel Answers to Interrogatories and Production of Documents (Docket No. 51), the Plaintiff's response thereto (Docket No. 61), and the Defendants' Response thereto (Docket No. 65), Plaintiff's Motion to Quash Subpoena and Strike the Deposition of Lee Holmes, Sr. (Docket No. 44), and the Defendants' response thereto (Docket No. 53), the Plaintiff's Motion for Protective Order to Cease Discovery (Docket No. 45), the Defendants' response thereto (Docket No. 55), the Plaintiff's reply thereto (Docket No. 62), and the Defendants' supplemental response thereto (Docket No. 63), the Plaintiff's Motion in Limine (Docket No. 56), and the Defendants' response thereto (Docket No. 64).

## I. BACKGROUND

On June 25, 1996, Plaintiff Robert E. Wright, Sr. ("Wright" or "Plaintiff") brought this employment discrimination action against Defendants Montgomery County, Richard S. Buckman, Commissioner of Montgomery County and Joseph M. Hoeffel, III, Commissioner of Montgomery County ("Montgomery County Defendants" or "Defendants"). In his complaint, Wright alleges, in substance, that the Defendants terminated his employment as Director at the Montgomery County Department of Housing Services ("MDHS") because he is black, and seeks damages.

Wright was employed by Montgomery County for approximately seventeen (17) years in the Department of Housing Services. He was promoted to the Director of the Department of Housing Services of Montgomery County on July 1, 1994.

On April 12, 1996, following an investigation by the Housing of Urban Development ("HUD"), Wright was suspended from his position as Director. Wright alleges that he was officially terminated from the position on June 13, 1996. Wright alleges that the reason for his termination was because he is black. He also alleges that he has suffered damages as a result of his firing.

## II. DISCUSSION

### A. Plaintiff's Motion to Quash Subpoena to G.E. Capital Mortgage Services, Inc.

*2 On October 6, 1998, Plaintiff Robert E. Wright, Sr. filed the instant motion requesting that this Court quash subpoena served upon non-party G.E. Capital Mortgage Services, Inc. ("GE Capital") by the Defendants. The Defendants served the subpoena on GE Capital on September 28, 1998. The subpoena commands that GE Capital produce the following documents:
Any and all documents relating or referring to Plaintiff, Robert E. Wright, Sr. and Sheilah D. Wright to include the entire loan file which shall include but are not limited to the following: credit files, documentation files, correspondence files, collateral files, financial statements tax returns and appraisals as related to the financing of the first mortgage on 2309 Oakland Drive, Norristown, PA 19403.

(Subpoena; Schedule A.) Wright objects to the production of such information arguing that its

production is unduly burdensome. Wright, however, makes no attempt to show that the subpoena issued to GE Capital subjects him to an undue burden; rather he argues that "the instant subpoena is not intended to lead to or result in discoverable evidence which would be admissible at trial." [FN1] / (Pl.'s Mem. in Supp. of Motion to Quash Subpoena at 2.)

FN1. In his Reply filed on October 23, 1998, the Plaintiff also argues that Defendants' request for documents from G.E. Capital Mortgage Services, Inc. should be "mooted" because GE Capital has already produced the "requested documents." The Defendants, however, disagree with this contention.

Rule 45(c)(3)(A) of the Federal Rules of Civil Procedure authorizes a court to quash or modify a subpoena that subjects a person to undue burden. Fed.R.Civ.P. 45(c)(3)(A)(iv), 28 U.S.C. (1994) ; *see Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enter.*, 160 F.R.D. 70, 72 (E.D.Pa.1995) (Joyner, J.)(stating same). Accordingly, a court may quash or modify a subpoena if it finds that the movant has met the heavy burden of establishing that compliance with the subpoena would be "unreasonable and oppressive." *Id.* (citing *Heat & Control, Inc. v. Hester Indus.*, 785 F.2d 1017, 1023 (Fed.Cir.1986) ).

Furthermore, Rule 26(b)(1) provides that discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1) . Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) . Rather, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action. *Id.*

Although courts have imposed broader restrictions on the scope of discovery when a non-party is targeted, *see Thompson v. Glenmede Trust Co.,* No. CIV. A. 92-5233, 1995 WL 752422, at *2 n. 4 (E.D.Pa. Dec.19 1995) (Hutton, J.), discovery rules are to be accorded broad and liberal construction, *see American Health Sys. v. Liberty Health Sys.,* No. 90-3112, 1991 WL 30726, *2 (E.D.Pa. Mar.5, 1991) (Naythons, M.J.). Since the precise boundaries of the Rule 26 relevance standard will depend on the context of the particular action, the determination of relevance is within the district court's discretion. *See Thompson,* 1995 WL 752422, at *2 n. 4 (district courts are empowered with "broad discretion to manage discovery") (quoting *Sempier v. Johnson & Higgins,* 45 F.3d 724, 734 (3d Cir.) , *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995) ).

*3 The records at issue could lead to admissible evidence since Plaintiff was suspended from his position as Director at the Montgomery County Department of Housing Services following an investigation of corruption within his department. The Defendants allege that the Plaintiff "corruptly abused his public position ... to selfishly benefit himself and his 50/50 partner in Northtowne Realty and attorney Joseph Pizonka in conflict of interest ridden real estate deals." (Defs. 'Surreply and Motion for Sanctions at 1 n. 1.) The Defendants also allege that the Plaintiff committed perjury in his deposition by stating that he had nothing to do with GE Capital, did not attend any settlement and did not sign any loan documents. [FN2] / ( *Id.* at 3.) In light of the broad and liberal construction which the discovery rules are to be accorded, *see American Health Sys.,* 1991 WL 30726, at *2, and given the Court's discretion in managing discovery, *see Thompson,* 1995 WL 752422, at * 2 n. 4 (quoting *Sempier,* 45 F.3d at 734), the Court finds that Defendants' request to documents in GE Capital's possession pursuant to Schedule A of the subpoena is reasonably calculated to lead to admissible evidence. Accordingly, the Court overrules the Plaintiff's objection regarding GE Capital's obligation

to produce documents pursuant to the subpoena. [FN3] /

FN2. The Defendants allege that Montgomery County Court records show the Plaintiff and his wife obtained a mortgage in both their names on their home from GE Capital.

FN3. On October 26, 1998, the Defendants filed their "Response to Plaintiff's Motion to Quash Subpoena to Sheilah Wright" (Docket No. 54). However, this Court is not aware of such a motion filed by the Plaintiff. Furthermore, in their response, the Defendants request that this Court "order Sheilah Wright to comply with the subpoena duly served upon her and to appear for her deposition within ten (10) days of this Order and produce the subpoenaed documents to Defendants' counsel within five (5) days of this Order." The Defendants, however, fail to attach a copy of the subpoena with their response. The Court is unwilling to order a non-party to comply with a subpoena that it has not yet seen. Accordingly, the Defendants' request is denied with leave to renew.

*B. Defendants' Motion for Sanctions for Costs and Attorney's Fees in Responding to Plaintiff's Motion to Quash Subpoena to G.E. Capital Mortgage Services, Inc.*

The Defendants filed the instant motion on November 4, 1998. In their motion, the Defendants allege that the Plaintiff "improperly advised GE Capital not to produce documents responsive to Defendants' subpoena." (Defs.' Surreply and Motion for Sanctions at 3.) As such, the Defendants move the Court to award the Defendants attorney's fees and costs associated with filing this motion. The Defendants, however, fail to provide any authority which compels this Court to grant their request. Accordingly, the Court refuses to award sanctions against the Plaintiff for GE Capital's refusal to honor the subpoena. *Cf. Gen'l Ins. Co. of America v. Eastern Consol. Utilities, Inc., 126 F.3d 215, 220 (3d Cir.1997)* ("A non-party, by definition, is not a participant in the litigation and, when a non-party refuses to provide discovery, no claim has been asserted by or against it.").

