IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FL RECEIVABLE TRUST 2002-A,<br>*Plaintiff*,<br><br>v.<br><br>Bagga Enterprises, Inc.<br>Jamuna Real Estate, LLC<br>United Management Services, Inc. and<br>Welcome Group, Inc.,<br>*Defendants* | The Honorable Lowell A. Reed, Jr., S.J.<br><br>Civil Action No. 02-2710<br><br>Civil Action No. 02-2711<br><br>Civil Action No. 02-2080<br><br>Civil Action No. 02-2086 |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff FL Receivables Trust 2002-A ("FL Receivables"), by its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 65(a), respectfully submits this Memorandum of Law in support of its request that the Court convert its November 13, 2003 Temporary Restraining Order (the "TRO") into a preliminary injunction enjoining Bagga Enterprises, Inc., Jamuna, L.L.C., United Management, Inc., their affiliates, Paul Bagga, Kushvinder Bagga, and Gary Gambhir from altering, concealing or destroying their computerized business and business-related records, computerized disks, and hard-drives.

**INTRODUCTION**

FL Receivables holds valid judgments against the Defendants.  It made diligent efforts to execute on those judgments, and continues to try to take discovery in aid of execution.  In disregard of their obligations to comply with such discovery, however, the judgment debtors and their owners have denied Plaintiff, FL Receivables, full and complete access to relevant business computers.  Prior to scheduled inspections of electronic data – of which defendants had notice –

497562                                                              1

2

they destroyed evidence by reformatting their computer hard-drives. Their attorney admitted to Plaintiff and the Court that hard-drives were replaced and discarded instead of being produced. Defendants' actions were knowing and deliberate and violated their duty to preserve evidence.

Because it feared further destruction of evidence, FL Receivables sought the extraordinary remedy of an *ex parte* TRO enjoining any further destruction or concealment of computerized business records and permitting FL Receivables to search for and seize such records without prior notice. This Court granted FL Receivables' motion for *ex parte* relief, and directed the U.S. Marshall to accompany FL Receivables in searching the homes, businesses and automobiles of the defendants for computerized business and business related records. That data is now in the possession of the U.S. Marshal, pending further order of the Court.

In granting FL Receivables' motion for *ex parte* relief, the Court directed FL Receivables, after completing its search, to file the instant motion for preliminary injunction upon notice to the defendants. Although FL Receivables has not yet had the opportunity to review substantively the electronic evidence it obtained in executing the TRO, FL Receivables does have reason to believe it now has some of the back-up information that the judgment debtors previously said did not exist. Accordingly, FL Receivables asks this Court to convert its TRO into a preliminary injunction and to further enjoin the defendants from altering, concealing, or destroying electronic information.

**FACTUAL BACKGROUND**

**The Judgments and the Judgment Debtors**

FL Receivables is a judgment creditor of Bagga Enterprises, Inc., Jamuna Real Estate, LLC, United Management, Inc., and Welcome Group, Inc. All of the defendants are owned by Paul Bagga and/or his wife, Kushvinder Bagga, and all have their offices at 714 Bethlehem Pike,

Erdenheim, Pennsylvania. In an effort to trace recoverable assets, FL Receivables has undertaken discovery of the financial records of the defendants and affiliated companies. Those records include files on business computers located at 714 Bethlehem Pike.

Welcome Group, Inc. has filed bankruptcy. Accordingly, this matter is stayed as to Welcome Group, Inc. Nothing in the instant motion is intended to seek any relief from the automatic stay.

### FL Receivables Attempts To Take Discovery In Aid Of Execution

FL Receivables served discovery in aid of execution on the defendants, to which the defendants responded in April of 2003. Defendants eventually agreed to produce documents in the Erdenheim office on July 9, 2003.