*C. Defendants' Motion to Compel Answers and Interrogatories and Production of Documents*

The Defendants filed the instant motion on October 23, 1998, seeking an Order to compel the Plaintiff to respond fully and completely to their Interrogatories, to respond to Document Requests and to produce all responsive documents pursuant to the discovery requests served on Plaintiff on September 16, 1998, and for sanctions. The Plaintiff argues, in substance, that the Defendants do not satisfy "Local Rule 24" governing such motions. First, the Plaintiff asserts that the Defendants failed to attach "a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute." Second, the Plaintiff alleges that the Defendants failed "to attach to their motion the interrogatories and request for production of documents as required by the Local Rules."

*4 Local Rule 24 does not exist. Rule 37(a)(2)(B) of the Federal Rules of Civil Procedure provides that if a party fails to respond to a proper discovery request, the discovering party may move for an order compelling the requested discovery. The motion, however, must include a "certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action." Fed.R.Civ.P. 37(a) (2)(B) . This requirement is mirrored in Local Rule 26.1(f) which provides that no motion governing discovery shall be made "unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute." E.D.Pa.R.Civ.P. 26.1(f). Moreover, Local Rule 26.1(g) provides:
A routine motion to compel answers to interrogatories or to compel compliance with a request for production under Fed.R.Civ.P. 34 , wherein it is averred that no response or objection has been timely

served, need have no accompanying brief, and need have no copy of the interrogatories or Rule 34 attached. The Court may summarily grant or deny such motion without waiting for a response.

E.D.Pa.R.Civ.P. 26.1(g). "[T]he Rule is intended to reduce the burden on the filing party in generally routine refusals to respond to discovery." *Ricci v. RCP/JAS, Inc.*, No. CIV. A. 97-7334, 1998 WL 372315, at *1 (E.D.Pa. Jun.17, 1998) .

In the instant case, the Defendants have included the required certification, and the Court concludes that sufficient communication has taken place between the parties in an attempt to resolve this discovery dispute. Nonetheless, without reviewing a copy of the Interrogatories and a Request for Production of Documents, this Court is reluctant to issue an order compelling the Plaintiff to respond to them. As the district court determined in *Ricci*, only the most routine of requests will be relieved of the burden of attaching a copy of such requests with a motion to compel. *See Ricci*, 1998 WL 372315, at *1. Accordingly, the Defendants' motion is denied with leave to renew.

## D. Plaintiff's Motion to Quash Subpoena and Strike the Deposition of Lee Holmes, Sr.

On October 8, 1998, the Plaintiff filed the instant motion requesting that this Court quash subpoena served upon non-party Lee Holmes, Sr. ("Holmes") and strike the deposition served by the Defendants on him. The Defendants served the subpoena on Holmes on October 2, 1998. The subpoena commands, in substance, that Holmes produce all documents pertaining to the Plaintiff, his employment with Montgomery County, his business affiliations, his real estate holdings and any documents relating to work or purchases for those real estate properties. ( *See* Subpoena; Schedule A.) Also requested are documents pertaining to any HUD and/or MDHS properties in Montgomery County, also documents pertaining to specific real estate properties, documents referring to certain individuals and entities and documents pertaining to various investigations conducted by federal agencies. ( *Id.* )

**\*5** Wright objects to the production of such information on grounds that the Defendants request such information in "bad faith." (Pl.'s Mem. in Supp. of Motion to Quash Subpoena at 2.) Besides this conclusory statement, the Plaintiff offers little to support his contention. In light of the broad and liberal construction which the discovery rules are to be accorded, *see American Health Sys.*, 1991 WL 30726, at *2, and given the Court's discretion in managing discovery, *see Thompson*, 1995 WL 752422, at *2 n. 4 (quoting *Sempier*, 45 F.3d at 734), the Court finds that Defendants' request to documents in Holmes's possession pursuant to Schedule A of the subpoena is reasonably calculated to lead to admissible evidence. *See supra* Part II.A. Accordingly, the Court overrules the Plaintiff's objection regarding Holmes's obligation to produce documents pursuant to the subpoena. Furthermore, because the Plaintiff fails to elaborate on his request to strike the deposition of Holmes, that request is denied.

## E. Plaintiff's Motion for Protective Order to Cease Discovery

On October 13, 1998, the Plaintiff filed the instant motion moving this Court pursuant to Rule 26 and Rule 45 of the Federal Rules of Civil Procedure to issue a protective order to cease further discovery in this case by the Defendants. The Plaintiff argues that "most, if not all, of the depositions and document requests made by the defendants do not and can not lead to discoverable evidence which would be admissible in this matter." To support this contention, the Plaintiff refers the Court to his previously filed motions to quash subpoenas as illustrative "improper and violative" nature of the Defendants' discovery requests. Besides this, the Plaintiff neglects to explain how any specific

discovery request will not lead to discoverable evidence which would be admissible in this case.

A party seeking an order protecting certain discovery from disclosure must establish that "good cause" exists for the protective order. *Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir.1994)*. While true that a district court may issue an order to protect a person from "annoyance, embarrassment, oppression, or undue burden or expense....," Fed.R.Civ.P. 26(c), the movant has the heavy burden of proving that a protective order is "particularly needed to obviate a significant harm; broad allegations of harm will not suffice." *Schofield v. Trustees of Univ. of Pennsylvania, 161 F.R.D. 302, 303 (E.D.Pa.1995)*. If the Plaintiff objects to a particular discovery request of the Defendants, he should file an appropriate motion explaining with particularity how such evidence fails to fall within the scope of discoverable evidence. [FN4] / As such, the Court refuses the Plaintiff's invitation to issue a blanket cease of discovery order in the instant matter.

FN4. Regarding specifically the Plaintiff's Motion to Quash Subpoena Issued to GE Capital, the Court has already found that it is likely to lead to discoverable evidence which would be admissible in this case. *See supra* Part II.A.

### F. Defendants' Motion to Compel and Extend Discovery, to Enforce Subpoenas and for Sanctions

*6 On October 30, 1998, the Defendants filed the instant motion in response to the Plaintiff's Motion for Protective Order to Cease Discovery. In their motion, besides opposing the Plaintiff's motion, the Defendants move this Court to compel and extend discovery, to enforce subpoenas and for sanctions. The form of order form, however, accompanying their motion refers only to sanctions. The form of order form accompanying their supplemental response to Plaintiff's Motion to Quash Subpoena refers to an extension of discovery. Local Rule 7.1(a) provides that:
Every motion shall be accompanied by a form of order which, if approved by the Court, would grant the relief sought by the motion. Every response in opposition to a motion shall be accompanied by a form of order which, if approved by the Court would deny or amend the relief sought by the motion.

E.D.Pa.R.Civ.P. 7.1(c). As such, this Court only addresses the issue of sanctions and extending the discovery deadline.

### 1. Sanctions

In their motion, the Defendants allege that the Plaintiff has failed to respond to interrogatories, appear for a deposition or provide complete documents in response to a request for documents. As such, the Defendants move this Court for an order requiring the Plaintiff to pay the fees and costs incurred in their response to "Plaintiff's instant motion."

The Court denies Defendants' Motion for Sanctions including the cost of attorney's fees associated with filing this motion. Such fees are appropriate under Rule 37(a)(4)(A),
unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(a)(4)(A). Considering the hostility displayed by the parties to this action as illustrated by the quantity and content of the motions filed with this Court concerning discovery and the vast amounts of discovery requests by the Defendants, this Court finds that the objections raised

in Plaintiff's instant motion are substantially justified. [FN5] / Accordingly, the Court denies Defendants' request for sanctions as well as reasonable attorney's fees associated with filing this Motion for Sanctions.

FN5. Regarding the Defendants' contention that the Plaintiff has not complied in good faith with their discovery requests, the Defendants should file an appropriate motion explaining with specificity how such conduct violates the Federal Rules of Civil Procedure. Moreover, such a motion should be accompanied with an appropriate form of order pursuant to Local Rule 7.1(a).