The day before the document production, defendants' attorney, Victor Lipsky, told counsel for plaintiff that most of defendants' books and records were only in electronic form (i.e. on computers). Plaintiff's counsel confirmed this in writing, and advised Mr. Lipsky that a data retrieval specialist would be present to copy the electronic data. A copy of Jonathan Hugg's July 8, 2003 letter to Victor Lipsky is attached hereto as Exhibit A.

On July 9, 2003, when plaintiff's counsel arrived, nothing was ready to be reviewed. On the afternoon of the 9th, Plaintiff's counsel began, but did not finish, inspecting twenty boxes of paper documents in the basement. Paul Bagga refused to allow access to any computers.

### Defendants Obstruct Review Of Computer Records

On July 10th, plaintiff's counsel returned to the Erdenheim office and asked to see computer records. Paul Bagga again refused. As a result of a call to the Court from plaintiff's counsel, the parties entered into a letter agreement pursuant to which defendants promised that plaintiff would receive "copies of *all books and records* of the judgment debtors that are *stored*

*electronically and/or on computer* and *all work papers*." (Emphasis supplied.)  A copy of the July 10, 2003 letter agreement is attached hereto as Exhibit "B."

Notwithstanding the letter agreement, plaintiff was only allowed to inspect a single computer (hereinafter, the "04 computer") on July 10th.  Janet Palumbo, a software support analyst at the Obermayer law firm, was asked to copy data from the 04 computer.  See the Affidavit of Janet Palumbo, attached hereto as Exhibit C, at ¶¶1, 2 and 3.  The 04 computer was in a room that was empty, except for a desk, a chair and the computer.  Exhibit C, ¶4.  The 04 computer was not networked to the other computers in the office and contained no software that would enable it to network with any other computer.  Exhibit C, ¶5 and ¶10.  Thus, the files on the other computers were not accessible to persons using the 04 computer.  Id.

The only files in the directory of the 04 computer were some "Quickbooks" (accounting software) files.  Exhibit C, ¶¶7, 8 and 9.  Ms. Palumbo copied the "Quickbooks" files to a Zip drive.  Exhibit C, ¶12.  Then, plaintiff had Michael Collins of ePlus Technology make a "clone" of the 04 hard-drive.  Exhibit C, ¶¶13-14.  Plaintiff left the 04 computer in working order, which was confirmed by Paul Bagga.  Exhibit C, ¶¶15-16.  Plaintiff had no access to any other computers in the office on July 10, 2003.  Exhibit C, ¶18.

Analysis, discussed below, revealed that the 04 computer was specially set up and loaded with selected "Quickbooks" files for plaintiff's inspection and was not the computer that Paul Bagga used to maintain the defendants' corporate books and records in the normal course of business.  Exhibit F, ¶ 15.

Paul Bagga represented to plaintiff's counsel on July 11, 2003 that the 04 computer contained everything that plaintiff had requested.  However, when plaintiff's forensic accountant

reviewed the "Quickbooks" files, he found that they were not complete and did not contain the entire books and records of the defendants.

Accordingly, on July 15, 2003, plaintiff's counsel wrote to Victor Lipsky, raising the issue of spoliation of evidence. Counsel again called the Court. As a result of the call, counsel exchanged letters, agreeing that plaintiff would be permitted to clone the hard-drives of the other computers in the Erdenheim office, and that the hard-drives would not be removed or altered. A copy of the July 15, 2003 correspondence is attached as Exhibit "D."

On July 18, 2003, plaintiff again visited the Erdenheim office with an employee of Micromedia Corporation, which provides computer network integration services. See the Affidavit of Mark Cohen, Vice President of Micromedia, attached hereto as Exhibit "E." Micromedia was able to clone four hard drives with viewable data only. Three other computers could not be cloned, but some or all of their viewable files were copied to one of the four hard drives that had been cloned. Exhibit E, ¶6.