## 2. *Motion to Extend Discovery*

Under Rule 16(b) of the Federal Rules of Civil Procedure , the Court may only modify the Scheduling Order upon a showing of good cause. Fed.R.Civ.P. 16(b) . The Advisory Committee Notes to Rule 16 provide that "the court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension." In order to establish good cause, the Defendants should demonstrate that a more diligent pursuit of discovery was impossible. *McElyea v. Navistar Int'l Trans. Corp., 788 F.Supp. 1366, 1371 (E.D.Pa.1991)* , aff'd. without opinion, 950 F.2d 723 (3d Cir.1991) . In light of the complexity of the case as well as the apparent lack of cooperation by the Plaintiff, the Defendants have sustained their burden as to the additional time needed to complete discovery. Accordingly, because the Court finds that the Defendants have shown good cause, the Defendants' motion is hereby granted.

## G. *Plaintiff's Motion in Limine*

*7 On November 2, 1998, the Plaintiff filed the instant motion seeking, in substance, "an Order prohibiting Defendants from either questioning Plaintiff or introducing any testimony" pertaining to the Plaintiff's alleged conflicts of interests, mismanagement, fraudulent transactions, corrupt business dealing and other misconduct, while he led the Montgomery County Department of Housing Services ("MDHS"). The Plaintiff argues that such evidence is inadmissible to the instant case because it does not tend to prove or disprove any fact relevant to determining whether the Defendants violated Plaintiff's rights. The Plaintiff argues, in the alternative, that the danger of unfair prejudice from such evidence substantially outweighs the probative value of the proffered evidence.

Under Federal Rule of Evidence 401 , " 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." " 'The standard of relevance established by [ Rule 401 ] is not high,' *Carter v. Hewitt*, 617 F.2d 961, 966 (3d Cir.1980) , and once the threshold of logical relevancy is satisfied the matter is largely within the discretion of the trial court, *see Hamling v. United States, 418 U.S. 87, 124-25, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974)* ." *United States v. Steele, 685 F.2d 793, 808 (3d Cir.)* , cert. denied, *Mothon v. United States,* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982) .

Under Federal Rule of Evidence 403 , relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." " Rule 403 does not act to exclude any evidence that may be prejudicial, but only evidence the prejudice from which substantively outweighs its probative value. Prejudice within the meaning of Rule 403 involves identifying a special damage which the law finds impermissible." Charles E. Wagner, *Federal Rules of Evidence Case Law Commentary*, 145 (1996-97) (footnotes omitted).

In this action, the Plaintiff alleges that he was improperly terminated as Director of the MDHS for racial reasons. The Defendants contend, however, that termination was justified because an HUD Report detailed Plaintiff Wright's conflict of interest, mismanagement and other misconduct while he led the MDHS's federally funded housing programs. Montgomery County has also filed an additional counterclaim against the Plaintiff for negligence, fraud and misrepresentation. Any evidence supporting a justification for the termination of the Plaintiff from his position as Director of the MDHS is highly probative and therefore outweighs any possible prejudicial value.

An appropriate Order follows.

## ORDER

AND NOW, this 3rd day of December, 1998, upon consideration of the Motion of Plaintiff Robert E. Wright, Sr. to Quash Subpoena Issued to G.E. Capital Mortgage Services, Inc. (Docket No. 43), Defendants Montgomery County, et al.'s Motion for Sanctions and Response to Plaintiff's Motion to Quash Subpoena to G.E. Capital Mortgage Services, Inc. (Docket No. 48), Plaintiff's reply thereto (Docket No. 50), the Defendants Response to Plaintiff's Motion to Quash Subpoena to Sheilah Wright (Docket No. 54) and the Montgomery County Defendants' surreply thereto (Docket No. 58), and the Defendants' Motion to Compel Answers to Interrogatories and Production of Documents (Docket No. 51), the Plaintiff's response thereto (Docket No. 61), and the Defendants' Response thereto (Docket No. 65), Plaintiff's Motion to Quash Subpoena and Strike the Deposition of Lee Holmes, Sr. (Docket No. 44), and the Defendants' response thereto (Docket No. 53), the Plaintiff's Motion for Protective Order to Cease Discovery (Docket No. 45), the Defendants' response thereto (Docket No. 55), the Plaintiff's reply thereto (Docket No. 62), and the Defendants' supplemental response thereto (Docket No. 63), the Plaintiff's Motion in Limine (Docket No. 56), and the Defendants' response thereto (Docket No. 64), IT IS HEREBY ORDERED that:

*8 (1) Plaintiff's Motion to Quash Subpoena Issued to G.E. Capital Mortgage Services, Inc. is DENIED;

(2) Defendants' Motion for Sanctions of costs and reasonable attorney's fees associated with responding to Plaintiff's Motion to Quash Subpoena to GE Capital is DENIED;

(3) Defendants' Motion to Compel Sheilah Wright to Comply with the Subpoena and to Appear for a Deposition is DENIED with leave to renew;

(4) Defendants' Motion to Compel Answers to Interrogatories and Production of Documents is DENIED with leave to renew;

(5) Plaintiff's Motion in Limine is DENIED;

(6) Plaintiff's Motion to Quash Subpoena Issued to Lee Holmes, Sr. and Strike the Deposition of Lee Holmes, Sr. is DENIED;

(7) Plaintiff's Motion for Protective Order to Case Discovery is DENIED; and

(8) Defendants' Motion to Compel and Extend Discovery, to Enforce Subpoenas and For Sanctions is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that:

This Court's June 26, 1998 Amended Scheduling Order is amended as follows:

(a) All discovery shall be completed on or before *March 1, 1999,* and all dispositive motions filed not later than two (2) weeks prior to the close of discovery; and

(b) All other deadlines will be deferred by ninety (90) days from the date of this Order.

1998 WL 848107, 1998 WL 848107 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1999 WL 228944
**(Cite as: 1999 WL 228944 (E.D.Pa.))**
H
Only the Westlaw citation is currently available.


United States District Court, E.D. Pennsylvania.

William F. DAVIS,
v.
GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA and William Jenkins.

**No. CIV. A. 98-4736.**

April 15, 1999.

*MEMORANDUM AND ORDER*

HUTTON .

*1 Presently before the Court are Defendants' Motion for Entry of a Protective Order (Docket No. 14), Plaintiff William Davis' reply (Docket No. 18), and Defendants' sur reply thereto (Docket No. 19). For the reasons stated below, the Defendants' motion is DENIED.

## I. BACKGROUND

Defendant General Accident Insurance Company of America ("General Accident") employed Plaintiff, William Davis, for fifteen years in its Information Services Department. Plaintiff consistently received high performance evaluations. The Plaintiff, an African-American, reported to John Cousins. Cousins reported to Defendant William Jenkins.

In May 1996, General Accident terminated Cousins for complaining to the EEO Department that: (1) Jenkins made racist remarks; (2) blocked attempts to promote Davis; and (3) falsely accused Davis of not being qualified for promotions. Following the termination of Cousins, General Accident instructed Davis to report to the EEO Department. Davis told the Department what he knew concerning Cousins' allegations. General Accident did not take any action against Jenkins.

Following this meeting with the EEO Department, General Accident denied Davis several promotions. Due to the threatening atmosphere and his belief that there was no future for him at General Accident, Plaintiff terminated his employment in September 1997. Subsequently, on the December 29, 1997, Plaintiff filed a four- count complaint against General Accident and Jenkins. The four counts are: (1) a claim under 42 U.S.C. § 1981 --Count I; (2) a claim under 42 U.S.C. § 1985 --Count II; (3) a claim under 42 U.S.C. § 1986 --Count III; and (4) a retaliation claim under Title VII--Count IV.

During the time that General Accident employed Plaintiff, Derrick Coker worked as in-house counsel for the Law Offices of Ralph L. Herbst, II, one of the in- house legal offices that defended insureds of General Accident. Coker, who is also an African-American, alleges that Herbst harassed him based upon his race. Coker filed a grievance in May 1994 with General Accident's Human Resources Manager. Coker filed a complaint against General Accident in *Coker v. General Accident Insurance Co.*, No. CIV.A.97-6321 (E.D.Pa.). Coker later settled his dispute with General Accident.

Plaintiff has now subpoenaed Alan Epstein, Esquire. Epstein was Coker's attorney in his lawsuit against General Accident. The subpoena seeks "[a]ll non-privileged records, pleadings, documents, files, or other documents within [Epstein's] possession or control referring or relating to William F. Davis and the matter captioned at *Derrick Coker v. General Accident Insurance Company*, NO. 97-CV-7321 (E.D.Pa.1998)." On February 24, 1999, the Defendants filed this motion for a protective order.