On July 25, 2003, Micromedia visited the Erdenheim office again and cloned the hard drive of the computer that contained the "Quickbooks" files. Exhibit E, ¶7. On July 31, Micromedia visited the site and cloned seven hard drives, including both viewable and deleted data.. Exhibit E, ¶8. Micromedia preserved the chain of custody and sent the eight clones that had been made on July 25 and July 31 to KrollOnTrack for analysis. Exhibit E, ¶11. Defendants' computer consultant observed and was satisfied with Micromedia's work. Exhibit E, 13. Micromedia left the computers in working order. Exhibit E, ¶12.

### Computer Experts Review Hard Drives And Discover Evidence Of Spoliation

KrollOnTrack received the eight cloned hard-drives from Micromedia on August 11, 2003. See Affidavit of Gary Haas, attached hereto as Exhibit F. Gary Haas is a computer

forensic engineer at KrollOnTrack who was asked to determine when the eight hard drives were last reformatted; to identify and attempt to retrieve "deleted" files, to the extent they could be recovered; to determine the number of computers that had access to the server hard drive; and, in order to determine the dates that certain CD-ROMS obtained from the defendants were created, whether the files on the CD-ROMS had been on the hard-drives before reformatting, and, if so, whether the CD-ROMS were used to restore data to the hard-drives after reformatting.. Exhibit F, ¶1 and ¶9. As a result of his analysis, Mr. Haas reached the following conclusions:

    a.    the defendants knowingly deleted information on their computers during the litigation and shortly before the computers were produced to Obermayer for inspection and copying;

    b.    the defendants knowingly replaced two hard-drives and disposed of the original hard-drives during the litigation, again shortly before production to Obermayer for inspection and copying;

    c.    the defendants either failed to take any reasonable precaution to back-up the deleted or destroyed information, or are knowingly withholding the information;

    d.    the defendants failed to produce an external hard-drive that they used as part of their computer network; and

    e.    the defendants failed to take reasonable steps during litigation to preserve evidence that was relevant to that litigation.

Exhibit F, ¶10.

Based on his analysis of the cloned hard-drives, Mr. Haas was able to determine that all the information on the 04 computer's hard drive had been deleted in May 2003, after this litigation began and even after the plaintiff's issuance of requests for production. Such deletion

was knowing, because it was accomplished by reformatting the computer's hard-drive. Before the reformatting process is complete, the computer warns the user that all stored information will be lost by proceeding to the next step, precisely in order to allow the user to cancel the reformatting process if that deletion is not desired. Exhibit F, ¶14.

Mr. Haas was able to recover many deleted files from Micromedia's clone of the 04 hard-drive; however, he could not recover deleted files that were over-written when the "Quickbooks" files and a new operating system were installed on the 04 hard-drive. Exhibit F, ¶15.

On July 10, 2003, right after plaintiff's representatives left the Erdenheim office, the defendants removed and replaced the hard drive on their 07 computer with a new hard-drive that had no information on it and they then disposed of the original hard-drive. Exhibit F, ¶16.

On or before July 17, 2003, the defendants also removed and replaced the hard-drive on their 08 computer with a new one and discarded the original hard-drive. Exhibit F, ¶17.

On July 31, 2003, Obermayer obtained "clones" of the 07 and 08 computer hard drives.[1] However, defendants only produced the replacement hard-drives for copying, which were created on July 10th and July 17th respectively (*i.e.*, shortly before July 18, the agreed date for the cloning). Exhibit F, ¶18, ¶19.

The original hard-drives were not produced. No back-up copies of the original hard-drives were produced. The source or sources of the data that was copied onto the replacement hard-drives was not identified or produced. Exhibit F, ¶18.

---

[1] The 07 computer was the "server" for the defendants' network. This means that the original 07 hard drive contained copies of "shared" files, *i.e.*, files that were available through the server to two or more of the networked computers. In addition, the original 07 hard drive may have contained records of any files that were transmitted from one networked computer to another through the server. Exhibit F, ¶20.