## II. STANDARD

Under the Federal Rules of Civil Procedure and in the United States Court of Appeals for the Third Circuit, district courts have broad discretion to manage discovery. *See Sempier v. Johnson,* 45 F.3d 724, 734 (3d Cir.1995) . Rule 45(c)(3)(A) of the Federal Rules of Civil Procedure authorizes a court to quash or modify a subpoena that subjects a person to undue burden. *See* Fed.R.Civ.P. 45(c)(3)(A)(iv) ; *see also* Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enter., 160 F.R.D. 70, 72 (E.D.Pa.1995) . Accordingly, a court may quash or modify a subpoena if it finds

that the movant has met the heavy burden of establishing that compliance with the subpoena would be "unreasonable and oppressive." *Id.*

**\*2** Furthermore, Rule 26(b)(1) provides that discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1) . Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case. *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) . Rather, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action. *See id.* As this Court has noted, "[r]elevance is broadly construed and determined in relation to the facts and circumstances of each case." *Hall v. Harleysville Ins. Co.,* 164 F.R.D. 406, 407 (E.D.Pa.1996) . Once the party opposing discovery raises its objection, the party seeking discovery must demonstrate the relevancy of the requested information. *See Momah v. Albert Einstein Med. Ctr.,* 164 F.R.D. 412, 417 (E.D.Pa.1996) . The burden then shifts back to the objecting party, once this showing is made, to show why the discovery should not be permitted. *See id.*

Courts have imposed broader restrictions on the scope of discovery when a non- party is targeted. *See Thompson v. Glenmede Trust Co.,* No. CIV. A.92-5233, 1995 WL 752422, at \*2 n. 4 (E.D.Pa. Dec.19 1995) (Hutton, J.). Nevertheless, discovery rules are to be accorded broad and liberal construction. *See American Health Sys. v. Liberty Health Sys.,* No. CIV.A.90-3112, 1991 WL 30726, \*2 (E.D.Pa. Mar.5, 1991) . Because the precise boundaries of the Rule 26 relevance standard will depend on the context of the particular action, the determination of relevance is within the district court's discretion. *See Thompson,* 1995 WL 752422, at \*2 n. 4.

## III. *DISCUSSION*

A. *Standing*

Before the Court addresses the merits of Defendants' motion, the Court must first consider Plaintiff's argument that the Defendants do not even have standing to object to a subpoena of Mr. Epstein, a non-party. Ordinarily, only the non-parties whom were served with the subpoenas may move to have them quashed under Federal Rule of Civil Procedure 45(c)(3)(A) . *See Smith v. Midland Brake, Inc.,* 162 F.R.D. 683, 685 (D.Kan.1995) ; *United States v. Urban Health Network, Inc.,* No. CIV.A.91-5976, 1992 WL 164950, at \*1 n. 1 (E.D.Pa. July 6, 1992) ; *Sneirson v. Chemical Bank,* 108 F.R.D. 159, 161 (D.Del.1985) . An exception exists, however, where a party claims "some personal right or privilege in respect to the subject matter of a subpoena duces tecum directed to a nonparty." *Dart Indus., Inc. v. Liquid Nitrogen Proc. Corp. of Cal.,* 50 F.R.D. 286, 291 (D.Del.1970) .

**\*3** While the Defendants do not specifically address whether they allege any personal right or privilege in the subject matter of the subpoenas, this Court finds that they have standing to challenge the subpoena of Mr. Epstein. In their argument requesting a protective order, Defendants claim that the subpoenas involve the production of documents protected by the attorney-client privilege. *See Florida v. Jones Chems., Inc.,* No. CIV.A.90-875, 1993 WL 388645, at \*2 (1993) (finding that movants had standing to assert their claims of attorney-client and work product privilege with respect to the testimony and documents sought in the subpoena directed to a non-party). Moreover, Defendants allege some personal right in the documents produced during the *Coker* matter. *See Dart Indus.,* 50 F.R.D. at 291-92 (finding that movant had standing to challenge subpoena because, while movant did not assert any personal privilege with respect to the documents requested in the subpoena, it did aver that some of these documents were "secret and confidential" and produced under

protective orders limiting their disclosure). Accordingly, the Court is satisfied that the Defendants have standing to challenge the subpoena at issue.

## B. *Relevance and Overbreadth*

The Defendants ask this Court to quash the subpoena because the subpoena is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. More specifically, the Defendants contend that the *Coker* information is not relevant because: (1) Coker had no contact with Jenkins, the alleged harasser in this case, and (2) Coker was not located in the offices of the Plaintiff, where the alleged harassment took place in this case. The Plaintiff responds that this information is relevant because it is evidence of a racially hostile work environment at General Accident.

This Court finds that the subpoena is not overbroad and is reasonably calculated to lead to the discovery of admissible evidence. First, the Court finds that the Defendants failed to demonstrate how the subpoena is overbroad. The Defendants only discuss in general terms the personal nature of the personnel files of their employees. This is insufficient to show overbreadth.

Second, the Court concludes that the *Coker* documents may reasonably be calculated to lead to admissible evidence in this case. While Coker may not have been similarly situated to Plaintiff, his treatment by General Accident may be relevant to whether a racially hostile work environment exists at the various offices in General Accident. *See, e.g., Ingram v. Home Depot, U.S.A., Inc.,* No. CIV.A.97-8060, 1999 WL 88939, at *3 (E.D.Pa. Feb.19, 1999) (rejecting defendants' relevancy objections to producing any personnel documents on employee who may have been involved in creating an alleged hostile working environment that defendants failed to remedy). For instance, this evidence may demonstrate that General Accident permits a racially hostile work environment which forced Coker and the Plaintiff--both of whom are African- American--and Cousins--who is not African-American but reported Jenkins' alleged harassing treatment of African-Americans--out of their jobs. Thus, the Court rejects the Defendants' request to quash the subpoena.

## C. *Confidentiality*

*4 Next, Defendants ask this Court to issue a protective order due to the confidential nature of the *Coker* documents. Defendants contend that many of the documents concern Coker's representation of clients and, thus, are protected under the attorney-client privilege. This Court disagrees. The subpoena requests "[a]ll *non-privileged* records, pleadings, documents, files or other documents." Thus, by definition, the subpoena does not raise any privilege concerns. Accordingly, the Court denies the Defendants' motion in this respect.

## D. *Attorney's Fees and Self-Executing Disclosures*

Finally, Plaintiff asks for attorney's fees in defending this motion. The Court refuses to exercise its discretion and award attorney's fees under the circumstances of this case. Furthermore, Defendants asks this Court to deny the discovery sought because Plaintiff failed to serve his self-executing disclosures. The Court will not quash or modify a valid subpoena based upon the unsupported allegation that Plaintiff has yet to serve his self-executing disclosures. Accordingly, the Court denies both of these requests.

An appropriate Order follows.

*ORDER*

AND NOW, this 15th day of April, 1999, upon consideration of the Defendants' Motion for Entry of a Protective Order, IT IS HEREBY ORDERED that the Defendants' motion is DENIED.

1999 WL 228944, 1999 WL 228944 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
**(Cite as: 1997 WL 734031 (E.D.Pa.))**
**H**
Only the Westlaw citation is currently available.


United States District Court, E.D. Pennsylvania.

Lydia GASKIN, et al.,
v.
COMMONWEALTH OF PENNSYLVANIA, et al.,

**No. Civ.A,. 94-4048.**

Nov. 4, 1997.

**ORDER**


.../delivery.html?dataid=B005580000027960003924439B9FE2AF4A18369CB&dest=atp&for 9/8/2003

ROBRENO , J.