To summarize, the defendants, after agreeing to let plaintiff clone their computers, knowingly took steps that defeated the whole purpose of cloning these computers, which was to obtain an exact duplicate of the data on these computers. Instead, plaintiff obtained only the data that the defendants chose to put on the 07 and 08 hard-drives after the hard-drives were replaced. Exhibit F, ¶18.

The defendants produced four CD-ROMS, which were not and could not have been original media copies of the reformatted or replaced hard-drives. The original media copies had to have been made prior to May 20 for the 04 hard-drive; prior to July 10th for the 07 hard-drive; and prior to July 18th for the 08 hard-drive. Mr. Haas determined that the CD-ROMS were all created after the relevant format dates of the hard-drives. Accordingly, the CD-ROMS were not original media copies of the hard-drives, and they were not used to restore the files that plaintiff copied from the 04, 07 or 08 hard-drives. Exhibit F, ¶25.

Finally, Mr. Haas found an activity log on the 07 hard-drive showing that an external hard drive had been attached to the 07 hard-drive. The external hard drive was used to copy from the original 07 hard-drive many more files than are currently contained on the CD-ROMS or on the 07 replacement hard-drive. Exhibit F, ¶26.

Although the defendants assert that they used an external hard drive to copy the 07 and 08 hard-drives, they have never produced the external hard drive. In fact, defendants never even mentioned the external hard-drive until Mr. Haas found evidence of its existence.

**Defendants' "Explanations" Further Demonstrate Their Deceit**

In an e-mail dated September 3, 2003, defendants' counsel, Louis Lipsky wrote, "Per my email to Jonathan Hugg of July 16, the computers have been operated in the normal course of business and nothing has been deleted. If any reformatting has occurred, you have been

provided with back up files." See Exhibit G, hereto. Those claims were not true: the 07 hard drive had been replaced on July 10, 2003, and the 08 hard drive had been replaced on or before July 17, 2003, the original hard-drives were allegedly "disposed of," and back-ups for the original hard-drives were not produced.

In an e-mail dated September 4, 2003, Louis Lipsky wrote that "on July 10, 2003, the server [*i.e.*, the 07 computer] began functioning erratically. My client became very concerned and made a quick back up copy." Exhibit H, hereto. Louis Lipsky then admitted, "That evening, my client replaced the hard drive on the server with a larger hard drive and reloaded the files. …The hard drive was disposed of." This action alone constituted spoliation of evidence. To minimize the effect of the spoliation, Louis Lipsky suggested that FL Receivables "had copied the files from this computer prior to the crash." However, that suggestion is demonstrably false, because Paul Bagga only allowed plaintiff to have access to the 04 computer on July 10, 2003. See the Affidavit of Janet Palumbo at Exhibit C, hereto. See also the Affidavit of Jonathan Hugg, attached hereto as Exhibit I.

In the same September 4, 2003 e-mail, Louis Lipsky also admitted that "on July 10, my client bought another hard drive" for a computer that allegedly "was only used for storing marketing information, and customer complaints," *i.e.*, the 08 computer. Louis Lipsky also admitted that "on July 17, the hard drive was replaced by my client's employee and disposed." He also stated that "back up files were never created" for this computer. Louis Lipsky again suggested that plaintiff "had the opportunity to copy this hard drive during their visit of July 10 but chose not to." That statement is not true. Plaintiff only had access to the 04 computer on July 10, 2003. See Exhibits C and I.

**Defendants' Letters To The Court Are Demonstrably False**

On October 10, 2003, in a letter to the Court, Louis Lipsky again admitted that the original 07 hard drive was "disposed of". Exhibit J hereto, at page 2. Louis Lipsky also admitted that defendants had an external hard drive that they allegedly used to back up the 07 hard-drive before it was replaced. According to Louis Lipsky, Paul Bagga was "attempting to locate the external hard drive" on October 10th. As of this date, the external hard drive still has not been produced, if it still exists.