**\*1 And Now**, this **31st** day of **October, 1997,** upon consideration of the defendants' privilege log (doc. no. 111), plaintiff's objections thereto (doc. nos. 117 & 136), and defendants response thereto (doc. nos. 124 & 139), and the motion of Hempfield and Northern Lehigh School Districts to quash subpoenas (doc. no. 140), and the motion by plaintiffs to compel nonparty Hempfield and Northern Lehigh School Districts to comply with their subpoena (doc. no. 141), it is hereby **ORDERED** that

1. As to the defendants' privilege log, plaintiffs' objections thereto are **OVERRULED IN PART** [FN1] and **SUSTAINED IN PART.** [FN2] It is **FURTHER ORDERED** that subject to a protective order the defendants shall produce the documents to counsel for plaintiffs by **November 7, 1997,** and that counsel for plaintiffs are not permitted to disclose the documents to any other source.

FN1. The Court will sustain the defendants' claim as to work product privilege finding that the relevant documents are privileged under that doctrine. *See* Fed.R.Civ.P. 26(b)(3) .

FN2. Defendants have objected to production of certain documents identified in their privilege log on the basis that the documents are protected under the deliberative process privilege. To support their claim of privilege, the defendants have submitted an affidavit from the Secretary of Education for the Commonwealth of Pennsylvania, Eugene W. Hickok, Ph.D. Plaintiffs counter that the defendants have not satisfied their burden of showing that the documents fall under the deliberative process privilege. At the Court's suggestion, the defendants submitted the documents for in camera review. After reviewing the documents, the Court agrees with the plaintiffs that the documents are not privileged and therefore will sustain the objection. "The deliberative process privilege permits the government to withhold documents containing 'confidential deliberations of law or policy-making, reflecting opinions, recommendations, or advice.' " *Redland Soccer Club v. Department of Army of the United States,* 55 F.3d 827, 853 (3d Cir.1995) (quoting *In re Grand Jury,* 821 F.2d 946, 959 (3d Cir.1987) (internal citations omitted)). The purpose behind the privilege is "to prevent injury to the quality of agency decisions." *Redland,* 55 F.3d at 854 (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 151, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1974) ). Accordingly, the privilege recognizes " 'that were [government] agencies forced to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer.' " *Redland,* 55 F.3d at 854 (quoting *First Eastern Corp. v. Mainwaring,* 21 F.3d 465, 468 (D.C.Cir.1994) . " '[I]n most situations, factual summaries prepared for informational purposes' will not be protected even if they are part of an investigative record." *In re Grand Jury,* 821 F.2d 946, 959 (3d Cir.1987) . Even if documents "contain advisory opinions, factual material which is severable is not protected [under the deliberative process privilege]." *Id.* (citing *EPA v. Mink,* 310 U.S. 73, 88-91 (1973). Moreover, the Third Circuit has counselled district courts that " 'in camera review is a highly appropriate and useful means of dealing with claims of [the deliberative process] privilege.' " *Redland Soccer,* 55 F.3d at 859 (quoting *In re Grand Jury,* 821 F.2d at 959).
"The initial burden of showing [the deliberative process] privilege applies is on the government." *Redland,* 55 F.3d at 854 (citing *Schreiber v. Society for Savings Bancorp.,* 11 F.3d 217, 221 (D.C.Cir.1993) . To meet this burden, "the government must present more than a bare conclusion that the documents sought are privileged." *Id.* Furthermore, to assert the privilege, at least one federal court in this district has found three requirements must be satisfied: (1) first, there must be a formal claim by the official with control over the matter after personal consideration; (2) the responsible official must demonstrate by affidavit precise and certain reasons for preserving the confidentiality of the documents; and (3) the documents at issue must be specifically identified and described. *See e.g., Resident Advisory Bd. v. Rizzo,* 97 F.R.D. 749, 753 (E.D.Pa.1983) (Broderick, J.).

The Third Circuit has instructed district courts that a party's assertion of the deliberative process privilege requires a two-step inquiry. First, the Court must decide whether the communications are in fact privileged. *See Redland,* 55 F.3d at 854. Second, even if the government makes a sufficient showing of entitlement to the privilege, the Court must balance the competing interests of the parties. *Id.* As to the first step, i.e. whether the documents are in fact privileged, the government agency must show that the documents are both (1) predecisional and (2) deliberative. *Manna v. United States Department of Justice,* 815 F.Supp. 798, 815 (D.N.J.1993) (citing *Schell v. U.S. Department of Health Health & Human Services,* 843 F.2d 933, 939 (6th Cir.1988) . "A document is 'predecisional' when it is received by the decision maker on the subject of the decision prior to the time the decision is made." *Id.* To establish that a document is predecisional, "an agency does not necessarily have to point specifically to a final decision, but merely establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.' " *Manna,* 815 F.Supp. at 815 (quoting *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 868 (D.C.Cir.1980) . A document is deliberative "when it reflects the give-and-take of the consultative process." *Manna,* 815 F.Supp. at 815 (quoting *Schell,* 843 F.2d at 940). Accordingly, the privilege has been found to apply to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.*

As to the second step, i.e. the competing interests of the parties, "[t]he privilege, once determined to be applicable, is not absolute." *Redland,* 55 F.3d at 854. In this vein, the Third Circuit has counselled district courts that the party seeking disclosures may overcome the claim of privilege by " 'showing a sufficient need for the material in the context of the facts or nature of the case ... or by making a prima facie showing of misconduct.' " *Id* (quoting *In re Grand Jury,* 821 F.2d at 959). Moreover, the Third Circuit has cited with approval a case from the D.C. Circuit which found that in balancing the interests of the parties the district court should consider the following factors: (1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and the issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *See Redland,* 55 F.3d at 854 (citing *First Eastern Corp. v. Mainwaring,* 21 F.3d 465, 468 n. 5 (D.C.Cir.1994) .

Here, the Court concludes that the government defendants have not satisfied the first step by demonstrating that the documents fall within the deliberative process privilege. Secretary Hickok's affidavit merely states that he is "seriously concerned about the impact their disclosure will have on the decision and policy making process within the Department of Education and the adverse impact that disclosure will have upon the candid exchange of ideas among staff," and that production of the documents "could have a serious negative effect on an ongoing process of self-evaluation and developmental decision making." *Hickok Affidavit* at 6-7. Secretary Hickok's affidavit, however, does not describe with sufficient particularity what deliberative process is involved and the role played by the documents in the process nor does it relate how the documents are deliberative in nature. Moreover, after reviewing the documents in camera, the Court cannot conclude that they are predecisional and deliberative in nature. To the contrary, the documents appear largely to contain factual information, including minutes of meetings by officials affiliated with the Pennsylvania Department of Education and its programs discussing routine administrative matters (as opposed to recommendations or deliberations about education policy matters) and several instruction guides outlining the relevant procedures established by the Pennsylvania Department of Education for compliance monitoring (again, as opposed to recommendations or deliberations about education policy matters). Accordingly, the Court finds that the defendants have not shown that the documents fall within the deliberative process privilege.

Even assuming that the documents fell under the deliberative process privilege, the Court would still sustain the objections and order disclosure of the documents. Despite the disputed contention by the defendants that plaintiffs can obtain much of the discovery which they seek through depositions,

nevertheless, the Court finds that on balance the interests of the parties weigh in favor of productions, especially in light of the fact that (1) the frank exchange of ideas among decision makers with the Pennsylvania Department of Education would not be adversely affected by the production of these documents; (2) that the plaintiffs have a need, albeit modest, for the information; (3) the documents will be subject to a protective order.