Mr. Lipsky's October 10 letter contained other "explanations" of his clients' conduct that are provably false. Mr. Lipsky suggested that on July 10, 2003, plaintiff and its consultants "were not totally competent and their maneuvers crashed [defendant's] server, Hard Drive A07." Of course, as noted above, plaintiff was not allowed access to the 07 computer on July 10, 2003. See Exhibits C and I. Lipsky's assertion that "the server crashed **after** plaintiff copied the hard drive" is likewise false – because plaintiff's consultants had no access to the 07 computer until July 18, 2003. Lipsky also asserts that, on July 10, 2003, defendants "made a quick backup copy of the data files." If this is true, defendants have never produced that back-up.

In summary, the defendants initially stalled FL Receivables' discovery, refused to allow inspection of their computers, then prepared a dummy computer for inspection, then agreed to inspection of their computers but first destroyed computer records by reformatting and or replacing hard drives, and either failed to make back-ups or concealed the back-ups. When confronted, defendants provided false explanations for their conduct.

**Plaintiff Seeks An *Ex Parte* TRO**

Faced with defendants' intransigence, and with their destruction of evidence, Plaintiff sought an *ex parte* TRO based on the information contained in Exhibits A through J, all of which

were included in the *ex parte* motion, and all of which are attached hereto as Exhibits A through J. Attached as Exhibit K is the Motion for *Ex Parte* TRO originally filed under seal, which is hereby incorporated in full. FL Receivables sought the *ex parte* relief because of its well-founded, good-faith belief that defendants knowingly destroyed evidence during the course of litigation, and that, if given notice of the request, that the defendants would again destroy the evidence FL Receivables sought before it could be inspected and copied.

On November 13, 2003, the Court granted the *ex parte* TRO. A copy of the Order is attached as Exhibit L. On November 17, 2003, at the request of FL Receivables, the Court struck Welcome Group from the ex parte TRO. A copy of the amending order is attached as Exhibit M. The Order was subsequently amended on November 18, 2003 to add an address for Gary Gambhir. A copy of the amending Order is attached as Exhibit N. On November 18, 2003, the United States District Court for the District of New Jersey (Irenas, J.) entered an order authorizing the seizure of records in New Jersey. A copy of that Order is attached as Exhibit O.

### Execution Of The TRO Immediately Reveals New Evidence

On November 19, 2003, Plaintiff executed the Court's TRO, with the aid of the United States Marshall. Plaintiff obtained numerous computer hard drives, disks, and other equipment, all of which is currently being held by the United States Marshall, pending agreement on a procedure to identify what data are discoverable. Until FL Receivables can review the substantive electronic information, it will not know the results of its search.

Nonetheless, FL Receivable already knows that the TRO has born fruit. Defendants' director of information systems turned over, from his home, computer disks he identified as "back-ups" to the original information on the replaced hard-drives. He said he had retained the "back-ups" for his own protection, in case Mr. Bagga ever accused him of losing information

while replacing the hard-drives. The defendants never previously produced or identified back-up disks maintained by Mr. Gambhir.

FL Receivables also obtained an actual hard-drive, which was found in a drawer in a filing cabinet at 714 Bethlehem Pike, and had never before been produced. Finally, FL Receivables found in the basement of 714 Bethlehem Pike a laptop computer that had never before been identified or produced.

FL Receivables will not know, until after it has reviewed the contents of the "back-ups," the hidden hard-drive, the laptop, and all of the other electronic information seized and currently held by the Marshalls whether it has obtained information that was previously either withheld or thought to have been destroyed.

**ARGUMENT**

A party seeking a preliminary injunction bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably harmed by the denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and, (4) granting preliminary relief will be in the public interest. ACLU of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 (3d Cir. 1996); ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987).

**I.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS**

Plaintiff's likelihood of success on the merits is clear. In these proceedings in aid of execution, the only 'merits' issue is whether Plaintiff is entitled to discovery of Defendants' business and business-related records.