2. It is **FURTHER ORDERED** that the motion of nonparty Hempfield and Northern Lehigh School Districts to quash the subpoenas is **DENIED** [FN3] and that the motion of plaintiffs to compel nonparties Hempfield and Northern-Lehigh School Districts is **GRANTED**. It is **FURTHER ORDERED** that the parties shall make arrangements as to the time, place, and methodology of the classroom observations, or if the parties cannot agree, the Court will order the appropriate arrangements. [FN4]

FN3. Nonparties Hempfield and Northern Lehigh School Districts ("the Districts") have moved the Court to quash the subpoenas issued by plaintiffs insofar as the subpoenas seek classroom observations by experts for the plaintiffs. The Districts do not contend that the Court is without authority to enforce the subpoenas. *See* Fed.R.Civ.P. 45(a)(2) . Rather, the defendants' contend that (1) the classroom observations which plaintiffs seek are beyond the scope of discovery permitted under Rule 45 of the Federal Rules of Civil Procedure ; and (2) that the classroom observations will disrupt the "learning environment" at the schools involved. Plaintiffs counter that the on-site classroom observations are permitted by the discovery rules and that the school districts have not shown that the requested discovery is unreasonable or oppressive.
Ordinarily, the Federal Rules of Civil Procedure are intended to facilitate the disclosure of information to litigants. *See* Fed.R .Civ.P. 26(b) ; *See also* 7 James W. Moore, *Moore's Federal Practice,* § 34.05 at 34-14 (3d ed. 1997) ("The general provisions governing discovery in Rule 26 have been held to apply to discovery under Rule 45 ."). Specifically, regarding subpoenas for nonparties, Rule 45 of the Federal Rules of Civil Procedure requires a district court to quash or modify the subpoena if it is "unreasonable or oppressive." Fed.R.Civ.P. 45(c)(3) . The burden of proving that a subpoena is oppressive is on the party moving to quash. *Id.* (citing *Westinghouse Electric Corp. v. City of Burlington, Vt.,* 351 F.2d 762 (D.C.Cir.1965) . "What constitutes unreasonableness or oppression is, of course, a matter to be decided in the light of all the circumstances of the case...." *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 403 (D.C.Cir.1984) (quoting 5A *Moore's Federal Practice,* § 40.05[2] n. 44)). However, the moving party cannot "rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance." 9A Wright & Miller, *Federal Practice & Procedure,* § 2549 at 46 (2d ed.1994).
Rule 45 of the Federal Rules of Civil Procedure , which governs the issuance of subpoenas to nonparties, was amended in 1991 to authorize the issuance of subpoenas to nonparties "to permit inspection of premises at a time and place specified therein." *Fed.* R.Civ.P. 45(a)(1)(C) . Prior to this 1991 amendment to Rule 45 , only Rule 34 of the Federal Rules of Civil Procedure , which governs the issuance of subpoenas for parties, made reference to the inspection of premises as a discovery tool whereby any party to a lawsuit could be served by another party with a request "to permit entry upon designated land or other party in the possession or control of the party upon whom the request is served for the purpose of *inspection* and measuring, surveying, photographing, testing or sampling the property or any designated object thereon, within the scope of Rule 26(b) ." Fed.R.Civ.P. 34(a) . Because Rule 45(a)(1)(C) makes reference to "inspection of premises" whereas Rule 34(a) refers to "inspection" and additional methods of discovery, the Districts contend that the scope of discovery for nonparties under Rule 45 is more limited than for parties under Rule 34 . Based upon this technical distinction, according to the Districts, they cannot be compelled to submit to the classroom

observations through the issuance of subpoenas pursuant to Rule 45 .

The Court will deny the motion to quash for four reasons. First, despite the unsupported contention by the Districts to the contrary, two of the leading commentators on the Federal Rules of Civil Procedure have explained after the recent amendments to Rule 45 the scope of discovery under Rules 34 for parties and Rule 45 for nonparties are virtually coextensive. *See e.g.,* 7 James W. Moore, *Moore's Federal Practice,* § 34.02 at 34-14 (3d ed. 1997) ("With respect to their scope, Rules 34 and 45 should be considered coextensive"); 8A Wright & Miller, § 2209 at 391-92 (2d ed.1994) (same). Second, the Court concludes that the Districts have not carried their burden by showing that the classroom observations are not within the meaning of the term "inspection of premises" under Rule 45 . *See* 8A Wright & Miller § 2206 at 384 ("The word 'inspection' has a broader meaning than just looking. The dictionary defines 'inspect' as 'to examine carefully or critically, investigate ... and 'inspection' as 'especially, a critical investigation or scrutiny.' "). *See also New York State Association for Retarded Children v. Casey, 706 F.2d 956, 960-61 (2d Cir.1983)* (concluding that district court did not abuse its discretion by permitting plaintiffs' counsel, consultants, and experts to inspect state facility for mentally retarded children and "to take photographs, make observations, take notes, and form conclusions and interview any class member, staff member, or employee desired outside the presence of defendants, their counsel, and representatives."). Third, the Court concludes that the school districts mere assertion that the classroom observations will likely be disruptive, without more, is insufficient to show that the subpoenas should be quashed as unduly burdensome under Rule 45 . Fourth, while the Districts raised privacy concerns generally, *see* 20 U.S.C. § 1232 , Family Educational Rights and Privacy Act ("FERPA"), they have not identified how those concerns would be specifically affected by the on-site visits. Since the Districts have not articulated a clear basis for their privacy objection, the Court cannot conclude that quashing the subpoenas would be appropriate under the circumstances.

FN4. Counsel for plaintiffs must give the Districts adequate notice prior to any on-site visits. Moreover, to minimize disruption to the educational process, the Court suggests that each of the parties limit the number of experts present during each visit.

**AND IT IS SO ORDERED.**

1997 WL 734031 (E.D.Pa.)

END OF DOCUMENT

Not Reported in F.Supp.
**(Cite as: 1993 WL 150350 (E.D.Pa.))**
**H**
Only the Westlaw citation is currently available.


United States District Court, E.D. Pennsylvania.

HEARST/ABC-VIACOM ENTERTAINMENT SERVICES, Plaintiffs,
v.
GOODWAY MARKETING, INC., Cpn Inc., Donald L. Wolk and Beryl J. Wolk, Defendant.

**Civ. A. No. 87-1638.**

April 30, 1993.

Melvin A. Schwarz, Lynn A. Herbert, Dechert Price & Rhoads, Philadelphia, PA, for plaintiff.


.../delivery.html?dataid=A00558000000162900039244439B9FE2DAF9EB2C4C5&dest=atp&for9/8/2003

Mark A. Lopeman, Tofel, Berelson & Saxl, Robert L. Tofel, New York City, pro hac vice, for plaintiff.

Gilbert B. Abramson, Abramson, Cogan, Kogan, Freedman & Thall, P.C., Bruce L. Thall, Philadelphia, PA, Thomas Peppert, Patterson Belknap Webb & Tyler, New York City, for Donald L. Wolk, Berly J. Wolk, Goodway Marketing, Inc. & CPN, Inc.

Jeremy D. Mishkin, H. Eisenberg, Montgomery McCracken Walker & Rhoads, Melvin A. Schwarz, Lynn A. Herbert, Dechert, Price & Rhoads, Philadelphia, PA, for K. Lyons & T. Burchill.

## MEMORANDUM

JAMES MCGIRR, District Judge.

*1 Paul Breen, Esq., ("Movant") attorney for Defendant, moves the court pursuant to Rule 45(c) of the Fed.R.Civ.P . to Quash Subpoena and/or pursuant to Rule 26(c) of the Fed.R.Civ.P . For a Protective Order.

The Plaintiff ("HAVES") on or about December 17, 1991, obtained judgment against the Defendants (the "Wolks") in the amount of $380,636.75. As of the date of this order, judgment remains unsatisfied. Subsequent to entry of judgment, the Wolks retained Paul Breen as counsel.

On or about January 25, 1993, Paul Breen was served with a Subpoena Duces Tecum. The Subpoena requested information pertaining to fee arrangements with his client, the Wolks. Movant is willing to provide the information on the amount of payment received by Movant and his law firm. However, Movant insists that such other information pertaining to the source of such payments, identity of funds used to make the payments is privileged information. Movant asserts that such information can be obtained directly from the client.

Plaintiffs contend that the Subpoena seeks information not protected under the attorney-client privilege.

The attorney-client privilege protects confidential disclosures relating to legal matters made by a client to his/her attorney. In re Grand Jury Investigation (Tinari), 631 F.2d 17, 19 (3d Cir.1980) , cert. denied, Tinari v. U.S., 449 U.S. 1083 (1981) ; Fisher v. United States, 425 U.S. 391, 403 (1976) . The privilege does not extend to all attorney-client communications. Communications pertaining to future illegal activity are not protected under the privilege. In re Grand Jury Investigation (Tinari), supra; Clark v. United States, 289 U.S. 1, 15 (1933) . Under most circumstances, identity of clients and fee arrangements are not protected under the privilege. Id.; (citing In re Semel, 411 F.2d 195, 197 (3d Cir.) , cert. denied, 396 U.S. 905 (1969) ). However, if disclosure of such information would serve to implicate the client in activities for which legal advice was sought, such information might be protected under the privilege. Id.; (citing United States v. Hodge and Zweig, 548 F.2d 1347, 1353 (9th Cir.1977) ). The present situation does not precipitate such protection.