Generally, permissible discovery includes any matter, not privileged that is relevant to the claim or defense of any party. Fed.R.Civ.P. 26(b)(1). Moreover, under Rule 69(a), the proceedings in aid of execution "shall be in accordance with the practice and procedure of the state in which the district court is held," in this case, Pennsylvania. Under Pennsylvania Rules of Civil Procedure, the range of discovery tools available for execution is broad, and unquestionably includes a request for documents. Pa.R.Civ.P. 3117; PaineWebber v. Devin, 658 A.2d 409, 413 (Pa.Super. 1995).

Throughout Plaintiff's attempts to obtain Defendants' electronic business and business-related information, the Defendants have never argued that the information sought is not discoverable, nor can they; the information plainly is discoverable.

Accordingly, Plaintiff is likely to succeed on the merits of its request for injunctive relief.

## II. IF DEFENDANTS ARE PERMITTED TO DESTROY EVIDENCE, PLAINTIFF WILL SUFFER IRREPERABLE HARM

Plaintiff would be irreparably harmed absent an injunction to prevent spoliation of evidence.

Parties to litigation have an unfailing obligation to preserve evidence. A party's failure to preserve evidence is considered "spoliation." Schroeder v. PennDOT, 710 A.2d 23 (Pa. 1998). Spoliation is a serious matter and can lead to an adverse inference instruction, Liafail, Inc. v. Learning 2000, Inc., 2002 U.S. Dist. Lexis 24803 (D.Del.), or even to dismissal of a case. Schmid v. Milwaukee Electric Tool Co., 13 F.3d 76 (3d Cir. 1994). Spoliation also raises an inference of consciousness of guilt. Commonwealth v. Dollman, 541 A.2d 319 (Pa. 1998).

Typically, spoliation is remedied by the use of an adverse inference against the party who destroyed the evidence. In the instant matter, however, an adverse inference would not help

Plaintiff. Plaintiff has already obtained a judgment against the defendants, so neither liability nor damages issues remain to be resolved. The only issue currently being litigated is Plaintiff's attempt to trace and recover hidden assets. An adverse inference would be of no use to Plaintiff in its attempts to find hidden assets. If evidence is either destroyed or concealed, Plaintiff would be unable to obtain the information and would be irreparably harmed.

### III. PROHIBITING THE DESTRUCTION OF EVIDENCE DOES NOT IN ANY WAY HARM DEFENDANTS

Neither the TRO nor the injunction would harm Defendants in any way. The Defendants are already required not to alter, conceal or destroy evidence. The injunction is merely a further Order against Defendants' illicit conduct. No information will be destroyed, altered, or in any way "lost" to the Defendants. Thus, they will suffer no harm.

### IV. THE PUBLIC INTEREST DEMANDS PROTECTION OF EVIDENCE

It is in the public interest that parties not be permitted to destroy or conceal evidence in litigation. Indeed, the discovery process is premised on parties taking seriously sworn oaths and producing (or objecting to the production of) all requested information. Prohibiting parties from flouting the rules of discovery and destroying or concealing evidence preserves respect for the Courts and is unquestionably in the public interest.

## CONCLUSION

For all of the foregoing reasons, Plaintiff FL Receivable Trust respectfully requests that this Court enter a preliminary injunction converting the November 13, 2003 TRO to a preliminary injunction and enjoining Bagga Enterprises, Inc., Jamuna, L.L.C., United Management, Inc., their affiliates, Paul Bagga, Kushvinder Bagga, and Gary Gambhir from altering, concealing, or destroying their computerized business and business-related records, computerized disks and hard drives disclosing business transactions.

Respectfully,

_____
William J. Leonard, Esquire
Richard P. Limburg, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
1617 John F. Kennedy Boulevard, 19th Floor
Philadelphia, PA  19103
215-665-3000
Attorneys for Plaintiff, FL Receivables Trust 2002-A

Dated:  November 21, 2003

497562                                             15