The existence of an attorney-client relationship between the Wolks and Breen has been freely disclosed. Movant objects to disclosure of the source or sources utilized in payment of legal fees. There has been no suggestion that disclosure of such information would in any way further implicate the Wolks in the matter for which they have consulted Breen. In addition, it has never been implied

that individuals who may have made payments on the Wolks' behalf were clients of the Movant. Therefore, disclosure of the source of payments would not violate the attorney-client privilege.

Furthermore, when attempting to satisfy a judgment, a judgment creditor is entitled to a thorough examination of the judgment debtor's assets. *Caisson Corporation v. County West Building Corp., 62 F.R.D. 331, 334 (E.D.Pa.1974)* (citing *Monticello Tobacco Co., Inc. v. American Tobacco Co., 12 F.R.D. 344 (S.D.N.Y.1952)*, *aff'd on merits,* 97 F.2d 629 (2nd. Cir.1952) *cert. denied,* 344 U.S. 875 (1958) ; *7 Moore's Federal Practice* § 69.05(1) (1974); 12 Wright and Miller, *Federal Practice and Procedure* § 3014 (1973) ). This may include the examination of third parties in relation to the financial affairs of the judgment debtor. *Id.* Evidence of a relationship between the third-party and judgment debtor must be set forth. *Id.* In addition, the questions should be narrowly drawn to examine assets of the judgment debtor. See *id.* (citing *Burak v. Scott,* 29 F.Supp. 775 (D.D.C.1939) ; 12 Wright and Miller, *Federal Practice and Procedure,* supra. This allows the court to balance the interests of both parties and provide protection from baseless harassment.

**\*2** In so forth that third parties may be examined in relation to the financial affairs of judgment debtors, this court shall permit the listed questions to be answered. There is sufficient information to establish a relationship between the judgment debtors and Movant. The questions are narrowly focused around the Wolk's financial circumstances. Therefore, the court is satisfied that the subpoena is not for the purpose of harassment. Movant's motion shall be denied.

An appropriate order follows.

## ORDER

AND NOW, this 29 day of April, 1993, in consideration of Paul Breen, Esq., attorney for Defendant Wolks Motion to Quash the Subpoena and/or for a Protective Order, Plaintiff Judgment Creditor's Answer, and the foregoing Memorandum of Law, it is hereby ORDERED that:
1) Movant's Motion is DENIED.
2) Movant is ORDERED to Respond to Plaintiff Judgment Creditor's Subpoena within thirty (30) days of the date of this Order.

1993 WL 150350 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
**(Cite as: 1995 WL 736907 (S.D.N.Y.))**
C
Only the Westlaw citation is currently available.


United States District Court, S.D. New York.

COSTAMAR SHIPPING CO., LTD., Petitioner,
v.
KIM-SAIL, LTD., Respondent.

**No. 95 CIV. 3349 (KTD).**

Dec. 12, 1995.

Edward P. Flood, Chalos & Brown, P.C., New York City.


.../delivery.html?dataid=B0055800000034060003924439B9FE2BA020BC744C&dest=atp&for 9/8/2003

Terry L. Stoltz , New York City.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

**\*1** The plaintiff in this action, Costamar Shipping Co., Ltd. ("Costamar") seeks to compel non-party Kersten Shipping Agency, Inc. ("Kersten") to produce for inspection certain documents identified in a subpoena. In addition, Costamar seeks attorneys' fees and costs incurred in connection with bringing this motion. For the reasons that follow, Costamar's motion is denied.

*Background*

On June 27, 1995, this Court confirmed an arbitration award of $358,028.13 payable to Costamar by Kim-Sail, Ltd. ("Kim-Sail"). This arbitration arose from a dispute between Costamar, [FN1] owner of the shipping vessel M/V Adventure in 1991 and 1992, and Kim-Sail, [FN2] which chartered the M/V Adventure. To date, Kim-Sail has not paid any portion of the judgment.

To aid in satisfying the judgment, Costamar served Kim-Sail with a subpoena pursuant to Rule 69(a) of the Federal Rules of Civil Procedure . It personally served Philip Gardner, Kim-Sail's Corporate Secretary, on July 6, 1995. The subpoena demanded that Kim-Sail produce records that would assist Costamar in identifying assets belonging to Kim-Sail.

On that same day, Costamar personally served Mr. Gardner with a subpoena addressed to Kersten Shipping (the "First Kersten Subpoena"). Mr. Gardner has been the President of Kersten Shipping since August 1994 and was Chartering Manager of Kersten in 1991. Deposition of Philip C. Gardner, dated July 19, 1995 ("Gardner Dep.") at 41. Kersten Shipping is a New York corporation that serves as Kim-Sail's general agent in the United States, and it acted in this capacity in 1991 when it chartered the M/V Adventure from Costamar. Kersten has acted as agent for a number of other companies engaged in commercial shipping in addition to Kim-Sail. Gardner Aff. at ¶ 2.

The First Kersten Subpoena required the production of: (1) all Kersten financial and property records related to Kim-Sail, (2) Kersten's most recent bank ledger sheets with respect to accounts owned by Kim-Sail, and (3) real property deeds owned by Kim-Sail in Kersten's possession. It also sought to depose Mr. Gardner. The required statutory fees were tendered at the time of service. Fed.R.Civ.P. 45 (b)(1) .

In response to the subpoena, Mr. Gardner produced copies of four time charters involving other vessels Kim-Sail had chartered between 1993 and 1995, as well as check stubs from Kim-Sail's New York checking account which had been closed in 1993. Flood Aff. at ¶ 22. During his deposition, Mr. Gardner noted that he had not attended any of Kim-Sail's Board of Directors meetings and did not know the names of its president, vice-president, and treasurer. Gardner Dep. at 8-10, 16, 89. In addition, although he was Kim-Sail's Corporate Secretary, he did not know any of Kim-Sail's personnel in Grand Cayman where it is incorporated, but only corresponded with a post office box address there. Gardner Dep. at 11-12, 15. Responding to the plaintiff's query concerning Kim-Sail's assets, Mr. Gardner testified that Kim-Sail was an inactive company and had no assets to satisfy the judgment. Gardner Aff. at ¶ 11.

**\*2** Subsequent to the deposition, Kersten produced bank statements from Kim-Sail's money market

account from July 1993 through June 1995, an insurance cover note, and the agency agreement between Kersten Shipping and Kim-Sail which had been executed in July 1979. Flood Aff. at ¶ 24. Mr. Gardner asserted that because of limited time, he had not been able to gather these documents by the deposition date. Gardner Aff. at ¶ 5. In addition, Kersten advised Costamar that it possessed a June 30, 1993 Accounts Receivable Report that covered activities as far back as 1991 and was still trying to determine if it could obtain any voyage files prior to August 1993. Gardner Aff. at ¶ 8.

On the basis of Mr. Gardner's testimony that revenue derived from Kim-Sail had been placed directly in Kersten's general bank account, [FN3] Costamar alleged that Kersten had commingled its assets with Kim-Sail's. Flood Aff. at ¶ 27. Recognizing that some of Kim-Sail's income had been deposited in Kersten's bank account and that Kersten had not produced its bank records in response to its initial subpoena, Costamar personally served Ben Bradburn of Kersten with a second subpoena (the "Second Kersten Subpoena"). No witness fee was tendered at this time.

The subject of this motion, the Second Kersten Subpoena, requested the production of: (1) all financial and business records maintained by Kersten pertaining to Kim-Sail's activities, (2) a copy of all charter parties in which Kersten acted as the general agent between 1991 and the present, (3) Kersten's bank records for the years 1991-1995, (4) all documents relating to corporate securities owned by Kersten, (5) all financial records of businesses in which Kersten has a ownership interest, (6) the names and addresses of enterprises currently indebted to Kersten, (7) copies of Kersten's income tax returns for the last five years, and (8) all titles to property owned by Kersten. Kersten objected to this subpoena. It stated that Costamar had all pertinent Kim-Sail documents, apart from the charter documents which Costamar had agreed to view in Kersten's office. With regard to the other documents, Kersten objected to their production because they referred to operations of Kersten and not of Kim- Sail.

*Discussion*

A. *Service of the Second Kersten Subpoena*

Kersten asserts that the Second Kersten Subpoena was improperly served because of Costamar's failure to tender statutory fees at the time of service. Where no fee is tendered with the service of a subpoena requiring a witness' attendance, the service is invalid. *CF & I Steel Corp. v. Mitsui & Co. (USA),* 713 F.2d 494, 496 (9th Cir.1983) . Rule 45(b)(1) of the Federal Rules of Civil Procedure states that "service of a subpoena ... shall be made by delivering a copy [of the subpoena] ... and, *if the the person's attendance is commanded,* by tendering to that person the fees for one day's attendance and the mileage allowed by law." Fed.R.Civ.P. 45(b)(1) (emphasis added). Since the Second Kersten Subpoena only required the production of documents and not the attendance of a witness, service was valid.

B. *Entitlement to Discovery*

**\*3** Rule 69 of the Federal Rules of Civil Procedure provides that "[i]n aid of the judgment or execution, the judgment creditor ... may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held." Fed.R.Civ.P. 69(a) . Under this rule, discovery may be "permitted against a non-party where the relationship between the judgment debtor and the non-party is sufficient to raise a reasonable doubt about the bona fides of the transfer of assets between them". *Magnaleasing, Inc. v. Staten Island Mall,* 76 F.R.D. 559, 562 (S.D.N.Y.1977) (citing *Caisson Corp.*

*v. County West Building Corp.,* 62 F.R.D. 331, 335 (E.D.Pa.1974) ). Pursuant to Rule 69(a) , "the judgment creditor must be given the freedom to make a broad inquiry to discover hidden or concealed assets of the judgment debtor." *Caisson,* 62 F.R.D. at 334 (citations omitted); 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3014 at 72 (1973) .

Generally, non-parties may only be examined about the assets of a judgment debtor and cannot be required to disclose their own assets. *Magnaleasing,* 76 F.R.D. at 561-62 ; *Caisson,* 62 F.R.D. at 334 ; *Burak v. Scott,* 29 F.Supp. 775, 776 (D.D.C.1939) (quashing Rule 69 subpoena requiring non-parties to disclose their individual assets); 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3014 at 72 (1973) . Thus, under Rule 69(a) and existing case law, the general rule is that non-party discovery is limited to a search for the defendant's hidden assets. *Magnaleasing,* 76 F.R.D. at 561-62 (citing *Burak,* 29 F.Supp. at 776). Applying this rule here, discovery must therefore be restricted to the alleged transfer of Kim-Sail's assets to Kersten. With regard to the Second Kersten Subpoena, only Kersten records relating to activities conducted on behalf of Kim-Sail are discoverable. However, this category of documents has purportedly been produced pursuant to the First Kersten Subpoena.

In the alternative, Costamar alleges that an alter ego relationship exists between Kim-Sail, the judgment debtor, and Kersten. If such a relationship were established, Costamar could pierce the corporate veil and obtain discovery of Kersten's assets. In *Trustees of North Florida Operating Engineers Health & Welfare Fund v. Lane Crane Service, Inc.,* 148 F.R.D. 662, 664 (M.D.Fla.1993) , the court held that evidence that a non-party was an alter ego of the judgment debtor was adequate to warrant discovery from the non-party in aid of execution. However, the mere allegation of an alter ego relationship is insufficient; it must be supported by facts showing the basis for the assertion. *Strick Corp. v. Thai Teak Products Co.,* 493 F.Supp. 1210, 1218 (E.D.Pa.1980) .

In New York, courts "disregard the corporate form reluctantly." *Itel Containers Int'l. Corp. v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698, 703 (2d Cir.1990) . The corporate veil will be pierced only when the corporate "form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation ... and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.' " *Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979) (citation omitted). The factors that courts consider in determining whether to pierce the corporate veil include the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities including the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors. *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 600-01 (2d Cir.1989) (collecting cases). Although there is no set rule as to how many of these factors must be present to pierce the corporate veil, the "general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result." *Id.* at 601 (citation omitted).

*4 An inference can be drawn from Kersten's commingling of its funds with those of Kim-Sail that there may have been a transfer of assets between the two corporations. The general rule is that an agent must segregate its principal's funds from its own:
[u]nless otherwise agreed, an agent receiving or holding things on behalf of the principal is subject to a duty to the principal not to receive or deal with them so that they will appear to be his own, and not so to mingle them with his own things as to destroy their identity.
*Restatement (Second) of Agency* § 398 (1957) . However, the mere fact that there is co-mingling of assets is not enough to establish a prima facie case of alter ego. *See William Wrigley,* 890 F.2d at 600-

01 (alter ego analysis requires consideration of totality of circumstances). In addition, there has been no evidence that Kersten used Kim-Sail for its own private ends, another element important to demonstrating an alter ego relationship. On the contrary, Kim-Sail was indebted to Kersten for $420,000. Gardner Aff. at ¶ 11. Furthermore, there has been no evidence of fraud or unjust enrichment. Thus, Costamar has not demonstrated that the corporate veil should be pierced.

Nevertheless, further discovery of Kersten's relationship with Kim-Sail may be appropriate. If, through such discovery, Costamar can provide evidence of fraud or unjust enrichment, additional discovery into Kersten's assets may be warranted on the basis of an alter ego theory.

*C. Attorney's Fees*

Pursuant to <u>rule 37(a)(4) of the Federal Rules of Civil Procedure</u> , Costamar seeks reasonable expenses incurred in bringing this motion, including attorneys' fees. Because its motion is denied, Costamar's request for attorneys' fees is also denied.

*Conclusion*

For the reasons set forth above, Costamar's motion to compel Kersten to produce documents in response to the Second Kersten Subpoena is denied.

SO ORDERED.

FN1. Costamar is a foreign corporation with an office and principal place of business in Piraeus, Greece. Affidavit of Edward P. Flood dated August 23, 1995 ("Flood Aff.") at ¶ 3.

FN2. Kim-Sail is a foreign corporation incorporated in the Cayman Islands. Affidavit of Philip Gardner, dated August 28, 1995 ("Gardner Aff.") at ¶ 1.

FN3. The following exchange occurred between Mr. Gardner and Costamar's lawyers:
Q: Pursuant to the charter parties that Kim-Sail had worked out with its shippers and/or subcharterers, they were required to pay freight by paying into Kim-Sail account; is that correct?
A: No, they would be instructed to pay into Kersten's account at least since I have been president. We have taken the freight money, any freight money into Kersten's account and paid expenses out of that account. What was done before that, I really don't know.
Q: So the money is put into Kersten's account?
A: Since I have been president, that is the way I have handled it.
Gardner Dep. at 39-40.

1995 WL 736907 (S.D.N.Y.)

END OF DOCUMENT

## CERTIFICATE OF SERVICE

I, Robert H. Hermann, hereby certify that a true and correct copy of the foregoing Memorandum of Law of Plaintiff FL Receivables Trust 2002-A in Opposition to Motion to Quash Bank Subpoenas was served September 8, 2003 by overnight delivery service through United Parcel Service, with which we have an account, by depositing a true and correct copy of the aforesaid in an overnight wrapper and placed in the designated area before the scheduled pick-up and properly addressed to the last known addresses of the addressees as follows:

Monica Mathews, Esq.
Spector Gadon & Rosen, P.C.
Seven Penn Center
1635 Market Street - 7th Floor
Philadelphia, PA 19103

Victor Lipsky, Esq.
Lipsky & Brandt
1101 Market Street, Suite 2820
Philadelphia, PA 19103

Steven D. Usdin, Esq.
Adelman Lavine Gold & Levin, PC
Two Penn Center Plaza, Suite 1900
Philadelphia, PA 19102-1799

Robert H. Hermann